## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WICHITA AND AFFILIATED TRIBES, WASHOE TRIBE OF NEVADA AND CALIFORNIA, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| vs. | |
| DOUG BURGUM, in his official capacity as Secretary of the Interior, THE UNITED STATES DEPARTMENT OF THE INTERIOR, THE BUREAU OF INDIAN AFFAIRS, AND THE BUREAU OF INDIAN EDUCATION, | |
| Defendants. | |

Plaintiffs Wichita and Affiliated Tribes ("Wichita" or "Wichita Tribe") and Washoe Tribe of Nevada and California ("Washoe" or "Washoe Tribe") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as more fully defined below), bring this Class Action Complaint against Doug Burgum, in his official capacity as the Secretary of the Interior, the United States Department of the Interior, the Bureau of Indian Affairs, and the Bureau of Indian Education, ("Defendants"), upon personal knowledge, and on information and belief based on an investigation by counsel, and allege as follows:

### I.    **INTRODUCTION**

1.    The United States, for nearly as long as it has existed and to the present day, has taken upon itself through treaties and statutes solemn trust responsibilities over the education of Native Nations' children. These promises were often made in exchange for land and peace. The

land was ceded; the peace was a mirage. And the primary victims of decades of ongoing statutory and treaty violations were the Native Nations' children.

2.      This trust accounting claim arises out of one of the most shameful policies in American history—the advent, perpetration, and tragedy of the Federal Indian Boarding School Program.

3.      The horrors inflicted by this program were a fundamental betrayal: the United States affirmatively acknowledges an ongoing relationship with Native Nations and trust responsibility over Native Nations' children's education; it has now admitted for the first time that it used the Native Nations' *own funds* to implement the Boarding School Program; and all of the documents to prove it have been, and are still, solely under the United States' exclusive control.

4.      This is no bare accusation. The United States has recently admitted—***for the first time***—in reports published in 2022 ( "Vol. I" or "Volume I"), and materially supplemented in 2024 ("Vol. II" or "Volume II"; and Vol. I and Vol. II together, "the Boarding Schools Investigative Report,"),[1] that it pursued the Federal Indian Boarding School Program in service of its twin goals of dispossessing Native Nations of territory while destroying Native Nations' cultures.

5.      The trust responsibility was born of a sacred bargain: in exchange for making permanent peace with the United States, and ceding land, Native Nations asked the United States to provide for the education of their children.

6.      The United States admits that it has identified at least 171 treaties with Native Nations "that implicate the Federal Indian boarding school system or education generally,"[2] and it

---

[1] Dep't of Interior, B. Newland, *Federal Indian Boarding School Initiative Investigative Report, Vol. I* (May 2022) (hereinafter "Vol. I"); Dep't of Interior, B. Newland, *Federal Indian Boarding School Initiative Investigative Report, Vol. II* (July 2024) (hereinafter "Vol. II"). Both volumes, and their appendices, are included as Exhibits 1 and 2 of this Complaint.

[2] Vol. II, at 93.

has provided excerpts of 127 treaties "that explicitly include Federal Indian boarding schools or general Indian education provisions."[3] These treaties, along with a series of statutes, including statutes which claim federal "responsibility for . . . education of Indian children,"[4] and a "unique and continuing trust relationship with and responsibility to the Indian people for the education of Indian children,"[5] establish a uniform class of beneficiaries among Native Nations of common education rights.

7.      The United States admits that it "has unique treaty and trust responsibilities to Indian Tribes, Alaska Native Villages, Alaska Native Corporations, and the Native Hawaiian Community, including to protect Indian treaty rights and land and other assets."[6] It further admits that "[t]he text of many Indian treaties documents that Indian education was a priority of U.S.-Indian relations."[7] This priority is demonstrated in treaties "that the U.S. entered into with Indian Tribes and ratified by the Senate that implicate the Federal Indian boarding school system or education generally."[8]

8.      But, rather than provide what was promised and what was legally owed, the United States forcibly separated Native children from their parents, and systematically sought to erase their cultural identity, killing, torturing, starving, and sexually assaulting many in the process and

---

[3] Vol. II, at 17, citing Vol. II App. J.

[4] Indian Self-Determination Assistance Act, 25 U.S.C. § 5301(b)(2).

[5] 25 U.S.C. § 2000; 25 U.S.C. § 2501(b).

[6] Vol. I, at 3.

[7] Vol. I, at 34.

[8] Vol. II, at 93.

doing untold damage to generations.[9] And it made the Native Nations put up the money to pay for it all.

9.      In 1819, the United States began to operate Federal Indian Boarding Schools ("Boarding Schools"). In 1879, the notorious Carlisle Indian Industrial School (the "Carlisle School") was founded—a militaristic institution dedicated to "Killing the Indian" inside of the children put into its care. Following its founding, the Carlisle School became the acknowledged model for the other schools in the Federal Indian Boarding School Program (the "Boarding School Program" or "Program").[10] The Boarding School Program would last until 1969, and represents one of the most shameful state-sponsored crimes in American history—the intentional attempted destruction of Native Nations and Native families through the systematic abuse of Native children.

10.     In October 2024, the President of the United States formally apologized for the Boarding School Program, calling it "a significant mark of shame" and "a blot on American history," and acknowledged that the apology was "long, long, long overdue."[11] Indeed it was.

---

[9] The term "Native Nations" includes Indian Tribes, Alaska Native Villages, Alaska Native Corporations, and the Native Hawaiian Community. "Native children" refers to children born into Native Nations. The term "Native American" refers to members of Native Nations, except where the Complaint cites to Census and survey records, in which case it uses the definition used in the respective survey. Where the Complaint quotes sources, it does not change the term used.

[10] *The Carlisle Indian Industrial School: Assimilation with Education after the Indian Wars*, Nat'l Park Serv., https://www.nps.gov/articles/the-carlisle-indian-industrial-school-assimilation-with-education-after-the-indian-wars-teaching-with-historic-places.htm (last visited May 9, 2025).

[11] Justin Gomez, *Biden apologizes for Native American children forced into federal boarding schools*, ABC News (Oct. 25, 2024), https://abcnews.go.com/Politics/biden-apologize-government-forcing-indian-children-boarding-schools/story?id=115146385. The apology, previously available on the White House website, has been removed. *See,* White House, Fact Sheet: President Biden Touts Historic Support for Indian Country and Transformation of the Nation-to-Nation Relationship with Tribal Nations (Oct. 24, 2024) https://www.whitehouse.gov/briefing-room/statements-releases/2024/10/24/fact-sheet-president-biden-touts-historic-support-for-indian-country-and-transformation-of-the-nation-to-nation-relationship-with-tribal-nations/ [https://web.archive.org/web/20250113225523/https://www.whitehouse.gov/briefing-room/statements-releases/2024/10/24/fact-sheet-president-biden-touts-historic-support-for-indian-country-and-transformation-of-the-nation-to-nation-relationship-with-tribal-nations/] (discussing the president "issuing a historic Presidential apology for the Federal Indian Boarding School era").

11.    But the admission of wrongdoing and a Presidential apology are not enough.

12.    Through the 150 years of the Boarding School Program, Native children were routinely physically and/or sexually abused, barred from speaking their native tongues, forced into physical labor, provided deficient instruction that did not equip them to participate in modern life, placed in overcrowded conditions, and regularly denied adequate nutrition and health care.

13.    Families that resisted giving up their children to the Boarding Schools were denied rations; when starvation failed, the United States turned to abduction. Children as young as four years old were taken away from their families and separated from their siblings. Many children died.

14.    The children forced to live, and all too often die, at these schools hailed from different tribes, traditions and regions. They were purposefully intermixed so they would lose their native tongues—the core of their cultural heritage.

15.    So far, the Department of the Interior ("DOI" or "Interior") has positively identified at least 18,624 Native children who entered the Boarding School Program and admitted that 973 child deaths have been documented at the Boarding Schools—*i.e.*, approximately five percent of identified documented enrollees—found in marked and un-marked graves on school grounds.[12] But, as the president admitted in 2024, "the real number is likely to be much, much higher."[13]

---

[12] Vol. II, at 15.

[13] Justin Gomez, *Biden apologizes for Native American children forced into federal boarding schools*, ABC News, Oct. 25, 2024, https://abcnews.go.com/Politics/biden-apologize-government-forcing-indian-children-boarding-schools/story?id=115146385. The apology, previously available on the White House website, has been removed. *See,* White House, Fact Sheet: President Biden Touts Historic Support for Indian Country and Transformation of the Nation-to-Nation Relationship with Tribal Nations (Oct. 24, 2024) https://www.whitehouse.gov/briefing-room/statements-releases/2024/10/24/fact-sheet-president-biden-touts-historic-support-for-indian-country-and-transformation-of-the-nation-to-nation-relationship-with-tribal-nations/ [https://web.archive.org/web/20250113225523/https://www.whitehouse.gov/briefing-room/statements-releases/2024/10/24/fact-sheet-president-biden-touts-historic-support-for-indian-country-and-transformation-of-the-nation-to-nation-relationship-with-tribal-nations/](discussing          the

16.     These children were all descendants of Native Nations, removed from their families, and deliberately severed from relatives and communities—all so that they could be stripped of their culture.

17.     By 1926, over 80% of Native children were enrolled in a Boarding School.[14] As the United States now admits, this removal was national policy, effectuated through treaties that deceived the Native Nations into giving up their land for, in material part, the false promise of "education" to be provided by the Boarding Schools.

18.     In a barbaric twist, at times as much as 95% of the funding purportedly used for the Boarding Schools came from Native Nations' Trust fund monies, raised by selling Native land to the United States, and held in trust by the United States for the Native Nations' collective benefit.[15]

19.     The United States Government, the trustee over Native children's education and these funds, has never accounted for the funds that it took, or detailed how, or even whether, those funds were ultimately expended. It has failed to identify any funds that remain.

20.     The harm inflicted by the Boarding School Program endures in the broken families and poor mental and physical health of survivors of the Boarding Schools and their descendants. It endures in the cycles of poverty, desperation, domestic violence, and addiction that were born of the Boarding School Program. It endures in the silence of lost language and culture, and the quiet desperation of so many survivors and their descendants, families that carry scars down

---

"historic Presidential apology for the Federal Indian Boarding School era"). The United States has since cut millions of dollars in grants to support research relating to the Boarding School Program. *See* Hallie Golden, *Trump administration makes major cuts to Native American boarding school research projects*, Associated Press, (Apr. 19, 2025), https://apnews.com/article/boarding-school-native-americans-research-grants-6309640a3df5934e46bc1151e78c99f8.

[14] *US Indian Boarding School History*, Nat'l Native Am. Boarding School Healing Coalition, https://boardingschoolhealing.org/education/us-indian-boarding-school-history/ (last visited Apr. 18, 2025).

[15] *Haaland v. Brackeen*, 599 U.S. 255, 301 (2023) (Gorsuch, J. concurring).

through generations. It endures in the missing remains and unmarked graves of the children who died.

21.     The United States systematically sought to destroy Native children's connections to their families, homes, languages, and cultural and religious practices, which, in turn, deprived those children of the skills necessary to prosper and participate in Native Nations' communities, indoctrinated the children into servile positions, and condemned Native Nations to cycles of poverty, violence, and drug addiction.

22.     Beyond being a national disgrace, the Boarding School Program was an undeniable violation of the United States' longstanding, explicit, and ongoing obligations (including, but not limited to, obligations guaranteed by treaty and statute) as trustee tasked with providing Native children's education.

23.     This trust duty was never disavowed and never ended, and the United States continues to recognize its "responsibility for . . . education of Indian children,"[16] based on a "unique and continuing trust relationship with and responsibility to the Indian people for the education of Indian children."[17] The United States has a moral, political, and legal responsibility to fully account for the Boarding School Program.

24.     As part of its ongoing trust obligations, the United States must account for the funds, including its use of Nation Nations' own monies, to perpetuate the Boarding School Program. The United States paid for the Boarding School Program with a pooled set of funds held in trust for all Native Nations' benefit. It now *admits* that these funds included funds specifically

---

[16] Indian Self-Determination Assistance Act, 25 U.S.C. § 5301(b)(2).

[17] 25 U.S.C. § 2000; 25 U.S.C. § 2501(b).

taken *from the Nations themselves*, and held in trust *for the Nations' collective benefit*, pooled together with Interior funds earmarked for Native Nations' purported educational benefit.[18]

25.    In May 2022, the United States *admitted* that the "total amount of Tribal or individual Indian trust fund account monies . . . used to directly support the Federal Indian boarding school system" remains unknown.[19] And in July 2024, in the "final volume" of the Boarding Schools Investigative Report, the United States still had not accounted for funds that had been obtained "from Tribal trust accounts for the benefit of Indians and maintained by the United States."[20]

26.    The United States also now *admits* that the "U.S. Government made appropriations available of more than $23.3 billion in FY23 inflation-adjusted dollars between 1871 and 1969" for the "Federal Indian boarding school system" and associated policies, but this $23.3 billion admission barely scratches the surface of the Native Nations' losses: this estimate "does not include the present-day value of Indian territory loss associated with the Federal Indian boarding school system [or] any funds that may have been obtained from Tribal trust accounts for the benefit of Indians and maintained by the United States."[21] Nor does this estimate include "wealth generated by Indian or Native Hawaiian children while in the [Boarding School] system including for the agriculture and railroad industries, Indian domestic and other labor for non-Indian families and

---

[18] Vol. I, at 44–45.

[19] *Id.*

[20] Vol. II, at 93; *Federal Indian Boarding School Initiative*, U.S. Dep't of Interior https://www.doi.gov/priorities/strengthening-indian-country/federal-indian-boarding-school-initiative (last visited May 15,2025).

[21] Vol. II, at 93.

communities through the Outing System," without which the boarding schools "could not possibly be maintained."[22]

27.    The United States for the first time admitted, in Volume I, that there were at least five separate sources of funds used to generate money for the Boarding School Program:

- Appropriations made under the educational provisions of existing treaties with Native Nations;

- Funded investments of bonds and other securities held by the United States;

- Proceeds of the sale of lands of certain Native Nations;

- Accumulations of money in the Treasury resulting from the sale of Native Nations' lands; and

- Annual appropriations by U.S. Congress for Indian school purposes.[23]

28.    The United States has not detailed how, or even whether, these funds were actually spent, and has not even attempted to provide an accounting of the economic harm, including the financial and property losses, inflicted on the Native Nations by the United States' misappropriation of those funds.

29.    The United States has *admitted* that it knows the funds were used to pay for the Program, but "time and resource constraints" prevented it from accounting for the "actual amounts" the United States spent on the Program.[24]

---

[22] Vol. II, at 18; Vol. I, at 63; *see also Haaland v. Brackeen*, 599 U.S. 255, 301–02 (2023) (Gorsuch, J. concurring) ("To lower costs further and promote assimilation, some schools created an 'outing system,' which sent Indian children to live 'with white families' and perform 'household and farm chores' for them. This program took many Indian children 'even further from their homes, families, and cultures.' Advocates of the outing system hoped it would be 'extended until every Indian child was in a white home.'") (internal citations omitted).

[23] Vol. I, at 43.

[24] Vol. II, at 51.

30.     The United States has *admitted* that it used "appropriations made under the educational provisions of existing treaties with Native Nations," but excluded this amount from its final volume of the Boarding Schools Investigative Report.[25]

31.     The United States has *admitted* the "actual amount of funds spent on Indian boarding schools [] must include Indian child labor both for institution operations and through the Outing System to non-Indian families," but similarly excluded "wealth generated by Indian or Native Hawaiian children while in the [Boarding School] system."[26]

32.     The United States' decision in 2024 to provide an arbitrary estimate flies in the face of its binding obligations under both laws and treaties to provide a proper accounting—"the price of a promise" is no basis to "cast a blind eye," and the United States is obligated to provide a complete accounting.[27]

33.     In other words, the United States has *admitted* that it made Native Nations pay for their own attempted destruction, but it does not yet know—or has not yet revealed—how much the Native Nations paid, how much money was actually spent, where those funds are now, or how much damage was wrought.

34.     The United States also now *admits* that many of the specific records relating to the Boarding School Program that it used to assemble the Boarding Schools Investigative Report— records spanning approximately 103 million pages[28]—were, and continue to be, solely "under its

---

[25] Vol. I at 43; Vol. II, at 51; *Federal Indian Boarding School Initiative*, U.S. Dep't of Interior https://www.doi.gov/priorities/strengthening-indian-country/federal-indian-boarding-school-initiative (last visited May 15,2025).

[26] Vol. II, at 51, 55.

[27] *McGirt v. Oklahoma*, 591 U.S. 894, 937 (2020).

[28] Vol. II, at 5.

control."[29] Until the United States' issuance of the Boarding Schools Investigative Report, no person could have hoped to uncover what occurred, much less how the schools were funded, and where the Native Nations' money and land taken for purported support of those schools actually went.

35.    Plaintiffs, individually and on behalf of all others similarly situated, demand an accounting. The United States must disclose the value of the land ceded and amount of Native Nations' funds taken for purported use in the Boarding School Program and in support of Native children's education, and detail how, and indeed whether, those funds were ever dispensed for the Native Nations' collective benefit as required. The United States Government must also account for the labor that Native Nations' children expended, which the United States Government now admits for the first time, was essential to the very functioning of the Boarding School Program. It must also finally account for the damage it has done as trustee.

36.    That such an accounting may be hard is no excuse. As the Supreme Court recently observed, the United States' arguments against following through on obligations owed to Native Nations "follow a sadly familiar pattern. Yes, promises were made, but the price of keeping them has become too great, so now we should just cast a blind eye."[30] But, after decades of broken promises, the Supreme Court has declared enough:

> We reject that thinking. If Congress wishes to withdraw its promises, it must say so. Unlawful acts, performed long enough and with sufficient vigor, are never enough to amend the law. To hold otherwise would be to elevate the most brazen and longstanding injustices over the law, both rewarding wrong and failing those in the right.[31]

---

[29] Vol. I, at 5.

[30] *McGirt v. Oklahoma*, 591 U.S. 894, 937 (2020).

[31] *Id.* at 937–38.

37.    The United States took upon itself the trusteeship over Native children's education. In that capacity, it forcibly took children as young as toddlers away from their families. It subjected Native children, solely because they were Native children, to physical and sexual abuse, denied them adequate health care and nutrition, barred them from speaking their native tongues, and deprived them of basic human rights. Many children died. The abuse continued for 150 years, and throughout this time, the United States forced Native Nations to fund it themselves. The impact of the United States' actions continues to be felt by every single Native person. The suffering so long inflicted cannot be undone. But the law does not turn an uncaring eye toward historic wrongs. Justice demands a remedy. That remedy begins with an accounting.

## II.    PARTIES

### A.    Plaintiffs

38.    The Wichita and Affiliated Tribes are a federally recognized tribe headquartered in Anadarko, Oklahoma. The Wichita concluded a Treaty with the United States on May 15, 1846.[32] The Wichita Treaty was ratified by the Senate on February 15, 1847, and signed by President James K. Polk on March 8, 1847.[33] Wichita children were forced to attend Federal Boarding Schools throughout the United States, including the Carlisle School.

39.    The Washoe Tribe of Nevada and California and its affiliates are a federally recognized tribe, headquartered in Gardnerville, Nevada, and who have had a presence in the region for approximately 6,000 years. While the Washoe have no formal treaty with the United

---

[32] Treaty with the Comanche, Ioni, Anadaco, Caddo, Lipan, Longwa, Keechi, Tawakoni, Tonkawa, Wichita, and Waco Indians, May 15, 1846–Mar. 8, 1847 (hereinafter "the Wichita Treaty"), https://www.lipanapache.org/LAT/assets/PDFs/treaties/Treaty05-15-1846.pdf.

[33] Instrument of Ratification Signed by President James K. Polk and Sec. of State James Buchanan (Mar. 8, 1847), https://catalog.archives.gov/id/175516195?objectPanel=transcription.

States, they have been a federally recognized tribe since 1936. Washoe children were forced to attend Federal Boarding Schools throughout the United States, including the Carlisle School.

**B.    Defendants**

40.    Doug Burgum is the Secretary of the United States Department of the Interior.

41.    The United States Department of the Interior is a Cabinet-level agency that manages the United States' natural and cultural resources. Interior is charged with honoring and fulfilling the United States' trust responsibilities and special commitments to Native Nations.

42.    The Bureau of Indian Affairs ("BIA") is a bureau within Interior tasked with promoting opportunity for and carrying out the United States' responsibilities to Native Nations.

43.    The Bureau of Indian Education ("BIE") is a bureau within Interior that funds and operates schools for Native children.

44.    Interior (including through BIA and BIE), along with its predecessor agencies, implemented and oversaw the Boarding School Program and its successors.

### III.    JURISDICTION AND VENUE

45.    Venue is proper pursuant to 28 U.S.C. § 1391(b), because "a substantial part of the events or omissions giving rise to the claim occurred" in this judicial district. Namely, this judicial district was home to the Carlisle School, which operated from 1879–1918, included students from more than 100 Native Nations, and served as the model for the entire Boarding School Program. The United States has admitted that at least 189 students perished at the Carlisle School,[34]

---

[34] Vol. II, App. B, at 357.

including 15-year-olds Alfred Charko[35] and Kate Ross of the Wichita,[36] and 18-year-old Raleigh James of the Washoe.[37]





---

[35]    Alfred Charko Student Info. Card (Dec. 16, 1882), https://carlisleindian.dickinson.edu/student_files/alfred-charko-student-information-card.

[36] Kate Ross Student Info. Card (Jan. 10, 1882), https://carlisleindian.dickinson.edu/student_files/kate-ross-student-information-card-0.

[37]    Raleigh James Student Info. Card (Apr. 18, 1900), https://carlisleindian.dickinson.edu/student_files/raleigh-james-student-information-card-0.



46.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, because the case arises under the Constitution, laws, or treaties of the United States.

## IV.    FACTUAL ALLEGATIONS

### A.     Introduction

47.     Pursuant to a United States Department of the Interior Secretarial Memorandum, issued June 22, 2021, then-Assistant Secretary of Indian Affairs Brian Newland ("Assistant Secretary Newland") published Volume I of the Federal Indian Boarding School Initiative Investigative Report in May 2022, which "shows for the first time that between 1819–1969 the United States operated or supported 408 boarding schools across 37 states (or then territories), including 21 schools in Alaska and seven schools in Hawaii."[38]

48.     In Volume I, the United States admits, among other material matters, that "the United States directly targeted American Indian, Alaska Native, and Native Hawaiian children in the pursuit of a policy of cultural assimilation that coincided with Indian territorial dispossession."[39]

---

[38] Apr. 1, 2022 Letter from B. Newland to Secretary of Interior Haaland *in* Vol. I.

[39] *Id.*

49.     Volume II was issued in July 2024, and updated the list to include 417 schools, added substantial profile information for each school and the Native Nations whose children were victimized, and confirmed additional details regarding the Boarding School Program.[40]

50.     In Volume II, the United States also admitted, for the first time: "Congress made appropriations available of more than an estimated $23.3 billion in FY23 inflation-adjusted dollars between 1871 and 1969 for the Federal Indian boarding school system as well as for similar institutions and associated assimilation policies. This amount does not include the present-day value of Indian territory loss associated with the Federal Indian boarding school system, any funds that may have been obtained from Tribal trust accounts for the benefit of Indians and maintained by the United States, or funds expended by other institutions including religious institutions and organizations for Indian boarding school operation."[41]

51.     In Volume II, the United States admitted that "the assimilation of Indian children through the Federal Indian boarding school system was intentional and part of that broader goal of Indian territorial dispossession for the expansion of the United States."[42]

52.     In Volume II, the United States also admitted: "Further review is required to determine the reach and impact of the violence and trauma inflicted on Indian children through the Federal Indian boarding school system. The Department has recognized that targeting Indian children for the Federal policy of Indian assimilation contributed to the loss of: (1) life; (2) physical and mental health; (3) territories and wealth; (4) Tribal and family relations; and (5) use of Tribal languages. This policy also caused the erosion of Tribal religious and cultural practices for Indian

---

[40] Vol. II, at 5, 13.

[41] Vol. II, at 93.

[42] Vol. II, at 94.

Tribes, Alaska Native Villages, and the Native Hawaiian Community, and over many generations."[43]

53.    Following the publication of Volume I, then-United States Secretary of the Interior Deb Haaland ("Secretary Haaland") engaged in a year-long tour, in which she met with Boarding School survivors and encouraged them and their families to share their stories.[44] The narratives reveal a pattern of physical and sexual abuse in the boarding school system that continued until the Boarding School Program ended in 1969, and confirm that the Boarding School Program continues to harm Native Nations today.

**B.    The Boarding Schools Had a Devastating and Lasting Impact**

54.    At a May 2022 meeting with Secretary Haaland at the site of the Riverside Indian School in Oklahoma—a meeting that took place immediately following publication of Volume I— survivor Donald Neconie from Anadarko, Oklahoma, rose to speak.[45]

55.    What Mr. Neconie recounted would have been familiar to generations of Native children victimized by the Boarding School Program:

> Actually, my story begins in St. Patrick's Mission[46] . . . the moment I landed there, they took me downstairs, took all my clothes off and threw a bunch of green stuff all over me and it stung like hell. It stung my eyes. It stung all over me, and when they put the water on me, it stung even worse. They did not care . . ..
>
> I used to talk Kiowa . . . every time I tried to talk Kiowa, they put lye in my mouth. And they washed my mouth. And when I got out of St. Patrick's Mission, I thought

---

[43] Vol. II, at 94–95.

[44] Kalle Benallie, *A Look at the Nearly Two-Year 'Road to Healing'*, ICT (Nov. 13, 2023), https://ictnews.org/news/a-look-at-the-nearly-two-year-road-to-healing.

[45] The "Road to Healing" meetings with survivors and survivors' families have been recorded; Donald Neconie, Remarks at Riverside Indian Sch. Road to Healing Listening Tour (July 9, 2022) *in* Riverside Indian Sch. Road to Healing, Dep't of Interior 11:14 (July 9, 2022) https://www.doi.gov/sites/default/files/rth-ok-riverside-indian-school-transcript.pdf ("Neconie Testimony.")

[46] St. Patrick's Mission and Boarding School was located in Anadarko, Oklahoma, and operated by the Bureau of Catholic Indian Missions. Vol. I, App. B at 367.

it was over. But then, I landed at Riverside,[47] here. And it started all over again. The same way. They put the lye on me . . . They washed my mouth out with lye to make me stop talking Kiowa.

And it was 12 years of hell. . . . [when the Matron] saw that we were doing something wrong, we were herded downstairs by Mr. Eshman. . . . And he pulled down our clothes and he whipped us, repeated beating -- during the daytime when we would walk and some getting ahead of us would walk and his coveralls would get stuck in his back because the blood would drain from his butt. We were almost all that way.

And when we went to the dungeon, we called it the dungeon. In the morning, there was a man by the name of (Incomprehensible), he was cross-eyed. And when we sat down, we had to put our chins inside of our neck and our legs would have to be underneath that chair and he -- the boys would come and kick, kick, kick, kick. . . .

We were sodomized. Men, girls, boys, we were sodomized. And people knew that was going on and did nothing to stop it. When the authorities came, and they said to put us in jail. They didn't put the people that did that to us, they put -- they didn't put them in jail. They didn't do anything to the people and we went through hell again because we were told that if you told anybody, you would get the hell beat out of you.[48]

56.    Mr. Neconie is hardly alone. The New York Times reported the statements of Mr. James LaBelle, a boarding school survivor who attended a school in southeast Alaska in 1955. Mr. LaBelle recounted his experiences of sexual violence and explained that when he was a child "[d]uring weekdays, it was common for supervisors to tell children to undress so they could be paddled or whipped with a cat-o-nine-tails. . . . And when weekends came . . . it was time for the 'gauntlet,' when some children were ordered to get completely naked and others were ordered to hit them with belts for perceived violations of school rules."[49]

---

[47] Riverside Indian School, also located in Anadarko, Oklahoma, was originally opened as a "government reservation boarding school" in or about 1871. Vol. II, App. B at 321.

[48] Neconie Testimony at 11:17–14:12.

[49] Zach Levitt et al., *War Against the Children*, N.Y. Times (Aug. 30, 2023), https://www.nytimes.com/interactive/2023/08/30/us/native-american-boarding-schools.html.

57.     Anthony Galindo, a member of the Wichita, recently shared the story of his grandmother, Ethel Roberts Wheeler. As a little girl, she was seized by Federal Marshalls from Camp Creek in Oklahoma and taken to the Riverside School nearby. After her fourth or fifth escape attempt, she was placed in a cattle car with other children and sent to a school in Phoenix, Arizona. On information and belief, this was the Phoenix Indian School, which opened in 1891 and was the site of at least 23 student deaths.[50] Ethel remembered the brutal beatings that awaited children who spoke their native tongue. The effects of the school never left her. As Anthony said, "She lived in fear all her life."[51]

58.     Oscar Stephens was a Wichita boy who had a similar experience to Ethel Wheeler's. When Oscar was about ten years old, and playing by a creek near his Anadarko Oklahoma home, he was taken by federal agents—at the time, he spoke two words of English, "Yes" and "No." He was sent to the Riverside School, spent three to four years there, and then was sent onward to the notorious Carlisle school, enrolling on Sept. 10, 1908 as a thirteen-year-old boy. Files describe Oscar as a thirteen-year-old student, weighing 94 pounds, with "numerous scars," round shoulders, and "fair development."[52]

---

[50] Vol. II, App. J, at 51.

[52] *Apr. 6, 1909 Physical Examination: Oscar Stephens in* Oscar Stephens Student File 3 (last visited May 11, 2025), https://carlisleindian.dickinson.edu/student_files/oscar-stephens-student-file.

59.     The files reveal that his mother died a year later—before Oscar returned home—as did a brother and a sister.[53] His head was shaved, and he was beaten for speaking his native tongue, the only language he knew. Records show that over the years as a young teenager he was routinely placed with families to do servile work—his file described him being sent to do housework for a family at the age of 14—and routinely ran away.[54] His records report he repeatedly "Ran from outing:"[55]



60.     Eventually, Oscar would join the army, and fight in World War I. Only when he returned from the war was he finally, at long last, able to go home.

61.     Michelle Emerson, another member of the Wichita, lived with the Boarding School Program's intergenerational impacts. Both her parents spent almost their entire youth within the Boarding Schools—Riverside for her mother, and Flandreau Indian School in South Dakota for her father. Like so many others, they both entered the military upon graduation, having lived so much of their lives in a tightly regulated, highly militarized environment. Their marriage was short, alcohol soaked, and violent. For Michelle, the line from the Boarding Schools to her parents'

---

[53] Letter from Examiner of Inheritance, U.S. Dep't of Interior, to Superintendent Carlisle Indian Sch. (Feb. 5, 1915) *in* Oscar Stephens Student File 23 (last visited May 11, 2025), https://carlisleindian.dickinson.edu/student_files/oscar-stephens-student-file.

[54] *Descriptive and Historical Record of Student: Oscar Stephens*, *in* Oscar Stephens Student File 2 (last visited May 11, 2025) https://carlisleindian.dickinson.edu/student_files/oscar-stephens-student-file; *Outing Record: Oscar Stevens in* Oscar Stephens Student File 43–44 https://carlisleindian.dickinson.edu/student_files/oscar-stephens-student-file.

[55] *Descriptive and Historical Record of Student: Oscar Stephens in* Oscar Stephens Student File 2 (last visited May 11, 2025) https://carlisleindian.dickinson.edu/student_files/oscar-stephens-student-file.

anguish was a direct one: "They were never around a structured family, so they didn't know how to model it. I know they loved us," she said, "but they could never express that."

62.     Until May 2022, the United States never revealed or permitted access to its vast records regarding the Boarding School Program, nor did it attempt to create an accounting of either the comprehensive, national reach of the Boarding School Program, the harm that it caused, or the way it was funded. That changed with the publication of the Boarding Schools Investigative Report—completed in July 2024—which identified the schools by name and revealed, for the first time, much, but by no means all, that occurred within.

63.     **Children were killed.** For the first time, the United States admits it is responsible for the "the deaths of Indian children" in boarding schools—approximated in the "thousands or tens of thousands"—and that the deaths of those "children while under the care of the Federal Government, or federally supported institutions, led to the breakup of Indian families, and the erosion of Indian tribes."[56]

64.     Interior's initial investigation disclosed marked and unmarked burial sites at approximately 53 different schools across the Boarding School Program.[57]

65.     In Volume II, Interior stated that it uncovered additional sites: there were at least 74 marked and unmarked burial sites at 65 different school locations, with 973 confirmed deaths of children who perished while attending the Boarding Schools.[58]

66.     **Language and culture were lost.** The Boarding School Program's official policy was to destroy Native children's cultural attachments, including and especially their attachment to

---

[56] Vol. I, at 93.

[57] Vol. I, at 8.

[58] Vol. II, at 5.

language. Children were beaten for speaking their native languages and students were routinely mixed with students from dozens of other Native Nations so that their only possible common tongue was English, ensuring a "break up of the tribal associations."[59] While the use of Native languages was once universal among Native Nations, today only about 6% of Native Americans speak a Native language, and without the single most spoken Native language, Diné, that number drops to 3%.[60] It is now clear, for the first time, that the Boarding School Program is the primary cause for this devastating loss. Indeed, the United States admits that the Boarding Schools were "designed" to "force the complete abandonment of" Native languages.[61]

67.     **Families were destroyed.** As the United States now admits, the Boarding School Program was intentionally "designed to separate a [Native] child from his [] family" in furtherance of its official "policy to assimilate Indian children" by "disrupt[ing] the Indian family unit."[62]

68.     When parents refused to surrender their children, the United States withheld rations it promised in treaties in an attempt to starve Native Nations into submission.[63]

69.     And "when economic coercion failed," the United States simply abducted children, Justice Gorsuch recently explained, quoting contemporaneous sources: "officers would 'visit [Native towns] unexpectedly with a detachment of officers, and seize []children' . . . 'When parents

---

[59] Vol. I, at 40 (citing Annual Report to the Secretary of the Interior 6 (1886), Commissioner of Indian Affairs (hereinafter "ARCIA for [year])).

[60] Ana I. Sánchez-Rivera, *et al.*, *A Look at the Largest American Indian and Alaska Native Tribes and Villages in the Nation, Tribal Areas and States*, U.S. Census (2023) https://www.census.gov/library/stories/2023/10/2020-census-dhc-a-aian-population.html; *Census Shows Native Languages Count,* Language Mag. (last visited Apr. 18, 2025), https://www.languagemagazine.com/census-shows-native-languages-count.

[61] Vol. I, at 51 (citation omitted).

[62] Vol. I, at 38, 51.

[63] Vol. I, at 35.

hurried their children off to the mountains or hid them away in camp, [federal agents] chased and captured them like so many wild rabbits.'"[64]

70.     The program relied on "complete isolation of" Native children from their families, because the "warm reciprocal affection existing between parents and children was among the strongest characteristics of the Indian Nature."[65]

71.     As Secretary Haaland has noted in her official remarks on behalf of the United States: "Many [Native] children []never made it back to their homes. Each of those children is a missing family member, a person who was not able to live out their purpose on this earth, because they've lost their bodies as part of this terrible system."[66]

72.     **The Boarding School Program has lasting health impacts**. Recent studies "systematically and quantitatively examine[d] the relationship between American Indian boarding school child attendance and physical health status," including chronic health conditions:

> Indian boarding school child attendees had a 44 percent greater count of past-year chronic physical health problems (PYCPHP) as adults compared with adult nonattendees. Now-adult attendees were more likely to have cancer (more than three times), tuberculosis (more than twice), high cholesterol (95 percent), diabetes (81 percent), anemia (61 percent), arthritis (60 percent), and gall bladder disease (60 percent) than nonattendees. Other studies demonstrate that now-adult attendees experience increased risk for PTSD, depression, and unresolved grief. As a result, a "prevailing sense of despair, loneliness, and isolation from family and community are often described." **"Both individual and paternal boarding school attendance are associated with chronic health problems" of now-adult Indian boarding school attendees.** A father's boarding school attendance was independently associated with chronic physical health problems. Participants whose fathers attended Indian boarding school had on average a 36 percent greater PYCPHP count than those whose fathers did not attend boarding school. When controlling for maternal and paternal boarding school attendance, only a father's attendance

---

[64] *Haaland v. Brackeen*, 599 U.S, 255, 300 (2023) (Gorsuch, J. concurring) (citing to Vol. I, at 36 & ARCIA 1886, at 199).

[65] *Id.* at 299.

[66] Eesha Pendharkar, *Native American Children Endured Brutal Treatment in U.S. Boarding Schools, Federal Report Shows*, Education Week (May 11, 2022), https://www.edweek.org/leadership/native-american-children-endured-brutal-treatment-in-u-s-boarding-schools-federal-report-shows/2022/05.

was related to an increased number of PYCPHP in adulthood, suggesting that a father's Indian boarding school attendance is an **independent** predictor of his child's adult PYCPHP. Previous research has noted that American Indian men experienced more physical and sexual abuse in boarding school then women, particularly those more "language-experienced."[67]

73.    Another study noted that "at a minimum, the separation from family" contributed to poor health impacts on boarding school survivors.[68] The United States now admits that the "studies reinforce that Federal Indian boarding school policies often impacted several generations."[69]

74.    **Communities remain devastated.** The Boarding School Program's systematic destruction of Native Nations' culture has had a devastating impact on them. Cultural connectedness is a statistically significant "social determinant of mental health/well-being" in Native and Indigenous communities.[70]

75.    Native Americans have the highest rates of alcohol, marijuana, cocaine, inhalant, and hallucinogen use disorders compared to other ethnic groups in the United States.[71] One of the strongest predictors of substance abuse amongst Native Americans is a lack of connection to

---

[67] Vol. I, at 88–89 (citations to Ursula Running Bear studies omitted) (emphasis added); Vol. II, at 60.

[68] Vol. I, at 88 (citing Maria Yellow Horse Brave Heart, *The Historical Trauma Response Among Natives and Its Relationship with Substance Abuse: A Lakota Illustration*, 35 J. of Psychoactive Drugs 1, 7–13 (2018)).

[69] Vol. I, at 90 (citing Ursula Running Bear et al., *The Impact of Individual and Parental American Indian Boarding School Attendance on Chronic Physical Health of Northern Plains Tribes*, 42 Fam. & Community Health 1 (2019)).

[70] Paul Masotti et al., *The Culture is Prevention Project: Measuring Culture as a Social Determinant of Mental Health for Native/Indigenous Peoples*, 27 Am. Indian & Alaska Native Mental Health Rsrch. 86, 97 (2020).

[71] Nicholas Jones et al., *2020 Census Illuminates Racial and Ethnic Composition of the Country*, Census.gov (Aug. 12, 2021) https://www.census.gov/library/stories/2021/08/improved-race-ethnicity-measures-reveal-united-states-population-much-more-multiracial.html; Detailed Tables, 2021 National Survey on Drug Use and Health, Substance Abuse and Mental Health Administration, U.S. Dep't Health & Human Servs. (2021), https://www.samhsa.gov/data/sites/default/files/reports/rpt39441/NSDUHDetailedTabs2021/NSDUHDetailedTabs2021/NSDUHDetTabsSect5pe2021.htm#tab5.6a.

Native identity and culture—Native American youth with strong Native identities are approximately 50% less likely to abuse alcohol.[72] According to one study, Native American youth who have the most cultural pride and spirituality are significantly less likely to abuse alcohol than Native American youth with the least cultural pride.[73] In Native Nations with weaker traditional cultures, youth are more likely to commit suicide[74] and are more likely to engage in unprotected sex,[75] resulting in higher youth pregnancy and sexually transmitted diseases.

76.    In the Cherokee community, to take but one example, "before the Federal Government took control of Cherokee affairs," the Cherokee Nation was "90 percent literate in its native language and used bilingual materials to such an extent that Oklahoma Cherokees had a higher English literacy level than the white populations of either Texas or Arkansas."[76] However, following the federal takeover—including the forced recruitment of Cherokee students into boarding schools—as of 1968, "40 percent of adult Cherokee [were] functionally illiterate."[77]

77.    According to the United States, more than 25% of all Native Americans live in poverty. The Native American share of the United States population in poverty is more than 200%

---

[72] Jennifer Unger, *et al.*, *Spirituality, Ethnic Identity, and Substance Use Among American Indian/Alaska Native Adolescents in California*, 55 Substance Use Misuse 1194 (2020) manuscript avail. at https://pubmed.ncbi.nlm.nih.gov/31996077/.

[73] ManSoo Yu & Arlene Rubin Stiffman, *Culture and Environment as Predictors of Alcohol Abuse/Dependence Symptoms in American Indian Youths*, 32 Addict Behaviors 2253 (2007) manuscript available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1989129/.

[74] Irving N. Berlin, *Suicide Among American Indian Adolescents: An Overview*, 17 Suicide & Life-Threatening Behavior 218 (1987). *See also,* Melissa D. Zephier Olson & Kirk Dombrowski, *A Systematic Review of Indian Boarding Schools and Attachment in the Context of Substance Use Studies of Native Americans*, 1 J. Racial & Ethnic Health Disparities 62 (2019).

[75] Mike Anastario et al., *Sexual Risk behaviors and the Legacy of Colonial Violence Among Northern Plains American Indian Youth: A Mixed Methods Explanatory Study*, 258 Soc. Science Med. (Aug. 2020).

[76] Report of the United States Senate Committee on Labor and Public Welfare, *Indian Education: A National Tragedy – a National Challenge*, S. Rep. No. 91-501, at 19 (1969) (hereinafter, "Kennedy Report").

[77] *Id.*

more than their share of the total United States population. No other demographic group comes close to this rate of overrepresentation in poverty.[78]

78.     On reservations and trust land, 34.5% of Native American households live in poverty. Almost *half* of Native children living in those areas live in poverty.[79]

79.     **The United States Admits Ongoing Harm.** In 2024, the President of the United States apologized for the Program, stating "quite frankly, there is no excuse that this apology took 150 years to make."[80] The president admitted that the "federally-run Indian boarding school system was designed to assimilate Native Americans by destroying Native culture, language, and identity through harsh militaristic and assimilationist methods."[81] The president stated the Boarding School Program caused "trauma and shame passed down through generations."[82]

80.     United States Secretary of the Interior Haaland and Assistant Secretary of the Interior for Indian Affairs Newland have admitted on behalf of the United States the lasting and present impact the Program continues to have on Native Nations. In their words:

- **Secretary Haaland**: "Federal Indian boarding school policies have touched every Indigenous person I know. . . . Some are survivors, some are descendants, but we all carry this painful legacy in our hearts. . . . My ancestors and many of yours endured the horrors of Indian boarding school assimilation policies carried out by the same department that I now lead."[83]

---

[78] Emily A. Shrider & John Creamer, U.S. Census Bureau, *Poverty in the United States: 2022,* at 5–6 (Sept. 2023).

[79] Native Community Data Profiles, Fed. Reserve Bank of Minneapolis, MinneapolisFed.Org https://www.minneapolisfed.org/indiancountry/resources/native-community-data-profiles.

[80] *Full speech: Biden apologizes for forced Native American boarding school policy*, NBC News(Oct. 25, 2024), https://www.nbcnews.com/video/full-speech-biden-apologizes-for-forced-native-american-boarding-school-policy-222701125937.

[81] *Id.*

[82] *Id.*

[83] Isabella Breda, *Interior secretary visits Tulalip in wake of boarding school revelations*, Seattle Times (Apr. 23, 2023), https://www.seattletimes.com/seattle-news/interior-secretary-visits-tulalip-in-wake-of-boarding-school-revelations/.

- **Assistant Secretary Newland**: "Federal Indian boarding schools have lasting impact on Native people and communities across America. That impact continues to influence the lives of countless families, from the breakup of families and tribal nations to the loss of languages and cultural practices, . . . This has left lasting scars for all indigenous people."[84]

- **Secretary Haaland**: "The consequences of federal Indian boarding school policies—including the intergenerational trauma caused by forced family separation and cultural eradication—were inflicted on generations of children as young as 4 years old and are heartbreaking and undeniable."[85]

81.    Secretary Haaland summed up the treatment of students in the Boarding School Program as follows: "It's almost like the folks at these schools got together and decided how to best make these children's lives a living terror."[86]

82.    Secretary Haaland is right, and the making of the "children's lives a living terror" was part of a deliberate project by the United States that would continue throughout the Boarding School Program's existence. The "terror" was not an incidental outcome of the Boarding School Program: it was the goal.

---

[84] Eesha Pendharkar, *Native American Children Endured Brutal Treatment in U.S. Boarding Schools, Federal Report Shows,* Education Week (May 11, 2022), https://www.edweek.org/leadership/native-american-children-endured-brutal-treatment-in-u-s-boarding-schools-federal-report-shows/2022/05.

[85] *Boarding Sch. Initiative Vol. I: Hearing Before the Comm. on the Dep't of Interior*, 117th Cong. (June 22, 2022) (statement of Deb Haaland, Sec'y, U.S. Dep't of Interior), https://www.doi.gov/ocl/boarding-school-initiative.

[86] Johnny Dodd, *Interior Sec. Deb Haaland on Hearing Accounts of Native American Boarding School Survivors: 'Hard Not to Cry'*, People (Oct 10, 2022), https://people.com/human-interest/interior-secretary-deb-haaland-native-american-boarding-school-survivors/.

C.      **The Boarding Schools Represented the United States' Systematized Campaign to Harm Native People and Dispossess Them of Their Land**

83.     The United States opened Boarding Schools throughout the country beginning at least as early as 1819.

84.     The Carlisle School, established in 1879 in Carlisle, Pennsylvania, became a template for other schools, and was dedicated to stripping students of their identity to serve "[t]he goal [of] provid[ing] a maximum of rapid coercive assimilation into white society."[87]

85.     First, rather than take Native children from nearby reservations, the Carlisle School took Native children from across the United States, including from Plaintiffs. As the United States admits, this model was "designed to separate a child from his reservation and family, strip him of his tribal lore and mores, force the complete abandonment of his native language, and prepare him in such a way that he would never return to his people."[88]

86.     The idea, as declared by Carlisle School's head, Captain Richard Henry Pratt, was simple: "[A]ll the Indian there is in the race should be dead. Kill the Indian in him, and save the man."[89]

87.     Removing children far from their familial bonds was crucial to the destruction of the Native Nations' culture, as was intermixing the children of multiple tribes in order to break down their Native identity and deprive them of the opportunity to speak their language.

88.     For example, records from the Haskell Institute—another militaristic program established at approximately the same time as the Carlisle School, and which would remain open

---

[87] Kennedy Report at 148; *see also, Official Report of the Nineteenth Annual Conference of Charities and Correction* 46–59 (1892), reprinted in Richard H. Pratt, *Americanizing the American Indians* 260–71 (Harvard Univ. Press, 1973), available at https://historymatters.gmu.edu/d/4929/.

[88] Vol. I, at 51 (citing Kennedy Report, at 12).

[89] *Haaland v. Brackeen*, 599 U.S. 255, 299 (2023) (Gorsuch, J., concurring) (internal citation omitted).

until at least 1968—indicate that students from separate tribes were purposefully intermixed, meaning that in many cases the students' *only* possible common language was English, ensuring a "break up [of] the tribal associations."[90]

89.    Indeed, in 1886 alone "the [Haskell] Institute intentionally mixed Indian children from 31 different Native Nations to disrupt Tribal relations and discourage or prevent Indian language use across the 'Apache, Arapaho, Cheyenne, Cherokee, Chippewa, Comanche, Caddo, Delaware, Iowa, Kiowa, Kickapoo, Kaw, Mojave, Muncie, Modoc, Miami, New York, Omaha, Ottawa, Osage, Pawnee, Pottawatomie, Ponca, Peoria, Quapaw, Seneca, Sac and Fox, Seminole, Shawnee, Sioux, [and] Wyandotte' children."[91]

90.    Second, and relatedly, having removed the children from their families and tribal communities, the schools used physical abuse and coercive identity-altering methods to strip the children's cultural bonds.

91.    The United States now admits that "[s]ystematic identity-alteration"[92] practices metastasized across the Boarding School Program, and included, but were not limited to:

- Forbidding the use of Native American languages through abusive methods like washing out children's mouths with lye soap;

- Enforcing rules through severe physical punishment such as whipping and cuffing;

- Physical and sexual abuse;

- Renaming Native American children from their Native American names to different English names;

- Cutting the hair of Native American children;

---

[90] Vol. I, at 40 (citing ARCIA for 1886, at 6).

[91] Vol. I, at 40 (citing ARCIA for 1885, at 5).

[92] Vol. I, at 53.

- Requiring the use of military or other standard uniforms as clothes;

- Forbidding Native American students to follow their own religious practices;

- Forcing students to adopt western practices and Christianity; and,

- Placing Native children into Christian families, often to work as unpaid domestic laborers.[93]

92.    In addition, the schools specifically limited "text-book instruction" in order to train Native children to "toil by [their] hands" and in vocational skills in fields disappearing in a rapidly industrializing United States.[94]

93.    The United States formed a "uniform curriculum," under which children were required to do four hours of "industrial work" a day as part of the Boarding Schools' focus on "agriculture and homemaking."[95]

94.    Indeed, the United States now admits that "[i]n addition to well-documented livestock and poultry raising, dairying, and western agriculture production, including for sales outside the Federal Indian boarding school system, Indian children at Federal Indian boarding schools engaged in other manual labor practices including, but not limited to the following: lumbering, working on the railroad—including on the road and in car shops, carpentering, blacksmithing, fertilizing, irrigation system development, well-digging, making furniture including mattresses, tables, and chairs, cooking, laundry and ironing services, and garment-making, including for themselves and other children in Federal Indian boarding schools."[96]

---

[93] Vol. I, at 53–54 (citing various sections of ARCIA for 1886, 1889, and 1904).

[94] Vol. I, at 60 (citing ARCIA for 1902).

[95] Vol. I, at 62 (citing ARCIA for 1916).

[96] Vol I, at 60–61 (citations omitted).

95.     Forced child labor was not merely part of "instruction." The children's hard labor was used to keep the schools running.[97] As reported in one boarding school in Arizona, "One hundred of the 191 girls are 11 years of age or under. The result is that the institutional work, instead of being done wholly by able-bodied youths of 15 to 20 nominally enrolled in the early grades, has to be done . . . by very small children, moreover, who, according to competent medical opinion, are malnourished."[98] And the United States did not pay the young, malnourished Native children for their hard labor. The United States admits that "[t]he economic contribution of Indian and Native Hawaiian children to the Federal Indian Boarding school system and beyond remains unknown."[99]

96.     The Boarding School Program's rules were enforced through severe punishment, including corporal punishment,[100] solitary confinement,[101] "flogging, withholding food, . . . whipping[,]"[102] and "slapping, or cuffing."[103] "At times, rule enforcement was a group experience: . . . 'a reprimand before the school is far better than a dozen whippings, because . . . it is humiliating to the offender and answers better than whipping.'"[104]

---

[97] Vol. I, at 63 (citation omitted).

[98] *Id.* (citing Meriam Report, at 375).

[99] Vol. I, at 63.

[100] Vol. I, at 8.

[101] Vol. I, at 54 (citing ARCIA for 1896, at 343).

[102] Vol. I, at 54 (citing ARCIA for 1899, at 206; Ursula Running Bear et al., The Impact of Individual and Parental American Indian Boarding School Attendance on Chronic Physical Health of Northern Plains Tribes, 42 Fam. Community Health 1 (2019)).

[103] Vol. I, at 54 (citing ARCIA for 1886, at 195; ARCIA for 1896, at 107, 123 (describing punishment for failure to speak English)).

[104] Vol. I, at 54 (citing ARCIA for 1886, at 195).



[105]

97.    Children who attempted to escape the Boarding Schools were captured, forcibly returned, and punished. For students like Anthony Galindo's grandmother, Ethel, repeated escape attempts resulted in forced expulsion, by cattle car, to a Boarding School even further from home.

98.    The United States also contracted with a number of religious orders to run boarding schools on the federal government's behalf, including the Catholic, Congregational, Episcopal, Methodist, and Presbyterian Churches, the better for, as one school superintendent put it in a report to the Secretary of Interior, "lead[ing Native American] people, whose paganism has been the chief obstacle to their civilization, into the light of Christianity."[106]

---

[105] Mary Annette Pember, Photograph of Child Handcuffs, *in* Rebecca Onion, *The Sad History of the Kid-Sized Handcuffs*, Slate (Jan. 11, 2013), https://slate.com/human-interest/2013/01/small-handcuffs-the-artifact-was-used-to-bring-native-american-children-to-boarding-school.html.

[106] Vol. I, at 49.

**D.**    **The United States Took Upon Itself the Role of Trustee Over Native Education**

99.    For well over 200 years, the United States has obligated itself to "teach [the] children" of Native Nations in order to "improve[ the] condition of [Native Nations.]"[107]

100.    In 1819, Congress laid the groundwork for the Boarding School Program with the Civilization Fund Act. The purpose of this Act was ostensibly to provide "against the further decline and final extinction of the Indian tribes . . . and for introducing among them the habits and arts of civilization."[108] The Act instructed the President to "employ capable persons of good moral character to instruct [Native Americans] in the mode of agriculture suited to their situation [] and for teaching [Native] children in reading, writing, and arithmetic and performing such other duties . . . according to such instructions and rules as the President may give and prescribe for the regulation of their conduct . . . ."[109]

101.    The United States apportioned the funds contemplated under the Civilization Fund Act, including "monies held in Tribal trust accounts" among "societies and individuals—usually missionary organizations—that had been prominent in the effort to 'civilize' the Indians."[110] The Federal government paid these societies "on a per capita basis for Indian children to enter the Indian boarding schools."[111]

102.    The Boarding School Program's first schools were opened with monies from the Civilization Fund Act soon thereafter.[112]

---

[107] Civilization Fund Act of 1819, 3 Stat. 516 (1819).

[108] *See* 25 U.S.C. § 271.

[109] *Id.*

[110] Vol. I, at 7 (citing Kennedy Report, at 143).

[111] Vol. I, at 7.

[112] Vol. I, at 6. For example, the Eliot School in Holcomb, Mississippi was opened in April 1819 with the use of Federal funding, and the Mayhew School in Starkville, Mississippi was opened around the same time. Vol. II, App. B., at 159, 162.

103.    Since then, Congress has repeatedly enacted laws which underscored the United States' obligation to educate all Native children. These statutes *do not* differentiate by tribe— rather, they mandate a responsibility to all Native Nations' children.

104.    The following statutes illustrate Congress's decision to make the United States a trustee of the Native Nations, responsible for, among other things, their educational well-being:

- Act of Mar. 3, 1883, ch. 141, § 2, codified at 25 U.S.C. § 155: "All miscellaneous revenues derived from Indian reservations, agencies, and schools, except those of the Five Civilized Tribes and not the result of the labor of any member of such tribe, which are not required by existing law to be otherwise disposed of, shall be covered into the Treasury of the United States under the caption 'Indian moneys, proceeds of labor[,]' and are made available for expenditure, in the discretion of the Secretary of the Interior, for the benefit of the Indian tribes, agencies, and schools on whose behalf they are collected."

- Indian Self-Determination and Education Assistance Act of 1975, § 3 codified at 25 U.S.C. § 5302: "The Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services. In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of

strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities."

- Education Amendments of 1978, pt. B § 1120, codified at 25 U.S.C. § 2000: "It is the policy of the United States to fulfill the Federal Government's unique and continuing trust relationship with and responsibility to the Indian people for the education of Indian children and for the operation and financial support of the Bureau of Indian Affairs-funded school system to work in full cooperation with tribes toward the goal of ensuring that the programs of the Bureau of Indian Affairs-funded school system are of the highest quality and provide for the basic elementary and secondary educational needs of Indian children, including meeting the unique educational and cultural needs of those children."

- Native American Language Resource Center Act of 2022, § 2, 136 Stat. 6143: Establishing a program within the Department of Education to support Native American language centers "to preserve, protect, and promote the rights and freedom of Native Americans to use, practice, and develop Native American languages in furtherance of . . . the United States trust responsibility to Native American communities."

105. Congress also enacted several statutes taking Native Nations' funds and empowering the United States military to support the United States' twin goals of dispossession and assimilation through the Boarding School Program:

- Act of June 23, 1879, Ch. 35, § 7, 21, codified at 25 U.S.C. § 273, *repealed by* 136 Stat. 4419 (2022): "The Secretary of the Army shall be authorized to detail

an officer of the Army, not above the rank of captain, for special duty with reference to Indian education."

- Act of July 31, 1882, Ch. 363, 22 Stat. 181, codified at 25 U.S.C. § 276 (2020): "The Secretary of War is authorized to set aside, for use in the establishment of normal and industrial training schools for Indian youth from the nomadic tribes having educational treaty claims upon the United States, . . . *Provided,* That moneys appropriated or to be appropriated for general purposes of education among the Indians may be expended, under the direction of the Secretary of the Interior, for the education of Indian youths at such posts, institutions, and schools as he may consider advantageous, or as Congress from time to time may authorize and provide."

- In 1887, Congress passed the General Allotment Act, also known as the Dawes Act, which instructed federal authorities to divide up, distribute, and sell off Native lands.[113]

- Along with the General Allotment Act, the Federal Government passed laws that empowered the Secretary of the Interior to force Native children into Boarding Schools and mandated that Native Nations surrender their children to DOI agents to be taken to distant boarding schools. For example, in March 1893, Congress passed the following law, codified at 25 U.S.C. § 283, and which was only repealed in 2022:

    The Secretary of the Interior may in his discretion establish such regulations as will prevent the issuing of rations or the furnishing of subsistence either in money or in kind to the head of any Indian family for or on account of

---

[113] General Allotment Act, 24 Stat. 388 (1887), *repealed by* Indian Reorganization Act, 25 U.S.C. § 5101 (1934)

any Indian child or children between the ages of eight and twenty-one years who shall not have attended school during the preceding year in accordance with such regulations…The Secretary of the Interior may in his discretion withhold rations, clothing and other annuities from Indian parents or guardians who refuse or neglect to send and keep their children of proper school age in some school a reasonable portion of the year.[114]

- In 1922, Congress authorized the "Secretary of the Interior to issue land patents of up to 160 acres to religious institutions and organizations or missionary boards already engaged in religious or school activities on Indian reservations." But that act specified the Native Nations maintained a reversionary interest in those land patents, and the lands "shall revert to the" Native Nation once the lands were no longer "used for mission or school purposes."[115]

106.    It was not only through statutes that enforceable duties were established. Binding treaties with individual Native Nations or groups of Native Nations—still in effect—also established the United States' trust duty over Native children's education.

107.    Provisions regarding the education of Native children were tied to coercive treaties designed to strip Native Nations of their land, in which Native Nations designated the funds from the sale of their lands for educating their children. The Wichita were one of the many Native Nations that entered into a treaty under which they agreed to "forever [] remain at peace with the United States" in exchange for the United States, among other commitments, sending school-teachers to the Wichita "for the purpose of instructing" the Nation's children.[116] The United States "pledge[d ]to carry [the Treaty] into full execution, in good faith and sincerity."[117] This treaty is

---

[114] 27 Stat. 612, 628 (1893).

[115] Vol. II, at 49 (citing Act of September 21, 1922, ch. 367 § 3, 42 Stat. 994, 995 (1922)).

[116] *Treaty with the Comanche, Aionai, Anadarko, Caddo, etc.*, The Wichita Treaty, at Arts. 10, 13.

[117] *Id.* at Arts. 10.

binding law and remains in full force today, and underscores the United States' long-repeated acknowledgment of its trust duty over Native Nations' education.[118] This concept of peaceful coexistence, and the United States' caretaking responsibility over Native children's education, at the very least forecloses the United States' systematic abuse of those children. And as the United States has recognized, "commitments made through written treaties" with Native Nations "established enduring and enforceable Federal obligations" to them.[119]

108. The guarantees of the Wichita Treaty are representative of the education guarantees the United States made to other Native Nations. As the Supreme Court has recognized, this was because they knew that schooling was necessary to "secur[e] a foothold for their children in a rapidly changing world."[120]

109. Indeed, in at least 171 treaties, in exchange for the Native Nations' homelands and everlasting peace, the United States promised to provide for Native American education.[121] A sample of the language in those treaties demonstrates the United States' explicit, wide-ranging obligations to numerous tribes:

---

[118] As noted, to the extent any doubt remains, such is resolved by the canon of construction that the United States' treaties with tribes should be construed against the drafter, that is, in favor of the Native Nations. *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U,S. 172, 196 (1999) (holding courts must "give effect to the terms" of treaties "as the Indians themselves would have understood them"); *see also, Worcester v. Georgia*, 31 U.S. 515, 582 (1832) (McLean, J., concurring) ("The language used in treaties with the Indians should never be construed to their prejudice").

[119] 2016 Indian Trust Asset Reform Act, 25 U.S.C. § 5601(4–5) (Congress confirming its belief that "commitments made through written treaties" with the tribes "established enduring and enforceable Federal obligations" to them). *See also Moe v. Confed Salish and Kootenai Tribes of Flathead Res.*, 425 U.S. 463, 472–77 (1976).

[120] *Haaland v. Brackeen*, 599 U.S. 255, 298 (2023) (Gorsuch, J., concurring).

[121] Vol. II, at 93.

- "In consideration of [their homeland], the United States do hereby agree to pay . . . annually, forever to support of schools in said nation."[122]

- Earmarking funds from the sale of Native Nations' homelands "for the purpose of raising a fund, to be applied, under the direction of the President, to the support of schools for the education of [the tribes'] children."[123]

- Obligating the United States to build schoolhouses.[124]

- Requiring the United States to set aside funds "to be applied in the discretion of the President of the United States, to the education of the said Tribes and Bands."[125]

110.    The United States highlights the similarities across the treaties in its recent Boarding Schools Investigative Report, updated and particularized in 2024, with a selection of "127 Indian Treaties that explicitly include Federal Indian boarding schools or general Indian education provisions."[126] In addition, numerous treaties expressly link these provisions to the cession of land.[127]

111.    Through these treaties, the United States took control of Native children's education, assuming duties to provide for and fund the education of Native children in their familial

---

[122] Treaty with the Choctaw, Art. 2 (1825) (guaranteeing the annuity will go towards education for 20 years, and then to education or other purposes "at the option of the Choctaw Nation"); *see also, e.g.,* Treaty with the Miami, Art. 4 (1828) (same); Treaty with the Potawatomi, Art. 2 (1828) (same); Treaty with the Creeks, Art. 5 (1833) (same); Treaty with the Sauk and Foxes, Art. 4 (1837) (same); Treaty with the Menominee, Art. 5 (1848) (same); Treaty with the Ottawa, Art. 4 (1821) (same).

[123] Treaty with the Kansa, Art. 5, (1825); *see also. e.g.,* Treaty with the Choctaw, Art. 7 (1820) (same); Treaty with the Delawares (1829) (same).

[124]Treaty with the Chippewa, etc., Art. 3 (1859); *see also, e.g.,* Treaty with the Navaho, Art. 3 (1868) (same).

[125] Treaty with the Sauk and Foxes, Art. 5 (1830); *see also, e.g.,* Treaty with the Miami, Art. 4 (1828) (same); Treaty with the Menominee, Art. Fifth (1831) (same).

[126] Vol. II, at 17, App. J.

[127] *See e.g.*, Vol. II, App. J.

and Native settings; and further obtained discretionary power to spend funds and direct schools for the purported benefit of all Native Nations, often using the Nations' own funds to do so.[128]

112.    But this discretion was subject to the highest standards of fiduciary responsibility that the United States bears in executing its duties to manage the resources of and protect Native Nations.

113.    Through these treaties, associated statutes, and its actions, the United States appointed itself as a trustee overseeing Native children's education. The United States now fully admits that "a priority of U.S.-Indian relations is Indian education, a treaty right, demonstrated by the 171 Treaties that the U.S. entered into with Indian Tribes and ratified by the Senate that implicate the Federal Indian boarding school system or education generally."[129]

E.    **The United States Coercively Exercised Its Trust Responsibility Over All Native Nations**

114.    When Interior assumed control of the United States' dispossession and assimilation strategy in 1849, it dramatically increased the use of the Boarding School Program and the forced enrollment of Native children into those schools.

115.    In 1850, DOI stated that it was "indispensably necessary that [the Indians] be placed in positions where they can be controlled, and finally compelled, by stern necessity, to resort to agricultural labor or starve."[130]

---

[128] *See, e.g.* Treaty with the Choctaw, Art. 7 (1820) ("Three-fourths of said fund [raised from sale of the Choctaw Nation's land] shall be appropriated for the benefit of the schools here").

[129] Vol. II. at 93.

[130] Vol. I, at 37–38 (citing ARCIA for 1850, at 1).

116.    As one Congressional Report acknowledged, "[t]he interrelationship between the educational policy and the land policy of this period is obvious—coercive assimilation at any cost."[131]

117.    In a reported episode from November 1894, U.S. soldiers arrived at the Hopi reservation in Northern Arizona with orders to take the children and:

> [f]acing resistance, authorities had tried bribing Hopi parents with yards of cloth, or tools like axes. They used their bare fists, striking Hopi who didn't want to send their children away. They withheld food supplies guaranteed by treaties in a bid to starve the Hopi into submission. When even those tactics failed, and resistance to having their children hauled away was compounded by tensions over farmland, two cavalry companies arrived to arrest 19 Hopi men. The captives were imprisoned on California's Alcatraz Island for nearly a year, and the removal of Hopi children proceeded as planned.[132]

118.    As control of the United States' Native American policy shifted from military to civil control, Congress empowered the President and the Department of War to aid Interior in carrying out its forced removal of Native children into the Boarding School Program. Appropriations relating to "Indian education" applied to all Native Nations collectively, rather than to any specific Native Nation individually.

119.    The national policy implemented through treaties with Native Nations guaranteeing educational duties and expenditures for the "benefit" of Native Nations continued as a policy of the United States taking upon itself the responsibility for "Indian Education," writ large, codified by statutes that guaranteed the educational duties, expenditures and ongoing trust relationships first established by numerous treaties.

---

[131] Kennedy Report, at 150.

[132]    Zach  Levitt,  et  al.,  War  Against  Children,  N.Y.  Times  (Aug.  30,  2023), https://www.nytimes.com/interactive/2023/08/30/us/native-american-boarding-schools.html\.

120.    By 1926, the United States had **forced 83% of Native Children** into boarding schools controlled by Defendant the Bureau of Indian Education – a product of the United States' acknowledged "responsibility" over Native children's education, and subject to the uniform curriculum set by the Federal government.[133]

### F.    Payment For the Boarding School Program: Appropriations Pooled with Trust Funds

121.    "Adding insult to injury, the United States stuck tribes with a bill for" the Boarding School Program; at times "as much as *95%* of the funding for Indian boarding schools came from 'Indian trust fund monies.'"[134]

122.    The Boarding School Program was paid for by a pooled combination of funds appropriated by Congress and other funds held in trust by the Federal government for the benefit of Native Nations. **Yet neither the composition of this pool, its size, nor how (or how much) funds were ultimately distributed from Federal accounts, has ever been accounted for.**

123.    First, the United States now admits that "[d]ue to time and resource constraints, [it] did not research actual amounts spent on Federal Indian boarding schools and similar institutions."[135]

124.    Further, the United States has not accounted for "the present-day value of Indian territory loss associated with the Federal Indian boarding school system [or] any funds that may have been obtained from Tribal trust accounts for the benefit of Indians and maintained by the United States."[136]

---

[133] *US Indian Boarding School History*, Nat'l Native Am. Boarding School Healing Coalition (last visited Apr. 18, 2025), https://boardingschoolhealing.org/education/us-indian-boarding-school-history/.

[134] *Haaland v. Brackeen*, 599 U.S. 255, 301 (2023) (Gorsuch, J. concurring) (emphasis added).

[135] Vol. II, at 18.

[136] Vol. II, at 93.

125.    Finally, the United States has not accounted for, among other matters, "Treaty-stipulated support, religious institution and organization support . . . wealth generated by Indian or Native Hawaiian children while in the system including for the agriculture and railroad industries, [or] Indian domestic and other labor for non-Indian families and communities through the Outing System."[137]

126.    And yet, the United States has admitted that the "actual amount of funds spent on Indian boarding schools [] must include Indian child labor both for institution operations and through the Outing System to non-Indian families," and that "appropriations made under the educational provisions of existing treaties with Native Nations" were used to fund the Boarding School Program.[138] As the United States acknowledges—the actual amount of funds spent on Indian boarding schools is likely far greater" than the $23.3 billion Interior estimated the United States appropriated for the Program.[139]

127.    The fact is plain: **No true accounting has ever taken place**.

128.    As purported beneficiaries, Plaintiffs and the other Class members have a right to such an accounting now, by equitable right as beneficiary, and by statute.

129.    Indeed, the United States admits that funds owned by Native Nations were a primary source of backing for the schools. The funds were substantial. For example, between 1845 and 1855, Federal government records indicate that $2 million—the rough equivalent of $73 million in present dollars[140]—was expended to support the Boarding Schools then in existence. Of

---

[137] Vol. II, at 18.

[138] Vol. II, at 55; Vol. I, at 43.

[139] Vol. II, at 51.

[140] The dollar has had an average inflation rate of 2.14% per year, translating to a cumulative price increase of 3,551.39% since 1855.

that amount, "only one-twentieth, or about $10,000 per year, came from Federal Government appropriations."[141] The rest came from funds "owned" by Native Nations, pooled together by the United States and expended on the Program.[142]

130.    The 1887 Dawes Act systematized the appropriation of Native Nations' monies in support of the Boarding School Program. Section 5 specified that surplus lands not allotted to individual Native Americans were to be held in trust in the Treasury of the United States, and were to be "at all times subject to appropriation by Congress for the education and civilization of such tribe or tribes of Indians or the members thereof."[143] The General Allotment Act was read by the Federal Government to allow it to collect "unused" funds "given" to specific Native Nations in exchange for their land, and to use those funds for education of "tribes" without distinction.[144]

131.    The United States for the first time admitted, in Volume I, that there were at least five separate sources of funds used to generate money for the Boarding School Program:

- Appropriations made under the educational provisions of existing treaties with Native Nations;

- Funded investments of bonds and other securities held by the United States;

- Proceeds of the sale of lands of certain Native Nations;

- Accumulations of money in the Treasury resulting from the sale of Native Nations lands; and

- Annual appropriations by Congress for Indian school purposes.[145]

---

[141] Kennedy Report, at 146.

[142] *Id*.

[143] General Allotment Act, ch. 119, § 5, 24 Stat. 388 (1887) *repealed by* Indian Reorganization Act, 25 U.S.C. § 5101 (1934).

[144] Kennedy Report at 150.

[145] Vol. I, at 43.

132.    Also, for the first time, the United States has explained therein that what resulted was a fund or set of funds—purportedly for the benefit of all Native Nations—for which it has never accounted.

133.    As the United States summarizes in the Boarding Schools Investigative Report:

- "The United States used monies resulting from Indian wealth depletion from cessions of territories, and held in Federal trust accounts for Indian Tribes, to pay for the attempted assimilation process of Indians."[146]

- This spending "depleted funds Indian Tribes were entitled to."[147]

- "Funding for the Federal Indian boarding school system included both Federal funds through congressional appropriations and funds obtained from Tribal trust accounts for the benefit of Indians and maintained by the United States."[148]

- "The Federal Indian boarding school system predominately used the manual labor of American Indian, Alaska Native, and Native Hawaiian children to compensate for the poor conditions of school facilities and lack of financial support from the U.S. Government."[149]

- The United States still needs to "[a]pproximate the amount of Tribal or individual Indian trust funds held by the United States in trust that were used to support the Federal Indian boarding school system, including to non-Federal

---

[146] Vol. I, at 44.

[147] Vol. I, at 45.

[148] Vol. I, at 92.

[149] Vol. II, at 93.

entities and, or individuals, recognizing that some records are no longer available."[150]

134.    Despite admitting that the Boarding School Program depleted funds to which Native Nations were entitled, the United States has never provided an accounting of those funds, much less an explanation regarding, among other things: (a) the amount of such funds purportedly earmarked for the Boarding School Program; (b) how such funds were expended; (c) whether all such funds taken for purported support of the schools were actually expended; (d) how such funds were otherwise invested pursuant to the United States' fiduciary duty over them; (e) the amount of any remaining, unexpended, funds belonging to Native Nations; or (f) the damage wrought by the expenditures that did take place.

135.    The United States fully admits that, despite identifying these sources of funds, and despite having long been in sole possession of the records regarding these funds, it does not know how much of what source was used to fund the Boarding School Program, what funds remain, and whether funds were mis-spent.

136.    The United States has *never* provided any form of accounting of this set of funds for Native children's education—either of the quantum of funds expended on the Boarding School Program, or an analysis of the economic impact of that expenditure.

---

[150] Vol. I, at 96.

### G.    The United States' Trust Obligations to the Native Nations Are Ongoing

137.    The United States has never repudiated—and has actually repeatedly and recently reaffirmed—its education trust obligations, through treaty, statute, and proclamation.[151]

138.    Indeed, as Congress explained in one statute, the Federal government holds a "unique and continuing trust relationship with and responsibility to the Indian people for the education of Indian children."[152]

139.    The Department of Interior further explicated this longstanding trust responsibility—unbroken to this day—in a December 2011 Report:

> [T]o secure a nation independent from the English crown, early U.S. governments were obliged to enter into more than 100 treaties with American Indian tribes. Treaties have long been regarded as the most legitimate and steadfast form of agreement between two nations. According to the United States Constitution, "…all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land." These treaties constituted contractual agreements between sovereign nations. Through these contracts, American Indian tribes ceded vast stretches of their ancestral lands since time immemorial to the United States in exchange for specific promises and considerations. Many of those treaties include solemn commitments by the United States to accept trust responsibility for the education of American Indian children.[153]

140.    The 2011 Report, *Broken Schools, Broken Promises*, (the "2011 *Broken Schools* Report") explained that the United States' trust obligations to the Native Nations were specifically acknowledged in more recent Congressional acts and appropriations.

141.    For example, the 2011 *Broken Schools* Report cites the Indian Self-Determination

---

[151] *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339 (Fed. Cir. 2004). *See also*, *e.g.*, U.S. Dep't of Interior, *Broken Promises, Broken Schools: Report of the No Child Left Behind School Facilities and Construction Negotiated Rulemaking Committee* 11 (2011), available at https://www.bia.gov/sites/default/files/dup/assets/as-ia/raca/pdf/idc1-025523.pdf.

[152] 25 U.S.C. § 2000; 25 U.S.C. § 2501(b).

[153] U.S. Dep't of Interior, *Broken Promises, Broken Schools: Report of the No Child Left Behind School Facilities and Construction Negotiated Rulemaking Committee* 6 (2011), available at https://www.bia.gov/sites/default/files/dup/assets/as-ia/raca/pdf/idc1-025523.pdf.

and Education Assistance Act, 25 U.S.C. § 2000, which describes Congress's recognition of the United States' ongoing and unbroken trust duties to provide for Native children's education. That Act acknowledges "[i]t is the policy of the United States to fulfill the Federal Government's unique and continuing trust relationship with and responsibility to the Indian people for the education of Indian children and for the operation and financial support of the Bureau of Indian Affairs-funded school system . . . ."[154] The 2011 *Broken Schools* Report further cites learned treatises for the proposition that there has long existed a "trust responsibility" from the Federal Government "respecting American Indian Education."[155] The 2011 *Broken Schools* Report emphasizes: "The federal obligation to American Indian children continues today."[156]

142.     Despite these explicit obligations, the United States admitted in 2022 that there has never been an "accounting of Federal support for the Federal Indian boarding school system, including a proactive approximate accounting of any Tribal and, or individual Indian trust funds held in trust by the United States used to support the Federal Indian boarding school system."[157] There has likewise never been an accounting of the contribution to the Boarding School Program

---

[154] *Id.*

[155] The 2011 *Broken Schools* Report excerpts Cohen's Handbook of Federal Indian Law, Section 22.03: Education, which states as follows: "Provisions regarding Indian education appear with the earliest colonial laws. Beginning with the 1794 Treaty with the Oneida, [7 Stat. 47 (1794)] over 150 treaties between tribes and the United States have included educational provisions. For almost as long a time, Congress has legislated to provide for Indian education generally. In 1819, Congress established a permanent "civilization fund," which, until its repeal in 1873, authorized the executive to spend an annual sum to employ teachers in Indian country to provide "against the further decline and final extinction of the Indian tribes . . . and for introducing among them the habits and arts of civilization." Civilization Fund Act, Act of Mar 3, 1819, 3 Stat. 516.

[156] U.S. Dep't of Interior, *Broken Promises, Broken Schools* 7 (2011). That trust responsibility is described elsewhere as well in the United States Code. For example, 25 U.S.C. § 5301(b)(2) describes the "Federal responsibility for . . . education of Indian children . . . ." 25 U.S.C. § 5302(a) acknowledges "the obligation of the United States to . . . assur[e] maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities."

[157] Vol. I, at 97.

by wealth created through forced labor of Native children.

143.    In the 21st Century, the United States has repeatedly affirmed its duty to educate Native children,[158] and, as recently as 2021, the United States recognized that the Federal government's obligations to Native Americans includes "educational equity [and] excellence."[159]

144.    While the United States has consistently failed to fulfill its obligations, "the magnitude of a legal wrong is no reason to perpetuate it."[160]

145.    No statute of limitations concerning losses or mismanagement of trust funds begins to run "until the affected tribe or individual Indian has been furnished with an accounting or such funds from which the beneficiary can determine whether there has been a loss."[161]

146.    The United States has admitted that no such accounting with regard to the Boarding School Program has ever taken place, and only the Boarding Schools Investigative Report revealed the very existence and nature of the funds for which an accounting is clearly owed.

**H.    The Boarding Schools' Reprehensible and Tragic Legacy Persists**

147.    Secretary Haaland and Assistant Secretary Newland, as representatives of the United States, have admitted on multiple occasions, including but not limited to in the Boarding Schools Investigative Report, that the negative effect of the Boarding School Program is currently felt by every single Native American, including not only survivors, but also those survivors' descendants and their communities.

---

[158] 25 U.S.C. § 2000 (the Federal Government holds a "unique and continuing trust relationship with and responsibility to the Indian people for the education of Indian children"); U.S. Dep't of Interior, *Broken Promises, Broken Schools* 7 (2011) ("The federal obligation to American Indian children continues today.")

[159] Executive Order on the White House Initiative on Advancing Educational Equity, Excellence, and Economic Opportunity for Native Americans and Strengthening Tribal Colleges and Universities, Exec. Order No. 14049, 86 Fed. Reg. 57313 (2021).

[160] *McGirt v. Oklahoma*, 591 U.S. 894, 934 (2020).

[161] Act of Oct. 30, 2009, Pub. L. No. 111-88, 123 Stat. 2904, 2922 (2009).

148.    As the United States has admitted, "[t]he targeting of Native American Children was not fair, right, or just" and continues to harm Native Nations through "deep and far-reaching socioeconomic impacts such as low life expectancies, loss and disconnection from Culture and land, and persistent poverty. Tribal Communities and Indigenous people today are dealing with the historical trauma of boarding school abuse."[162]

149.    When the United States tore Native children from their homes, it deliberately destroyed the kinship and family bonds that provided supportive upbringings. As detailed herein, children at Boarding Schools were subject to sexual and physical abuse leading to widespread trauma and depression.[163] The destruction of the family unit and other horrors experienced by Native children directly contribute to high levels of substance abuse among Boarding School survivors, which has in turn reverberated across generations.[164]

150.    According to one study, Boarding School survivors were 93% more likely to have had a child removed from their care than other Native Americans.[165] Children taken from their

---

[162] White House Council on Native Am. Affairs Educ. Comm., *Framework for the 10 Year National Plan on Native Language Revitalization White House Tribal Nations Summit 2022* (last accessed March 23, 2025), https://www.bia.gov/sites/default/files/dup/inline-files/framework_for_10yr_national_plan.pdf. *See also* White House Council on Native Am. Affairs, *10-Year Nat'l Plan on Native Language Revitalization* 10, 42 (Dec. 2024) ("Native Nations rightfully expect the federal government to honor its treaty and trust obligations by allocating funding for language revitalization")

[163] Maria Yellow Horse Brave Heart, *Gender Differences in the Historical Trauma Response Among the Lakota*, 10 J. Health & Soc. Pol'y 4:1 (1999); Melissa D. Zephier Olson & Kirk Dombrowski, *A Systematic Review of Indian Boarding Schools and Attachment in the Context of Substance Use Studies of Native Americans*, 1 J. Racial & Ethnic Health Disparities 62 (2019).

[164] Melissa D. Zephier Olson & Kirk Dombrowski, *A Systematic Review of Indian Boarding Schools and Attachment in the Context of Substance Use Studies of Native Americans*, 1 J. Racial & Ethnic Health Disparities 62 (2019).

[165] Abram J. Lyons, *et al.*, *Factors Associated with Child Removal Among American Indian and Alaska Native People in an Alcohol Intervention Study*, 28 Child Maltreatment 599 (2023).

parents in turn face higher rates of suicide, mental health problems, and substance abuse disorders.[166]

151.    The Boarding School Program had a lasting, cognizable, universal, and overwhelmingly negative effect on Native Nations. As Secretary Haaland stated soon after announcing the Report: "The federal policies that attempted to wipe out Native identity, language, and culture continue to manifest in the pain Tribal communities face today, including cycles of violence and abuse, the disappearance of Indigenous people, premature deaths, poverty, and loss of wealth, mental health disorders and substance abuse."[167]

152.    An accounting—which the United States is legally required to undertake—is an important step toward trying to right this horrific wrong.

## V.    CLASS ACTION ALLEGATIONS

153.    All Class members' claims derive directly from the United States' wrongful violation of its treaty-based and statutory duties to provide Native Nations' education.

154.    The underlying facts are the same for all Class Members: the United States collected and pooled together funds on behalf of all Native Nations for the purported benefit of all Native children and executed a uniform policy for the education of Native Nations' children that was designed, for all Native Nations, to strip them of their unique identity, destroy their language and culture, and forcibly assimilate them, all while depriving them of an adequate education.

---

[166] Childs. Rts. Litig. Comm., Am. Bar Assoc., *Trauma Caused by Separation of Children from Parents* 4–5 (2019), https://www.americanbar.org/content/dam/aba/publications/litigation_committees/childrights/child-separation-memo/parent-child-separation-trauma-memo.pdf.

[167] Deb Haaland, Sec., Dep't of Interior, Remarks on UN Int'l Day of World's Indigenous People at the Wash. Foreign Press Ctr. (Aug. 5, 2021) *in Sec. Haaland on the Biden-Harris Admin.'s Commitment to Indigenous Communities*, State.gov (Aug. 5, 2021) https://2021-2025.state.gov/briefings-foreign-press-centers/secretary-haaland-on-the-biden-harris-administrations-commitment-to-indigenous-communities/

155.    The United States was systematic in its actions, and did not discriminate among Native Nations in implementing it.

156.    Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed Classes, pursuant to Federal Rules of Civil Procedure 23(a), b(1), and (b)(2). This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions. Plaintiffs respectfully propose the following class:

> All Native Nations whose citizens between 1819 and 1969 attended a boarding school pursuant to the Boarding School Program.

157.    Excluded from the Class are: (a) Defendant and its members, agencies, divisions, departments, and employees; (b) any legal counsel or employee of legal counsel for any Defendant; and (c) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members.

158.    Plaintiffs reserve the right to amend the Class definition and create or amend any subclass if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

159.    **Numerosity**. The Native Nations class is composed of hundreds of Native Nations and thus is so numerous that joinder of all members is impracticable.

160.    **Common Questions of Law and Fact**. Common questions of law and fact exist for all Class Members. These common legal and factual questions include, but are not limited to, the following:

> a.    The amount of funds taken from Class Members, including the value of land ceded, to fund the Boarding School Program for the Class Members' purported benefit;

52

b.  The nature of the funds used to pay for the Boarding School Program;

c.  Whether the United States must account for the funds used to fund the Boarding School Program;

d.  Whether the United States must account for the value of Class Members' lands it took in exchange for education under treaties with Native Nations;

e.  Whether the United States must account for the value of Class Members' lands sold to fund the Boarding School Program;

f.  Whether the United States must detail how the funds taken from Class Members to fund the Boarding School Program were actually spent;

g.  Whether the monies used to fund the Boarding School Program consisted of monies taken from Class Members;

h.  Whether the United States pooled Class members' resources together to fund the Boarding School Program;

i.  Whether the United States used Class Members' forced labor to support the Boarding School Program, and the value of such labor;

j.  Whether Defendants misused Class Members' funds to implement the Boarding School Program; and

k.  Whether the Class Members' claims are timely.

161.  **Typicality**. Plaintiffs' claims are typical of those of the other Class Members' claims in that Plaintiffs and each of the other Class Members are Native Nations to whom the United States owed a treaty-based and/or statutory duty of trust with respect to Native children's education, and whose members (including ancestors) were forced to attend federal boarding

schools, and whose funds, resources, and/or labor were used to support the Boarding School Program.

162.    **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the other Class members. By prevailing on their own claims, Plaintiffs will establish Defendants' liability to all Class Members. Plaintiffs' counsel are unaware of any conflicts of interest between Plaintiffs as class representatives and absent Class Members with respect to the matters at issue in this litigation; Plaintiffs will vigorously prosecute the suit on behalf of the Class. Plaintiffs have retained counsel with substantial experience in handling complex class action litigation, including actions relating to Native Nations' equitable rights. Further, Plaintiffs and their counsel are committed to the vigorous prosecution of this action.

163.    **Insufficiency of Separate Actions**. Absent a class action, Plaintiffs and the other Class members will continue to suffer the harms described herein, for which they would have no remedy. This is a complex trust matter which applies to each and every Native Nation, including numerous that are small and lack the resources to pursue such a claim on their own.

164.    The Class may be certified under Rule 23(b)(1) for the following reasons:

a.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication concerning individual Class members, which would establish incompatible standards of conduct for Defendants; and

b.    Adjudications of claims of the individual Class members against Defendants would, as a practical matter, be dispositive of the interests of other Class members who are not parties to the adjudication and may substantially impair or impede the ability of other Class members to protect their interests. In

particular, the intermingling of Native Nations' funds may prevent meaningful tribe-by-tribe accounting, any settlement would drain funds from a general pool for all Native Nations, and any assessment of the United States' trust duties to Native Nations collectively would affect all Class members.

165.    Class action status is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to all Class members, all Class members have irreparable injuries, the remedies available at law are inadequate to compensate Class members for those injuries, in light of the balance of hardships a remedy in equity is warranted, and the public interest is not disserved by declaratory relief, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

166.    The United States implemented the Boarding Schools Program without differentiating among Native Nations, and treated Native Nations on grounds that apply generally to all Class Members. Plaintiffs, individually and on behalf of the other Class Members seek declaratory and equitable relief defining and enforcing the legal relationship and enforceable duties between the Class of Native Nations and the United States.

## VI.    INADEQUACY OF LEGAL REMEDIES

167.    Plaintiffs, individually and on behalf of the other Class members, allege that no plain, adequate, and complete remedy exists at law to address Defendants' actions. To the extent

that legal remedies currently exist, they are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief.[168]

## VII.    CLAIMS ASSERTED ON BEHALF OF THE CLASS

### COUNT I
### ACCOUNTING PURSUANT TO FEDERAL TRUST RESPONSIBILITY

168.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–167, above.

169.    At least 171 treaties were signed by the United States, and identified in Volume II, guaranteeing Native children's education, and the United States repeatedly reaffirmed in statutes and proclamations its obligation to ensure that all Native children receive an adequate education. The United States' long-acknowledged trust responsibility over Native children's education endures to this day.

170.    The United States has affirmed its obligation in statutes including, but not limited to: 25 U.S.C. § 5301(b)(2); 25 U.S.C. § 2000; 25 U.S.C. § 2501; ch. 86, 3 Stat. 516 (1819); 25 U.S.C. § 271; 25 U.S.C. § 155; 25 U.S.C. § 273; ch. 35, 21 Stat. 30, 35 (1879); Pub. L. No. 117-317, 27 Stat. 612, 628 (1893); ch. 367, 42 Stat. 994, 995 (1922); and 25 U.S.C. § 5601(4–5).

171.    The Boarding Schools Investigative Report was the United States' first attempt "in the history of the country" to "account[] for its role in operating Indian boarding schools to forcibly

---

[168] *Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("'The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 204 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view . . . It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

assimilate Indian children"[169] or to "comprehensively address the facts and consequences of its Federal Indian boarding school policies."[170]

172.    "Due to time and resource constraints," Volume II was unable to provide a full accounting of federal support, and it "did not research actual amounts spent."[171] Further, the Boarding Schools Investigative Report's estimate of $23.3 billion excluded "Treaty-stipulated support . . . U.S. military support, wealth generated by Indian or Native Hawaiian children while in the system [and] . . . Indian domestic and other labor for non-Indian families and communities through the Outing System."[172] It explicitly excluded any funds taken from Native Nations' trust funds or other assets and used to support of the Boarding School Program. This incomplete estimate is no substitute for an accounting of these funds.

173.    The United States has also admitted that it collected funds in purported support of this trust responsibility and for use in the Boarding School Program. The United States revealed for the first time in the Boarding Schools Investigative Report, that there were at least five separate sources of funds used to generate money for the Boarding School Program:

- Appropriations made under the educational provisions of existing treaties with Native Nations;

- Funded investments of bonds and other securities held by the United States;

- Proceeds of the sale of lands of certain Native Nations;

- Accumulations of money in the Treasury resulting from the sale of lands;

---

[169] Vol. II, at 4.

[170] Letter from Sec. of Interior Deb Haaland, *Federal Indian Boarding School Policies* (May 11, 2022). Available at https://www.bia.gov/sites/default/files/dup/inline-files/bsi_secretarial_cover_letter_esb46-007491_signed_508.pdf.

[171] Vol. II, at 51.

[172] Vol. II, at 51.

- Annual appropriations by Congress for Indian school purposes.[173]

174.    Also, for the first time in the Boarding Schools Investigative Report, the United States has explained that what resulted was a fund or set of funds—purportedly for the benefit of all Native Nations—for which it has never accounted. It admits:

- "The United States used monies resulting from Indian wealth depletion from cessions of territories, and held in Federal trust accounts for Indian Tribes, to pay for the attempted assimilation process of Indians."[174]

- This spending "depleted funds Indian Tribes were entitled to."[175]

- "Funding for the Federal Indian boarding school system included both Federal funds through congressional appropriations and funds obtained from Tribal trust accounts for the benefit of Indians and maintained by the United States."[176]

- "The Federal Indian boarding school system predominately used the manual labor of American Indian, Alaska Native, and Native Hawaiian children to compensate for the poor conditions of school facilities and lack of financial support from the U.S. Government."[177]

- The United States still needs to "[a]pproximate the amount of Tribal or individual Indian trust funds held by the United States in trust that were used to support the Federal Indian boarding school system, including to non-Federal

---

[173] Vol. I, at 43.

[174] Vol. I, at 44.

[175] Vol. I, at 45.

[176] Vol. I, at 92.

[177] Vol. I, at 92.

entities and, or individuals, recognizing that some records are no longer available."[178]

175.    The United States admitted more work is necessary to "approximat[e] a full accounting of Federal support for the Federal Indian Boarding School system, including a proactive approximate accounting of any Tribal and, or individual Indian trust funds held in trust by the United States to support the Federal Indian Boarding School system."[179]

176.    That accounting is not merely necessary, it is required by law and equity.

177.    As trustee over Native Nations' education trust accounts—which included but was not limited to moneys drawn from Native Nations' trust accounts—the United States has an equitable duty to accurately account for all trust asset expenditures.

178.    25 U.S.C. § 4011 further provides that "The Secretary shall account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian . . . ." The statute further requires the Secretary to "provide a statement of performance to each Indian tribe and individual with respect to whom funds are deposited and invested . . . ."[180] The funds allocated from Native Nations' trust accounts for the purported benefit of Native children's education are funds "held in trust by the United States for the benefit" of Indian tribes.[181]

179.    25 U.S.C. § 4044 further ordered a reconciliation of tribal accounts, whereby there would be a "report identifying for each tribal trust fund account for which the Secretary is responsible a balance reconciled as of September 30, 1995."

---

[178] Vol. I, at 96.

[179] Vol. I, at 97.

[180] 25 U.S.C. § 4011(b).

[181] 25 U.S.C. § 4011(a)

180.    No such reconciliation ever took place with respect to accounts used to pay for Native children's education, including those expended for the Boarding School Program.

181.    Only in the Boarding Schools Investigative Report completed in July 2024 did the United States admit that there even existed a pooled fund or set of funds used to pay for the Boarding School Program, and taken from Native Nations and purportedly used for those Native Nations' benefit.

182.    The United States has *never* provided an accounting of that fund/set of funds. It has never provided a statement respecting such deposit of monies, much less the "performance," 25 U.S.C. § 4011, of those funds, or whether those funds were in fact expended to the benefit of Native children's education, despite being drawn for that explicit purpose from Native Nations' trust accounts.

183.    The United States has failed to provide the accounting required by 25 U.S.C. § 4011 and 25 U.S.C. § 4044, and the United States has failed to provide the accounting required by dint of its duty as fiduciary and trustee.

184.    Plaintiffs accordingly seek an Order from this Court requiring the Defendants to provide an accounting of Trust Funds that are held or have been held by the United States as a trustee over the Native Nations for purposes of the education of Native Nations' children, as required by equity, treaties, and statutes.

185.    At a minimum, this accounting must provide a detailed itemization of:

a.    The $23.3 billion the United States estimates were appropriated for the Boarding School Program and associated policies, including how such funds were disbursed for the Native Nations' purported benefit;

b.    The monies removed from Native Nations' Trust accounts for expenditure on the Boarding School Program and associated policies, including detail regarding the retention by the United States and/or subsequent disbursement of such funds for the Native Nations' purported benefit;

    c.   The manner in which such monies from Native Nations' Trust accounts were pooled;

    d.   The performance as a result of investment by the United States of any funds held in trust by the federal government for the purpose of Native children's education;

    e.   The value of land ceded in exchange for the United States' promises to Native Nations related to education;

    f.   The "Treaty-stipulated support" spent to support the Program;[182]

    g.   The value, including any monies, generated by "Indian child labor both for institution operations and through the Outing System to non-Indian families;"[183]

    h.   The economic harm caused by the Boarding School Program; and

    i.   The remainder of Native Nations' funds and assets that have been taken by the United States and allocated for the education of Native Nations' children.

186.    An accounting is required.

187.    The Defendants must also preserve all documents it used to prepare the Boarding Schools Investigative Report, and any other relevant documentation, until a full accounting is provided and authenticated.

### COUNT II
### EQUITABLE ACCOUNTING PURSUANT TO
### THE ADMINISTRATIVE PROCEDURE ACT – 5 U.S.C. §§ 706(1–2)

188.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-167, above.

189.    Doug Burgum, in his official capacity as the Secretary of the Interior, and the United States Department of the Interior (together, "Interior Defendants") were required, through the

---

[182] Vol. II, at 51.
[183] Vol. II, at 55.

ongoing trust relationship established by treaties and statutes, to properly account for Native Nations' funds that Defendants controlled only as a result of their ongoing trust relationship with Native Nations. Defendants have failed to provide such an accounting.

190.    Interior is an agency within the meaning of the APA. *See* 5 U.S.C. 551.

191.    The APA directs courts to "compel agency action unlawfully withheld or unreasonably delayed" when an agency has failed to take a specific action that it was required to take. 5 U.S.C. § 706(1); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).

192.    The APA directs courts to hold unlawful and set aside agency actions that are found to be "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(a).

193.    Agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quotation omitted). This standard requires that agencies provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). An action is also arbitrary and capricious if the agency "failed to consider . . . important aspect[s] of the problem." *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25 (2020) (quotation omitted) (alterations in original).

194.    Failure to account for Native Nations' funds held in trust is a final agency action within the meaning of the APA. *See* 5 U.S.C. 551; *c.f. Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (decades-long failure to conduct accounting of Native Americans' funds held in trust was an agency action "tantamount to denying review altogether").

195.    Interior Defendants' decision to omit "Treaty-stipulated support, [] U.S. military support, [and the] wealth generated by Indian or Native Hawaiian children while in the system including for the agriculture and railroad industries, Indian domestic and other labor for non-Indian families and communities through the Outing System" from the "final volume" of the Boarding Schools Investigative Report is a final agency action within the meaning of the APA.[184] 5 U.S.C. § 551.

196.    Interior Defendants' actions alleged herein constitute "[a]gency action made reviewable by statute," 5 U.S.C. § 704, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and are therefore subject to judicial review. 5 U.S.C. §§ 702, 704.

197.    Interior Defendants' actions alleged herein are arbitrary and capricious because the decision to not provide an accounting required by law, or to carry out other mandatory duties, was not objectively reasonable and Interior Defendants failed to provide a reasoned explanation for that decision.

198.    Plaintiffs have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Interior Defendants' agency actions alleged herein for purposes of 5 U.S.C. § 702.

199.    The Interior Defendants are required, through treaty and statute, including 25 U.S.C. § 4011 and 25 U.S.C. § 162a(d)(1–2), to provide, but have not and are not providing, accounting of receipts and disbursements from the Native Nations' pooled funds for the Boarding School Program that are controlled by the United States.

---

[184]    Vol. II, at 51; *Federal Indian Boarding School Initiative*, U.S. Dep't of Interior https://www.doi.gov/priorities/strengthening-indian-country/federal-indian-boarding-school-initiative (last visited May 15, 2025).

200.    The Interior Defendants are required, through treaty and statute, including 25 U.S.C. § 4011 and 25 U.S.C. 162a(d)(3), to provide, but have not provided and are not providing, the Native Nations with periodic, timely reconciliations to assure the accuracy of accounts in violation of their nondiscretionary duties.

201.    The Interior Defendants have not determined and are not determining accurate cash balances in the Native Nations' pooled fund or set of funds, first revealed by the Boarding Schools Investigative Report, in violation of their nondiscretionary duties under 25 U.S.C. § 4011 and 25 U.S.C. § 162a(d)(4).

202.    The Interior Defendants have not prepared and are not preparing or supplying the Native Nations with periodic statements of the account performance and with balances of the pooled education fund available on a daily basis in violation of their nondiscretionary duties under 25 U.S.C. § 4011(a) and 25 U.S.C. § 162a(d)(5).

203.    The Interior Defendants have not established and are not establishing consistent, written policies and procedures for trust fund management and accounting for the Native Nations' pooled education fund in violation of their nondiscretionary duties under 25 U.S.C. § 4011 and 25 U.S.C. § 162a(d)(6).

204.    The Interior Defendants have not provided the Native Nations with as full and complete an accounting as possible of the Native Nations' funds used to support Native Nations' education, including the Boarding School Program, to the earliest possible date.

205.    Because the Interior Defendants breached each of these duties set forth herein, as well as other obligations specifically set forth in treaties, other statutes, regulations, and orders, the Interior Defendants, through their agencies and sub-bureaus, have acted contrary to statutory obligations and the Plaintiffs are entitled to review thereof under 5 U.S.C. §§ 702, 704, and 706.

206.    Accordingly, the Interior Defendants have withheld agency action that is required by statutes, including 25 U.S.C. § 4011 and 25 U.S.C. § 162a.

207.    Interior Defendants have acted in an arbitrary and capricious manner by not providing reasoned explanations for their failures to provide an accounting, and by providing an incomplete estimate of Federal support for the Program, because those decisions were not objectively reasonable.

208.    As a remedy, Plaintiffs seek an Order requiring that the Interior Defendants account for and provide a detailed itemization of:

    a.   The $23.3 billion the United States estimates were appropriated for the Boarding School Program and associated policies, including how such funds were disbursed for the Native Nations' purported benefit;

    b.   The monies removed from Native Nations' Trust accounts for expenditure on the Boarding School Program and associated policies, including detail regarding the retention by the United States and/or subsequent disbursement of such funds for the Native Nations' purported benefit;

    c.   The manner in which such monies from Native Nations' Trust accounts were pooled;

    d.   The performance as a result of investment by the United States of any funds held in trust by the federal government for the purpose of Native children's education;

    e.   The value of land ceded in exchange for the United States' promises to Native Nations related to education;

    f.   The "Treaty-stipulated support" spent to support the Program;[185]

    g.   The value, including any monies, generated by "Indian child labor both for institution operations and through the Outing System to non-Indian families,"[186]

    h.   The economic harm caused by the Boarding School Program; and

    i.   The remainder of Native Nations' funds and assets that have been taken by the United States and allocated for the education of Native Nations' children.

---

[185] Vol. II, at 51.
[186] Vol. II, at 55.

209.    An accounting is required.

## VIII.    <u>REQUEST FOR RELIEF</u>

**WHEREFORE,** Plaintiffs, individually and on behalf of the other Class members, respectfully request that this Court:

A.    Declare that this action is a proper class action, certify the Class as requested, designate Plaintiffs as Class Representatives, and appoint Plaintiffs' counsel as Class Counsel;

B.    Order the Defendants to:

1.    Conduct a full accounting of Native Nations' funds used in connection with the Federal Indian Boarding School Program, including, at minimum, a detailed itemization of:

   a.    The $23.3 billion the United States estimates were appropriated for the Boarding School Program and associated policies, including how such funds were ultimately disbursed;

   b.    The monies removed from Native Nations' Trust accounts for expenditure on the Boarding School Program and associated policies, including detail regarding the retention and/or disbursement of such funds;

   c.    The manner in which such monies from Native Nations' Trust accounts were pooled;

   d.    The performance as a result of investment by the United States of any funds held in trust by the federal government for the purpose of Native children's education;

   e.    The value of land ceded in exchange for promises related to education;

   f.    The "Treaty-stipulated support" spent to support the Program;[187]

---

[187] Vol. II, at 51.

  g. The value, including any monies, generated by "Indian child labor both for institution operations and through the Outing System to non-Indian families;"[188]

  h. The economic harm caused by the Boarding School Program; and

  i. The remainder of Native Nations' funds and assets that have been taken by the United States and allocated for the education of Native Nations' children;

2. Publish and preserve all documents related to the Boarding School Program on an openly accessible electronic database; and

3. Preserve all documents it used to prepare the Boarding Schools Investigative Report, and any other relevant documentation, until a full accounting is provided and authenticated.

C. Award Plaintiffs reasonable attorneys' fees and reimbursement of their litigation costs; and

D. Order such other and further relief as the Court may find just and proper.

---

[188] Vol. II, at 55.

Dated: May 22, 2025

/s/ *Larry Bendesky*
Larry Bendesky
Jeffrey P. Goodman*
**SALTZ MONGELUZZI BENDESKY PC**
1650 Market Street, 52nd Floor
Philadelphia, Pennsylvania 19103
Telephone: 215-496-8282
jgoodman@smbb.com

Richard Fields*
Martin Cunniff*
**FIELDS HAN CUNNIFF PLLC**
1701 Pennsylvania Avenue NW,
Suite 200
Washington, DC 20006
Telephone: 833-382-9816
fields@fhcfirm.com
martincunniff@fhcfirm.com

Austin R. Vance*
**ALL RISE! PLLC**
1000 West Wilshire Blvd., Ste. 362
Oklahoma City, Oklahoma 73116
Telephone: 405-698-0131
Austin@AllRise.Law

\**pro hac vice* motions to be filed

Respectfully submitted,

Adam J. Levitt*
Daniel R. Schwartz*
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com
dschwartz@dicellolevitt.com

Faith E. Gay*
Matthew Nussbaum*
Jacob Maiman-Stadtmauer*
**SELENDY GAY PLLC**
1290 Avenue of the Americas
New York, New York 10104
Telephone: 202-390-9001
fgay@selendygay.com
mnussbaum@selendygay.com
jmaimanstadtmauer@selendygay.com

***Counsel for Plaintiffs and the Putative Class***