

# Federal Indian Boarding School Initiative Investigative Report
# Vol. II

**July 2024**

**Assistant Secretary for Indian Affairs
Bryan Newland**



# Table of Contents

1.   **Federal Indian Boarding School Initiative**

2.   **Executive Summary**

3.   **Recommendations of the Assistant Secretary for Indian Affairs**

4.   **Data Collection Process and Review of Relevant Information**

5.   **Federal Indian Boarding School List Updates**

6.   **List of Other Institutions**

7.   **Indian Child Names and Tribal Identities**

8.   **Marked and Unmarked Burial Sites**

9.   **Indian Treaties Involving the Federal Indian Boarding School System and Indian Education**

10.   **The Role of Religious Institutions and Organizations in the Federal Indian Boarding School System**

11.   **U.S. Government Support for the Federal Indian Boarding School System**

12.   **Preventing Indian Child Removal: The Indian Child Welfare Act**

13.   **Indigenous Child Removal: Canada, New Zealand, Australia**

**14.    The Road to Healing and Oral History Project**

**15.    List of Information Resources**

**16.    Federal Indian Boarding School Initiative Findings and Conclusions**

**17.    Recommendations of the Assistant Secretary for Indian Affairs**



# United States Department of the Interior

### OFFICE OF THE SECRETARY
Washington, DC 20240

July 17, 2024

The Honorable Deb Haaland
Secretary
U.S. Department of the Interior
Washington, D.C. 20240

Dear Madam Secretary:

On December 28, 1890, the U.S. military entered Third Mesa of Hopi and took 104 children from their families so they could be sent to the Keams Canyon Boarding School.  Four years later, on November 25, 1894, two U.S. cavalry companies with rapid-fire artillery guns arrived again at Third Mesa to arrest 19 Hopi leaders as prisoners of war after they refused to send additional Hopi children to the school: Heevi'ima, Polingyawma, Masatiwa, Qotsventiwa, Piphongva, Lomahongewma, Lomayestiwa, Yukiwma, Tuvehoyiwma, Patupha, Qotsyawma, Sikyakeptiwa, Talagayniwa, Talasyawma, Nasingayniwa, Lomayawma, Tawalestiwa, Aqawsi, and Qoiwiso.

The U.S. Government sent those leaders to Alcatraz Island, a former U.S. military installation, where they were held captive until September 1895 — isolated next to the frigid waters of San Francisco Bay more than 1,000 miles from their families, their Tribe, and their Hopi homelands.

More than a century later, on June 22, 2023, I visited Alcatraz Island to learn about the important role it played in our nation's relationship with Indigenous Peoples.  During my visit, I looked down into the underground military prison cell where the United States held those 19 Hopi government and religious leaders for refusing to send Hopi children to boarding school.

As I stood there, I imagined their lives, their hopes for the children in their villages, and their experience with the U.S. Government.  I also reflected on our work together to tell the truth about our nation's history of operating Federal Indian boarding schools.  I thought of the hundreds of people we have met in communities across the country, who came to share their experiences, and their relatives' experiences, at Federal Indian boarding schools – many, for the first time.

For the first time in the history of the country, the U.S. Government is accounting for its role in operating Indian boarding schools to forcibly assimilate Indian children, and working to set us on a path to heal from the wounds inflicted by those schools.

You launched the Federal Indian Boarding School Initiative in June 2021 which, among other things, called for the Department of the Interior (Department), to produce the first official U.S. Government investigation into the Federal Indian boarding school system.

The Department released the first volume of its Investigative Report on Federal Indian boarding schools on May 11, 2022.  That report included the first official list of Federal Indian boarding schools across the United States.  It explained the policy justification for establishing those institutions, the conditions children experienced at those schools, and the intergenerational impacts

those schools had on Indigenous Peoples throughout the United States. That first volume also indicated that the Department would complete a second written report to more fully explain the cost, scope, and nature of the Federal Indian boarding school system.

Accordingly, I am submitting to you Volume II of the Federal Indian Boarding School Initiative Investigative Report. This second volume adds to our understanding of the Federal Indian boarding school system by:

- Updating the official list of Federal Indian boarding schools to include 417 institutions across 37 states or then-territories;
- Providing detailed profiles of each Federal Indian boarding school;
- Identifying 1,025 other institutions that did not satisfy the four criteria used for this investigation, but were nevertheless used to advance similar assimilation and education policy goals;
- Confirming that at least 973 American Indian, Alaska Native, and Native Hawaiian children died while attending Federal Indian boarding schools;
- Confirming that there are at least 74 marked and unmarked burial sites at 65 different school sites;
- Listing 127 different Treaties between the United States and Indian Tribes that implicate the Federal Indian boarding school system; and,
- Reporting that the Department estimates that the U.S. Government made appropriations available of more than $23.3 billion in FY23 inflation-adjusted dollars between 1871 and 1969 for the Federal Indian boarding school system as well as other similar institutions and associated assimilation policies.

In the process of publishing these two volumes, the Department's staff and contractors reviewed approximately 103 million pages of U.S. Government records. We also participated in listening sessions with hundreds of Indian boarding school survivors at 12 locations across the United States. The reflections and words of some of those individuals are included in this volume. We have also met with government officials and Indigenous leaders in some of our peer nations to understand their process of healing from the legacy of similar assimilationist boarding schools and institutions.

We have witnessed a change in our nation's understanding of these schools in a short period of time. Survivors and leaders have begun efforts to explain the legacy and impacts of Indian boarding schools on local communities across Indian country. Universities and other institutions have begun their own actions to  redress for their role in the Federal Indian boarding school system. Popular books, television shows, and films have discussed these institutions, and humanized this history for wide audiences. Courts and members of Congress have engaged in a dialogue on the policies and laws advanced by this system.

It is important to acknowledge the work of the U.S. Government team members and contractors who carried out the research for this Initiative. They reviewed heart-wrenching documents, listened to survivors, and got to know the people affected by Federal Indian boarding schools. Their work was heavy, and it took a toll on them. Nevertheless, they remained dedicated to completing this work to bring truth and healing to people and communities across our nation who have been seeking it for generations. I will forever be grateful for their commitment, effort, and sacrifice.

Madam Secretary, it is my hope that this report does not mark the end of the U.S. Government's work to acknowledge, understand, and heal from the impacts of these boarding schools. Instead, our shared work should mark the beginning of a long effort to heal our nation – after all, these schools were used to pursue a policy of forced assimilation over a century and a half. Our work has occurred over just three years.

This volume includes eight additional recommendations that chart a road to healing. We recommend that our nation develop concrete actions to fulfill these recommendations, as some of our peer countries have done in similar circumstances. These actions should be rooted in what we have learned and set forth in this report, as well as in consultation with Indian Tribes and the people impacted by these schools. Our research and reporting can aid a national truth and healing commission, academic researchers, Tribal leaders, members of Congress, and policymakers in seeking a more detailed understanding of the present-day impacts of these institutions, and in developing specific remedies.

The most important thing is that our work to tell the truth about the Federal Indian boarding school system be paired with action.

As we have learned over the past three years, these institutions are not just part of our past. Their legacy reaches us today, and is reflected in the wounds people continue to experience in communities across the United States. We should honor the spirit of the Hopi leaders imprisoned at Alcatraz, as well as the people from across Indian country who have shared their families' stories with us, by working to heal those wounds.

I want to thank you, Secretary Haaland, for your leadership and courage in speaking the truth about our past, and the imperative to heal from it.

Sincerely,

Bryan Newland
Assistant Secretary – Indian Affairs



[1]

---

[1] Hopi prisoners of the U.S. Government sent to Alcatraz Island for "seditious conduct" [Photograph]. (1895). National Park Service (attributing photograph to Mennonite Library and Archives, Bethel College, North Newton, Kansas).

**The Federal government had darker designs.  By the late 1870s, its goals turned toward destroying tribal identity and assimilating Indians into broader society.  Achieving those goals, officials reasoned, required the 'complete isolation of the Indian child from his savage antecedents.'**

**And because 'the warm reciprocal affection existing between parents and children' was 'among the strongest characteristics of the Indian nature,' officials set out to eliminate it by dissolving Indian families.**

**– *Haaland v. Brackeen*, 599 U.S. 255, 298 (2023) (Gorsuch, J., concurring) (internal citations omitted).**



2

★   ★   ★   ★   ★   ★

## 1.   Federal Indian Boarding School Initiative

On June 22, 2021, Secretary of the Interior, Deb Haaland, announced the Federal Indian Boarding School Initiative, a comprehensive effort to recognize the troubled legacy of Federal Indian boarding school policies with the goal of addressing their intergenerational impact and to shed light on the traumas of the past.

The Federal Indian Boarding School Initiative would have many facets, but the immediate direction was that the Department undertake the first U.S. Government investigation of the loss of human life and lasting consequences of the Federal Indian boarding school system.  For nearly two centuries, the U.S. Government was responsible for operating or overseeing Indian boarding schools across the United States and its territories.  Secretary Haaland determined that the Department was therefore uniquely positioned to assist in the effort to recover the histories of these institutions.

As described in Volume I, the United States has unique treaty and trust responsibilities to Indian Tribes, Alaska Native Villages, and the Native Hawaiian Community, including to protect Indian treaty rights and land and other assets.  To support these political and legal obligations, the Department protects and stores critical archival

---

2 Indian children from the Sheldon Jackson School [Photograph]. (between ca. 1900 and ca. 1930). Library of Congress Prints and Photographs Division Washington, D.C.

records and other information relating to Indian Affairs.  Important goals of the Federal Indian Boarding School Initiative include:

- Identifying Federal Indian boarding school facilities and sites;

- Identifying names and Tribal identities of Indian children who were placed in Federal Indian boarding schools;

- Identifying locations of marked and unmarked burial sites of remains of Indian children located at or near school facilities; and

- Incorporating viewpoints, including those of descendants, on the experiences in, and impacts of, the Federal Indian boarding school system.



The Department completed the Federal Indian Boarding School Initiative Investigative Report Volume I within the scope of its existing U.S. Government appropriations, which limited the scope of the Department's ability to carry out some of

[3] Choate, J. N. (1870-1879). *Group of Four Students at the Carlisle Indian School* [Photograph]. Photo ID: PO#19, Collection: Potamkin, Cumberland County Historical Society.

the research needed for this investigation.  The COVID-19 pandemic and resulting closures of U.S. Government facilities also warranted a continuation of the investigation.

Congress subsequently invested $7 million per fiscal year in dedicated support for the Federal Indian Boarding School Initiative, totaling $21 million as of January 1, 2024.

As part of the Federal Indian Boarding School Initiative and in response to recommendations from Assistant Secretary Newland in Vol. I, Secretary Haaland launched The Road to Healing.  This tour across the country provided survivors of the Federal Indian boarding school system the opportunity to share their experiences, help connect communities with trauma-informed support, and facilitate collection of an oral history. This volume includes anonymized statements from speakers at these sessions to highlight the perspective of those who were directly affected by Federal Indian boarding schools.

This report identifies potential policy and investment opportunities that will help to inform priorities and the Federal budget development process, but it is not a budget document and does not imply approval of any specific action or investment.  All activities and recommendations included in this report are subject to resource constraints and weighing of priorities as part of the annual budget formulation process, as well as the availability of appropriations provided by Congress.



---

[4] Photograph No. 519137; "Students in cadet uniforms in front of the buildings, Indian training school, Forest Grove, Oregon," 1882; Photographs of Indians, Indian Agencies, and Schools, 1876-1896; Records of the Bureau of Indian Affairs, Record Group 75; National Archives at College Park, College Park, MD.



## 2.    Executive Summary

"Conditions within Indian schools, particularly boarding schools, have done a great deal to bring about the causes of problem drinking and very little to prevent them."

– Kennedy Report, U.S. Senate, 1969.[5]



[6]

For this volume, the Department analyzed additional U.S. Government records to update the official list of Federal Indian boarding schools.  Congress appropriated funding to support the Department's efforts to compile information for the second volume of the Federal Indian Boarding School Initiative, and the National Endowment for the Humanities provided additional funding to support this work.  The National Native American Boarding School Healing Coalition, through a Memorandum of Understanding with the Department, was instrumental in the sharing of information and records pertinent to the U.S. Government's development of the list.[7]

---

[5] Committee on Labor and Public Welfare, Indian Education: A National Tragedy – A National Challenge, S. Rep. No. 91-501 at 19 (1969) [hereinafter Kennedy Report].

[6] Choate, J. N. (1879). Portrait of Group of Children [Photograph]. Scope and Contents: "Frank Cushing, Taylor Ealy, Mary Ealy, and Jenny Hammacker, All in School Uniform," Photo lot 81-12, John N. Choate photographs of Carlisle Indian School, National Anthropological Archives, Smithsonian Institution.

[7] Memorandum of Understanding Between the U.S. Department of the Interior and National Native American Boarding School Healing Coalition, Dec 7, 2021.

For Vol. I and Vol. II, the Department reviewed and considered all documents submitted to it regarding the Federal Indian Boarding School Initiative by American Indian, Alaska Native, and Native Hawaiian individuals, Indian Tribes, Alaska Native Villages, the Native Hawaiian Community, Indigenous organizations, and religious institutions and organizations.

The Department found that between 1819 and 1969, the Federal Indian boarding school system consisted of 417 Federal schools across 37 states or then-territories, including 22 schools in Alaska and 7 schools in Hawaiʻi. Some individual Federal Indian boarding schools comprised multiple sites. The 417 Federal Indian boarding schools accordingly comprised 451 specific sites. The list of the names and locations of these schools are included in this report at **Appendix A**. New profiles for each school are provided in **Appendix B**. School Sites by State are listed in **Appendix C**. Maps of each current state showing the schools are provided in **Appendix D**.

For a school to qualify as a Federal Indian boarding school, for the purpose of the U.S. Government investigation, the institution must meet four criteria, that the institution: (1) provided on-site housing or overnight lodging; (2) was described in records as providing formal academic or vocational training and instruction; (3) was described in records as receiving U.S. Government funds or other support; and (4) was operational before 1969. This is the definition of "Federal Indian boarding school" used in this report.

The Department examined U.S. Government records, and using this investigation's definition of a "Federal Indian boarding school," the number of schools increased from 408 (reported in Volume 1) to 417. The updates fall into one of five categories:

### Net Effect of List Changes

| Recategorization of Federal Indian boarding schools from Volume I to Volume II | Federal Indian Boarding School Initiative Report Volume II |
|---|---|
| **Category 1**: Schools that were identified as Other Institutions in Volume I of Federal Indian Boarding School Initiative (BSI) reporting, but additional research/documentation for Volume II now meet all four criteria for official Federal Indian boarding school classification. | **+6 schools**<br>1. St. Pius X Mission Home; Skagway, Alaska<br>2. Dwight Mission School; Oklahoma<br>3. Wills Town Mission School; Fort Payne, Alabama<br>4. Flathead Agency Boarding and Day School; Old Agency, Montana<br>5. New Hope Academy; Fort Coffee, Oklahoma<br>6. St. Francis Regis Mission School; Ward, Washington |
| **Category 2**: New schools that were not previously identified in Volume I of BSI reporting, but with the documentation located during Volume II research, meet | **+5 schools**<br>1. Choctaw and Chickasaw Sanatorium School; Talihina, Oklahoma |

| | |
|---|---|
| all four criteria for Federal Indian boarding school classification. | **2.** Methvin Institute; Anadarko, Oklahoma<br>**3.** Lone Wolf Boarding School; Lone Wolf, Oklahoma<br>**4.** Washita Boarding School; Washita, Oklahoma<br>**5.** Stickney Home Mission School for Indians; Washington |
| **Category 3**: Merging of Federal Indian boarding schools – two schools that were identified during Volume I reporting that were determined during Volume II research to be the same school. | <u>-1 school</u><br><br>**1.** St. Rose/St. Francis Xavier School and Holy Child Academy; Avoca, Minnesota |
| **Category 4**: Separating Federal Indian boarding schools – two sites that have a significant enough change to be considered their own Federal Indian boarding school. If a school changed any two of the three data elements of location, name, or operator, they are considered a new Federal Indian boarding school. | <u>+1 school</u><br><br>**1.** Forest Grove Indian Training School separated from Chemawa Indian Training School; Oregon |
| **Category 5**: Federal Indian boarding school in Volume I of BSI reporting that upon further research was determined to be an Other Institution. | <u>-2 schools</u><br><br>**1.** Shawnee Boarding School: was related to the Absentee Shawnee Boarding School. BSI researchers also updated the school's name on the "Other Institutions" list to Shawnee Mission Quaker School, as additional research shows it was an Indian day school; Shawnee, OK<br>**2.** Puyallup Indian School: Additional research shows it was an Indian day school. When the school moved to the Puyallup reservation and was eventually renamed Cushman Indian School, it did have a boarding component. Cushman Indian School is a separate school on the "Federal Indian Boarding School" list; Squaxin Island, Washington. |

The Department acknowledges that some institutions classified as Federal Indian boarding schools continue to operate but without historical assimilationist intention or practices, including boarding schools now operated or funded by the Bureau of Indian Education. Instead, the Bureau of Indian Education is critical to providing high-quality educational opportunities from early childhood through life, accounting for the mental, physical, religious, and cultural aspects of learners from Indian Country.

And as described in Vol. I, so "her own people"[8] could once again thrive, Princess Bernice Pauahi Bishop, the last direct descendant of King Kamehameha I, in 1883 left her estate in "trust for a school dedicated to the education and upbringing of Native Hawaiians" on the Hawaiian monarchy's ancestral lands.[9] Kamehameha Schools are critical to

---

[8] Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate, 470 F.3d 827, 831 (9th Cir. 2006) (en banc) (citing Charles R. Bishop, The Purpose of the Schools, at 3 (1889)).
[9] Id.

providing quality education opportunities from early childhood through life, accounting for the mental, physical, religious, and cultural aspects of learners from the Native Hawaiian Community.

A graph of overall Capacity, Enrollment, and Attendance for the Federal Indian boarding school system is provided in **Appendix E**.

The Department is also releasing a List of Other Institutions based on available U.S. Government records. There were 1,025 of these institutions, listed in **Appendix F**, that did not meet the four criteria used for this investigation that may have involved education of Indian people, mainly Indian children. The List of Other Institutions includes Indian boarding schools operated by religious institutions and organizations that did not receive U.S. Government support.

The Department was able to identify, by name, 18,624 Indian children who entered the Federal Indian boarding school system. This number does not represent a comprehensive list of all children who attended Federal Indian boarding schools, but rather reflects the number of students the Department was able to identify since the beginning of this Initiative. This number does not include children who: attended a Federal Indian boarding school outside the period 1819-1969, may be listed as an attendee on records not available to the Department including those of religious institutions and organizations, or may be listed as an attendee of an Other Institution including Indian day schools, sanitariums, asylums, orphanages, stand-alone dormitories, and Indian boarding schools operated by religious institutions and organizations that received no U.S. Government support. Recognizing that some records are no longer available, the Department notes that there may be missing information for certain Indian children who attended a school in the Federal Indian boarding school system. The Department acknowledges that the actual number of children who entered Indian boarding schools is greater.

After removal and confinement from their Indian Tribes and families to Indian boarding schools, many children did not return home. Based on available records, the Department concludes at least 973 documented Indian child deaths occurred across the Federal Indian boarding school system between 1819 and 1969. For this investigation, an identified deceased student means "any student enrolled at a Federal Indian Boarding School who may have died during a period of enrollment at a school between 1819 and 1969." This information is not complete and does not count children who died and who: attended a Federal Indian boarding school outside the period 1819-1969, may be listed as an attendee on records not available to the Department including those of religious institutions and organizations, or may be listed as an attendee of an Other Institution including Indian day schools, sanitariums, asylums, orphanages, stand-alone dormitories, and Indian boarding schools operated by religious institutions and organizations that

received no U.S. Government support.  The Department acknowledges that the actual number of children who died while in Indian boarding schools is greater.

**Appendix G** provides a list of Tribal identities.  Data collected represents the Tribal identities identified at Federal Indian boarding schools.  The number of Federal Indian boarding schools is unique to each line of data.  Individual Tribal identities will not add up to totals as schools can contain multiple Tribal identities.  **Appendix H** provides a Graph of Deceased Indian Children by Year.  **Appendix I** provides a List of Deceased Indian Children by Indian Tribe.

The Department's continued investigation has now identified 74 marked or unmarked burial sites at 65 different schools across the Federal Indian boarding school system based on available records.  The composition of the approximate numbers of identified burial sites to date is as follows:

- Marked burial sites – 53

- Unmarked burial sites – 21

This information is not complete and does not include burial sites that may be: associated with Federal Indian boarding schools operational outside the period 1819-1969, listed on records not available to the Department including those of religious institutions and organizations, or associated with Other Institutions including Indian day schools, sanitariums, asylums, orphanages, stand-alone dormitories, and Indian boarding schools operated by religious institutions and organizations that received no U.S. Government support.  The Department acknowledges that the actual number of burial sites associated with Indian boarding schools is likely far greater.

The Department will not make public the specific locations of burial sites associated with the Federal Indian boarding school system, in order to protect against well-documented grave-robbing, vandalism, and other disturbances to Indian burial sites.[10]

The Department is working with Indian Tribes that wish to repatriate or protect in place any human remains or funerary objects from historical Indian boarding school sites that are currently located on U.S. Government lands consistent with specific Tribal practices, as applicable, and under the Native American Graves Protection and Repatriation Act (NAGPRA) and Archaeological Resources Protection Act (ARPA) processes.  This may include the decision to keep the human remains or funerary objects in the current location but to maintain or change the headstone or to enhance protection of the burial site.

The Department supports the Office of Army Cemeteries (OAC), United States Army, collaborating with Indian Tribes, Alaska Native Villages, and descendants regarding human child remains buried at the Carlisle Barracks Main Post Cemetery

---

[10] *See, e.g.,* 43 C.F.R. §§ 7.18, 10.3 (2023).

consistent with specific Tribal practices for disinterment, continued safeguarding of child remains at the cemetery, or headstone modification.

Under the U.S. Constitution, treaties are part of the "supreme law of the land." The U.S. Government ratified approximately 374 treaties with Indian Tribes. The Department identified and lists in this volume 127 Indian Treaties that explicitly include Federal Indian boarding schools or general Indian education provisions, provided in **Appendix J**.

**Appendix K** provides a List of Federal Indian Policies associated with the Federal Indian boarding school system. The Department acknowledges that this list is not comprehensive.

The United States laid the groundwork for a general and publicly supported Indian education system when Congress enacted the Civilization Fund Act in 1819.[11] The purpose of the Act was "providing against the further decline and final extinction of the Indian tribes, adjoining the frontier settlements of the United States, and for introducing among them the habits and arts of civilization."[12] To carry the Act's provisions into effect, Congress appropriated an annual sum of $10,000 and further required an annual report of the proceedings adopted to execute the Act.[13] The funds annually appropriated under the Act were often apportioned to various religious institutions and organizations until Congress discontinued providing the annual appropriation in 1873.[14] This volume includes estimates of U.S. Government appropriations enacted to support assimilationist policies through the Federal Indian boarding school system, similar institutions, and related programs.

---

[11] Act of March 3, 1819, Ch. 85, 3 Stat. 516, codified at 25 U.S.C. § 271 (2020).
[12] Act of March 3, 1819, Ch. 85, 3 Stat. 516.
[13] Act of March 3, 1819, Ch. 85, 3 Stat. 516.
[14] Act of Feb. 14, 1873, c. 138, 17 Stat. 437, 461.

In this report, the Department estimates that the U.S. Government made appropriations available of more than $23.3 billion in FY23 inflation-adjusted dollars between 1871 and 1969 for the Federal Indian boarding school system as well as other similar institutions and associated assimilation policies.

Due to time and resource constraints, we did not research actual amounts spent on Federal Indian boarding schools and similar institutions. Further research on actual expenditures would help to further illuminate the extent of U.S. Government resources committed to this policy.

In some instances, Congress made lump-sum appropriations that included multiple categories of appropriations. In these cases, it is not possible to quantify how much of a general appropriation is attributable to Federal Indian boarding schools, other similar institutions, and related assimilation policies or programs. So as not to exclude relevant appropriations, the Department has included the full amount of these lump-sum appropriations in the overall estimate. Further details on the appropriations included in the Department's estimate are available in section 11 and **Appendix M** of this report.

Acknowledging these limitations and the uncertainty inherent in any estimate of U.S. Government appropriations for the purposes of this report, this report relies on $23.3 billion as the estimated U.S. Government appropriations available for the Federal Indian boarding school system, as well as other similar institutions and associated assimilation policies.

This amount excludes the following: Treaty-stipulated support, religious institution and organization support, U.S. military support, state support, wealth generated by Indian or Native Hawaiian children while in the system including for the agriculture and railroad industries, Indian domestic and other labor for non-Indian families and communities through the Outing System, and expenditures by non-federal entities.

Further, the Department did not analyze appropriations beyond the Federal Indian boarding school system. That is, a separate financial analysis is needed for appropriations associated with Federal Indian boarding schools operational outside the period 1871-1969 or associated with Other Institutions including Indian day schools, sanitariums, asylums, orphanages, stand-alone dormitories, and Indian boarding schools operated by religious institutions and organizations that received no U.S. Government support in order to create a complete picture of the resources that supported these policies.

The total amount appropriated by year is based on available U.S. Government records and information.

The U.S. Government and Department maintained relationships with religious institutions and organizations for the Federal Indian boarding school system. Indian reservations "were distributed among the major religious denominations, which, in an unprecedented delegation of power by the U.S. Government to church bodies, were given the right to nominate new agents, and direct educational and other activities on the reservations."[15] U.S. Government records indicate that, in addition to the U.S. Army assigning officers to duty as superintendents of Indian affairs and Indian agents under the direction of the Indian Office, the Executive Branch accepted official recommendations by religious institutions and organizations for presidential appointed posts in states and territories.[16]

The Department has described the public-private relationship as follows:

> [T]he [Indian] agencies were, so to speak, apportioned among the prominent denominational associations of the country, or the missionary societies representing such denominational views; … to make nominations to the position of agent … and in and through this extra-official relationship to assume charge of the intellectual and moral education of the Indians thus brought within the reach of their influence.[17]

The U.S. Senate has confirmed, that the U.S. "military was frequently called in to reinforce the missionaries' orders."[18]

The Department concludes that at least 59 religious institutions and organizations received U.S. Government support to operate or support schools in the Federal Indian boarding school system. Accordingly, 210 of 417 Federal Indian boarding schools were operated by a religious institution or organization. This number does not include Indian boarding schools operated by religious institutions and organizations that did not receive U.S. Government support. This volume lists the religious institutions and organizations that the U.S. Government provided support to, available in **Appendix L**.

Given U.S. Government and religious institution and organization operation for nearly two centuries, "children of the first attendees of [Federal Indian] boarding schools

---

[15] Committee on Labor and Public Welfare, Indian Education: A National Tragedy – A National Challenge, S. Rep. No. 91-501 at 147 (1969) (citing ALVIN M. JOSEPHY, JR., THE INDIAN HERITAGE AMERICA, 339 (1968)) [hereinafter Kennedy Report].
[16] Annual Report to the Secretary of the Interior (1872), at 72, Commissioner of Indian Affairs, [hereinafter ARCIA for [year]].
[17] ARCIA for 1872, at 72.
[18] Kennedy Report, at 147.

went on to attend, as did their grandchildren, and great grandchildren leading to an intergenerational pattern of cultural and familial disruption."[19]



[20]

As U.S. policy of Indian assimilation over time disfavored use of the Federal Indian boarding school system, the U.S. Government supported a new system: the removal of Indian children from their families for non-essential state foster care and adoption by non-Indian families. In 1978, the U.S. determined that the "wholesale separation of Indian children from their families is perhaps the most tragic and destructive aspect of American Indian life today."[21] Congress responded by enacting the Indian Child Welfare Act of 1978 (ICWA).[22] The enactment of ICWA marked the United States' official repudiation of forced assimilation through child removal as national Indian policy. On June 15, 2023, in a 7-2 decision, the U.S. Supreme Court upheld the 45-year-old U.S. Government law in *Haaland v. Brackeen* against constitutional challenge, with an opinion authored by Justice Barrett.[23]

---

[19] Ursula Running Bear et al., The Impact of Individual and Parental American Indian Boarding School Attendance on Chronic Physical Health of Northern Plains Tribes, 42 Fam. Community Health 1 (2019).
[20] Photograph No. 0143; "T.B. skin Tests for students at the Intermountain School," ca. 1960; Records of the Indian Health Service, Record Group 513; National Archives at College Park, College Park, MD.
[21] U.S. House of Representatives, Committee on Interior and Insular Affairs, Establishing Standards for the Placement of Indian Children in Foster or Adoptive Homes, to Prevent the Breakup of Indian Families, H.R. REP. NO. 95-1386, 9 (1978); Margaret D. Jacobs, A Generation Removed: The Fostering and Adoption of Indigenous Children in the Postwar World 143-46 (2014).
[22] Indian Child Welfare Act of 1978, P.L. 95-608, Nov. 8,1978; 25 U.S.C. §§ 1901-1963.
[23] Haaland v. Brackeen, 599 U.S. 255 (2023).

During oral arguments, Justices Alito, Sotomayor, and Gorsuch addressed, mentioned, or responded to historical Federal Indian boarding school system points in questioning.[24]  Justice Gorsuch cited the Federal Indian Boarding School Initiative Investigative Report Vol. I in his concurrence.

Detailed further below, the U.S. established and supported the precedent for Indigenous child removal as part of formal relations with Indigenous Peoples, which Canada, Australia, and New Zealand replicated in their formal relations with Indigenous Peoples.  Canada, Australia, New Zealand, and the United States (CANZUS states) derive from the British Empire and maintain English common law systems.  The four countries are distinct because they have political and legal relationships with Indigenous Peoples based on founding national documents, centuries-old judicial decisions, and legislative and executive actions and instruments—unlike other countries that base official interactions with Indigenous Peoples on human rights, or non-binding principles.

This volume references the official actions of Canada, Australia, and New Zealand to redress First Nations, Inuits, Métis, Aboriginal and Torres Strait Islanders, and Māori Tribes for state removal of Indigenous children to enter boarding schools and contemporary redress.  It also describes the laws that Canada, Australia, and New Zealand enacted after the U.S. enacted ICWA to prevent official and widescale removal of Indigenous children through state and private adoption practices.

The List of Information Resources, in **Appendix N**, provides a collection of sources of information related to the Federal Indian boarding school system.



25

---

[24] Haaland v. Brackeen, Docket Number 21-376, Transcript (2022).
[25] Photograph No. 290019486; "Students at a Train Station"; Photographs of Navajo Life in the Southwestern Region of the United States, 1936-1956; Records of the Bureau of Indian Affairs, Record Group 75; National Archives at College Park, College Park, MD.



## 3.    Recommendations of the Assistant Secretary for Indian Affairs

The Department's investigative findings based on available U.S. Government records detail the U.S. Government role in the Federal Indian boarding school system and subsequent outcomes.  The United States has an obligation to correct and heal the wrongs wrought by the Federal Indian boarding school system because those wrongs continue to harm Indian Tribes, Alaska Native Villages, and the Native Hawaiian Community.  Based on the political and legal status and rights of Indian Tribes, Alaska Native Villages, and the Native Hawaiian Community flowing from the Constitution, treaties, Supreme Court jurisprudence, statutes, and executive actions, Assistant Secretary for Indian Affairs Newland provides **eight** recommendations as part of Volume II for meaningful actions that the U.S. Government may undertake to correct and heal those wrongs.

1. **Acknowledge, Apologize, Repudiate, and Affirm.**  The U.S. Government should issue a formal acknowledgment of its role in adopting a national policy of forced assimilation of Indian children, and carrying out this policy through the removal and confinement of Indian children from their families and Indian Tribes and the Native Hawaiian Community and placement in the Federal Indian boarding school system.  Such an acknowledgment should include a recognition that the United States operated or supported public-private partnerships with religious institutions and organizations to carry out its policy; that many Indian children suffered physical, sexual, and emotional abuse at these institutions, and that many Indian children died; and that these harms continue to impact American Indian and Alaska Native individuals and Indian Country.  The United States should accompany this acknowledgment with a formal apology to the individuals, families, and Indian Tribes that were harmed by U.S. policy.  In addition, the United States could formally repudiate forced assimilation of American Indian, Alaska Native, and Native Hawaiian people as a national policy, and affirm that it is the policy of the United States to ensure that American Indian, Alaska Native, and Native Hawaiian people have the right to maintain their unique cultural identities and languages.  Such a statement should be issued through appropriate means and officials to demonstrate that it is made on behalf of the people of the United States and be accompanied by bold and actionable policies.

2. **Invest in Remedies to the Present-Day Impacts of the Federal Indian Boarding School System.**  The United States could invest in healing Indian Tribes, the Native Hawaiian Community, and American Indian, Alaska Native, and Native Hawaiian individuals from the legacy impacts of forced assimilation on a scale that is, at a minimum, commensurate with the investments made in the Federal Indian boarding school system between 1871 and 1969.  This investment should be in addition to

annual appropriations to fund agency programs to fulfill the U.S. Government's trust and treaty obligations, and consistent with the full scope of its authority to act on behalf of Indians under various articles and clauses of the Constitution. The funding should be designed to remedy the present-day harms caused by historical Federal Indian boarding schools and policies of forced assimilation. These investments should also be designed to reach American Indian, Alaska Native, and Native Hawaiian individuals in urban communities. Funding to remedy the harms flowing from assimilationist policies and institutions should consider that Federal Indian boarding schools received funding and investments above and beyond annual appropriations from Congress.

Consideration for this investment should be applied to all of these recommendations, and include **five** interdependent areas of focus:

a. ***Individual and Community Healing.*** Provide funding and support for culturally based, community-driven healing efforts in Indian Country, urban Indian communities, and the Native Hawaiian Community. This support should be aimed at addressing the effects of Adverse Childhood Experiences (ACEs), traumatic stress, and intergenerational trauma. In distributing these funds, U.S. Government agencies should be flexible when it comes to access and use of the funds, including allowing tribal governments and other organizations to coordinate and consolidate funds from a range of federal programs to provide services. The U.S. Government should, support holistic and innovative approaches, including those rooted in connections to homelands and culture, and make these funds available to Indian Tribes, as well as organizations based in American Indian, Alaska Native, and Native Hawaiian communities, including in urban areas. It is also important to develop infrastructure to support this work, including facilities to provide specialized patient services for the treatment of historical and intergenerational trauma caused by the Federal Indian boarding school system and other institutions.

b. ***Family Preservation and Reunification.*** The U.S. Government should continue efforts to preserve, protect, and reunify American Indian and Alaska Native families. This funding would enable Indian Tribes to provide prevention and intervention services based in culture and tradition to families in need. The U.S. Government should support Tribal government agencies and courts in their actions to exercise jurisdiction over Indian child welfare cases, including ensuring that Tribal governments can directly administer child welfare programs, and to support the reunification of families. In addition, the U.S. Government should develop a national strategy for Native children and families, with a defined goal of measurably reducing the number

of American Indian, Alaska Native, and Native Hawaiian children in foster care, and supporting Tribes' long-term goals to preserve families and communities though self-determination and self-governance.

c. **_Violence Prevention._**  The United States has trust obligations to protect Indian Tribes, the Native Hawaiian Community, and American Indian, Alaska Native, and Native Hawaiian individuals.[26]  Having safe communities and safe family home environments are crucial for positive life outcomes. The U.S. Government should place a priority on prevention and healing from historical and current violence across Indian Country.

Indian Tribes are hampered in their efforts to engage in violence prevention by patchwork jurisdiction over public safety within their borders that limits Tribal governmental powers, as well as the lack of funding to carry out this important work.  With some exceptions, Indian Tribes have lacked the ability to exercise criminal jurisdiction over non-Indians on their lands.

There have been several recent reports commissioned by the U.S. Government to examine and combat violence in Indian Country, and many of the recommendations included in those reports have not yet been fulfilled.[27]  The U.S. Government should implement many of those recommendations and continue to work to strengthen the ability of Tribes to exercise jurisdiction to directly prevent, investigate, and prosecute violent crimes within Indian country, including violent crimes committed by non-Indians on Indian lands.[28]  The U.S. Government should also invest in violence prevention programs for Indian Tribes, the Native Hawaiian Community, and urban Indian communities; and, invest in tribal justice systems and victim services.

In addition to carrying out recommendations made in federally commissioned reports, the U.S. Government should develop a strategy to

---

[26] Cf. U.S. v. Jicarilla Apache Nation, 564 U.S. 162, 175 (2011) (describing "that the Government 'has a real and direct interest' in the guardianship it exercises over the Indian tribes; 'the interest is one which is vested in it as a sovereign.'  United States v. Minnesota, 270 U.S. 181, 194 (1926). This is especially so because the Government has often structured the trust relationship to pursue its own policy goals.  Thus, while trust administration 'relat[es] to the welfare of the Indians, the maintenance of the limitations which Congress has prescribed as a part of its plan of distribution is distinctly an interest of the United States.' Heckman v. United States, 224 U. S. 413, 437 (1912)"); Oglala Sioux Tribe v. U.S., 674 F.Supp.3d 635 (2023).

[27] See, e.g., The Attorney General's Advisory Committee on American Indian/Alaska Native Children Exposed to Violence: Ending Violence So Children Can Thrive; The Way Forward Report of the Alyce Spotted Bear & Walter Soboleff Commission on Native Children; The Final Report to The President | Activities and Accomplishments of Operation Lady Justice; The Not One More: the Not Invisible Act Commission Final Report.

[28] See, e.g., 2013 and 2022 Reauthorizations of the Violence Against Women Act, recognizing the inherent authority of participating Tribes to exercise special domestic violence criminal jurisdiction over certain defendants, regardless of their Indian or non-Indian status, who commit certain covered crimes in Indian country; Tribal Law and Order Act.

measurably reduce the occurrence of Adverse Childhood Experiences (ACEs) for American Indian, Alaska Native, and Native Hawaiian children. In making these investments, the Federal Government should also ensure that Indian Tribes and Alaska Native Villages can exercise self-determination in the use of those funds, including pooling resources from various U.S. Government agencies, to carry-out this work.[29]

d. **_Redress Indian Education._**  The U.S. Government should better fulfill its Treaty and trust obligations, consistent with the full scope of its authority to act on behalf of Indians under various articles and clauses of the Constitution, by investing in high-quality elementary, secondary, and higher education for American Indian, Alaska Native, and Native Hawaiian individuals.  This investigation reveals the historical U.S. strategy to use education systems against Indian Tribes and the Native Hawaiian Community.  In response, the U.S. Government should adequately fund the Bureau of Indian Education and increase investments to Tribal and public school systems to support American Indian, Alaska Native, and Native Hawaiian students.  The U.S. Government should also consider ways to promote public higher education access by providing nationwide in-state tuition rates for American Indian, Alaska Native, and Native Hawaiian individuals at public colleges and universities receiving U.S. Government support.  U.S. Government education funding to Indian Tribes and the Native Hawaiian Community should be delivered with minimal agency administrative barriers and represent a correct response to education needs, including for modern infrastructure and water and sanitation systems.

e. **_Revitalization of First American Languages_**.  First American languages, those spoken by the Indigenous Peoples of the United States, are a vital aspect of identity, improve academic performance, are foundational to individual and group healing, and bolster socioeconomic resilience.  The Federal Indian boarding school system, and assimilationist policies, have severely damaged the ability of American Indian and Alaska Native individuals to use, develop, and transmit their languages, oral histories, and knowledge to current and future generations.

The U.S. Government should provide funding to repair that damage and affirm that Indian Tribes and the Native Hawaiian Community have the right to revitalize and use their languages.  This funding should support community-based efforts to preserve and revitalize Indian and Native

---

[29] U.S. Government action should be consistent with the commitments laid out in President Biden's Executive Order 14112, _Reforming Federal Funding and Support for Tribal Nations To Better Embrace Our Trust Responsibilities and Promote the Next Era of Tribal Self-Determination_.

Hawaiian languages.  These investments should be available to Indian Tribes, the Native Hawaiian Community, community organizations, schools, and universities in a way that supports language learning and usage by people at all ages and stages of development, and promote ownership of intellectual property by Indian Tribes, Alaska Native Villages, and the Native Hawaiian Community.

3. **Build a National Memorial.**  The U.S. Government should establish a national memorial to acknowledge and commemorate the experiences of Indian Tribes, individuals, and families within the Federal Indian boarding school system.  This memorial should be accessible to the American people, so it may also educate the nation about the existence and effects of these institutions and honor the loss of American Indian, Alaska Native, and Native Hawaiian children.

4. **Identify and Repatriate Children who Never Returned from Federal Indian Boarding Schools.**  The U.S. Government should assist individuals in locating the records of their family members who attended Federal Indian boarding schools.  Where children are known to have died and been buried at burial sites, the U.S. Government should assist individuals in locating the burial sites of their family members and supporting them, and Tribes, in any efforts to either protect those burial sites or repatriate their remains to their homelands.  Congress should amend the Recreation and Public Purposes Act[30] to facilitate the use of Bureau of Land Management (BLM) lands to allow for the reburial of remains and funerary objects of Indian children who died at Indian boarding schools repatriated pursuant to NAGPRA, or by other authority, and consistent with specific Tribal practices on BLM lands.  Many Indian Tribes do not have the land base to rebury human remains and funerary objects in many cases, cultural practices require repatriation to occur in a person's homelands, which are often found on lands managed by the U.S. Government today.

5. **Return Former Federal Indian Boarding School Sites.**  The Department should conduct reviews, upon request of Tribes, of property and title documents for former Indian boarding school sites, including land patents provided to religious institutions and organizations or states, including during territorial status.  When required by patent, deed, statute, or other law, including reversionary clause activation, the Department should work to facilitate the return of those Indian boarding school sites to U.S. Government or Tribal ownership.  This includes reversionary clauses under the Indian Appropriation act of September 21, 1922, 42 Stat. 994, 995 ("1922 Act") and Tribal-specific legislation.  Where former boarding school sites revert to U.S. Government ownership or remain in U.S. Government

---

[30] 43 U.S.C. 869 - 869-4.

ownership, the Department should engage with Indian Tribes in government-to-government consultation when asked, to address the ownership and management of those sites, including the protection of burial sites and cultural resources.

6. **Tell the Story of Federal Indian Boarding Schools.**  The U.S. Government should work with appropriate institutions to ensure that the American people learn about the role of Federal Indian boarding schools in the history of the United States.  This should include allowing people to share their firsthand accounts of their time at Federal Indian boarding schools.  Afterward, the U.S. Government should make information regarding Federal Indian boarding schools available to individuals, Indian Tribes, organizations, academic institutions, and government agencies.

7. **Invest in Further Research.**  The U.S. Government should make further investments in research regarding the present-day health and economic impacts of the Federal Indian Boarding School system, as well as policies of child removal, confinement, and forced assimilation.  This research should be designed to understand how these policies affected mental and physical health outcomes for individuals, families, and their descendants; and, how these policies affected individual, family, and tribal wealth, health, and well-being.

For biomedical and behavioral research, Congress should appropriate funds to the National Institutes of Health (NIH), in the Department of Health & Human Services, to support research grants, contracts, cooperative agreements, or other transactions to develop new and expand on existing scientific studies, including the Running Bear studies, examining the impact of the Federal Indian boarding school system on American Indian, Alaska Native, and Native Hawaiian physical, mental, and emotional health, parenting practices, and well-being at the individual, familial, and population levels.  This action should also include supporting studies in collaboration with Indian Tribes and the Native Hawaiian Community that test and advance culturally-relevant interventions that promote healing from intergenerational trauma at the individual, familial, and population levels.

8. **Advance International Relationships.**  The U.S. Government could strengthen engagement with other countries with their own histories of boarding schools or other assimilationist policies, including Canada, Australia, and New Zealand to exchange best practices for healing and redress between Federal governments and Indigenous governments for Indigenous child removal through boarding schools and predatory foster care and adoption practices.  To further this goal, the U.S. should expand capacity, including through the Department's Bureau of Indian Affairs (BIA), to support engagement on international Indigenous issues.  To strengthen the U.S. Government's expertise on Indigenous issues globally and

connections with other countries, the U.S. Government should establish an ambassador position focused on engagement on international Indigenous issues.



## 4.    Data Collection Process and Review of Relevant Information

Volume I of this report describes the overall data-collection process and review of relevant information.  Beginning in May 2022, the Bureau of Trust Funds Administration (BTFA) continued departmental research related to the Federal Indian boarding school system.  For Vol. II, BTFA continued to review U.S. Government record repositories.  BTFA completed the work at the American Indian Records Repository (AIRR) in Lenexa, Kansas, and expanded its research at National Archives and Records Administration (NARA) facilities.  BTFA conducted research at these nine NARA field locations:

1. Ft. Worth, TX
2. Seattle, WA
3. San Bruno, CA
4. Riverside, CA
5. Chicago, IL
6. Kansas City, KS
7. Atlanta, GA
8. Washington, DC
9. College Park, MD

The total analysis of U.S. Government records for the Federal Indian Boarding School Initiative included:

- **Vol. I:** Potentially responsive box list that included 39,385 boxes (98,462,500 sheets of paper).

- **Vol. II:** Reviewed 103,699 documents under AIRR control (4,098,612 sheets of paper).

  Reviewed 41,098 documents under NARA control (438,862 sheets of paper).

  Total Reviewed: 144,797 documents (4,537,474 sheets of paper).

For the Federal Indian Boarding School Initiative, BTFA implemented a five-step approach to the identification, collection, and research of these record repositories:

1) Identify potentially responsive collections or record series at each location. This record selection step included BTFA teams reviewing record indexes and discussions with the archivists at each location.

28

2) Review and digitize responsive documents. BTFA teams operated at each of the locations and scanned the documents for review outside of the physical location for key data elements.

3) Review electronic documents for relevant information. BTFA teams reviewed documents for student attendance information, student death information, burial site information, general school information (to the extent not gathered during research for Volume I), and religious and Tribal identity information for the school and individual.

4) Once the specific information was identified within a document, BTFA teams keyed the information into a tool created by BTFA to specifically store the school and student-level information.

5) BTFA teams then formatted the information gathered during the research into the School Profiles for this volume.

Data and research limitations exist given that the research is complex and involves seeking information about hundreds of Indian Tribes and schools spanning nearly two centuries. The data limitations for this phase of research are:

- **Record Locations**

  o BTFA collected documents from only U.S. Government resources described above.

  o BTFA did not digitize records from NARA facilities in totality. BTFA prioritized available documents based on the type of information they contained given the time and other resources available.

  o BTFA did not review potentially available records of other U.S. Government agencies, religious institutions and organizations, or other private record repositories.

- **Record Content**

  o Given the large time period to be reviewed, the records collected varied in consistency and content. Each state, region, and school could have different reporting requirements and those requirements changed over the length of time.

  o Record gaps are not uncommon, even within organized record series. Some schools burned down, for instance, and it is possible that some records were permanently destroyed as a result. In general, historical records are known to have gaps due to missing, destroyed, damaged, or inaccessible records.

29

- A portion of the NARA documents, especially pre-1900, are hand-written in cursive which can be very difficult to read both with the writing style and the ornate form of cursive writing common to early time periods. Handwritten student listings with dozens or hundreds of students are very time-consuming to review and, at the time of the report, some of these records were still being reviewed and entered. Because these lists are one of the key sources of student deaths, the collection of death information in these records is particularly time-consuming.

- Some documents, due to age or condition, are difficult to read in part or entirely. The time period of boarding school operations studied (1819 to 1969), involved innumerable authors with a wide variety of writing skills, resulting in differences in scope, interpretation, and thoroughness differences from year to year.

- **Combined Records**

  - It was not uncommon for the administrative agency to conduct business on behalf of a school or vice versa. It was not uncommon to have an Indian Tribe's name, an agency jurisdiction, and a boarding school all referenced with similar or the same names.

  - School hospitals were needed to serve the entire community due to lack of medical services being available generally, so names contained within these records were not always able to be determined as related to students versus community members.

- **Record Specificity**

  - Records may not breakdown data by specific schools but may indicate only the region or agency. Some information is at the boarding school program level and cannot be attributed to a specific school or student.

  - Some death information identifies a specific student, but other death information offers only numerical quantities of deaths (e.g., describing a single death with no name or a total number of deaths over a time period). In those instances, if both types of data are discussed, there is often no way to ascertain duplication between the two different types of data. Even when student death information is found in the documents collected, burial location information is less likely to be documented.

- **The Road to Healing Transcripts**

o The Department secured court reporters to transcribe the Secretarial visits on The Road to Healing. Limitations of the transcripts include lapses in transcription given inaudible feedback and the inability to spell or transmit the audio to English when a speaker used their Native language.



31

★ ★ ★ ★ ★ ★

## 5. Federal Indian Boarding School List Updates

With congressional appropriations totaling $14 million through fiscal year 2024 and additional National Endowment for the Humanities investment, the Department analyzed additional records under its control to update the official list of Federal Indian boarding schools.

The Department found that between 1819 and 1969, the Federal Indian boarding school system consisted of 417 U.S. Government schools across 37 states or then-territories, including 22 schools in Alaska and 7 schools in Hawai'i. Some individual Federal Indian boarding schools accounted for multiple sites. The 417 U.S. Government Indian boarding schools accordingly comprised 451 specific sites. The list of the names and locations of these schools are included in this report at **Appendix A**. New profiles for

---

[31] Johnston, F.B., School assembly in Hampton Institute, Hampton, Va. [Photograph]. (between 1899 and 1900). Frances Benjamin Johnston Collection, Library of Congress, Prints & Photographs Division, Reproduction Number: LC-USZ62-94863.

each school are provided in **Appendix B**. School Sites by State are listed in **Appendix C**. Maps of each current state showing the schools are provided in **Appendix D**.

For a school to qualify as a Federal Indian boarding school, for the purpose of the U.S. investigation, the institution must meet four criteria: that the institution (1) provided on-site housing or overnight lodging; (2) was described in records as providing formal academic or vocational training and instruction; (3) was described in records as receiving U.S. Government funds or other support; and (4) was in operation before 1969.

With appropriations to examine additional U.S. Government records, and using the definition of a "Federal Indian boarding school" for the purpose of this investigation, the number of schools increased from 408 schools listed in Volume I to 417. The updates fall into one of five categories:

### Net Effect of List Changes

| Recategorization of Federal Indian boarding schools from Volume I to Volume II | Federal Indian Boarding School Initiative Report Volume II |
|---|---|
| **Category 1**: Schools that were identified as Other Institutions in Volume I of Federal Indian Boarding School Initiative (BSI) reporting, but additional research/documentation for Volume II now meet all four criteria for official Federal Indian boarding school classification. | <u>+6 schools</u><br><br>1. St. Pius X Mission Home; Skagway, Alaska<br>2. Dwight Mission School; Oklahoma<br>3. Wills Town Mission School; Fort Payne, Alabama<br>4. Flathead Agency Boarding and Day School; Old Agency, Montana<br>5. New Hope Academy; Fort Coffee, Oklahoma<br>6. St. Francis Regis Mission School; Ward, Washington |
| **Category 2**: New schools that were not previously identified in Volume I of BSI reporting, but with the documentation located during Volume II research, meet all four criteria for Federal Indian boarding school classification. | <u>+5 schools</u><br><br>1. Choctaw and Chickasaw Sanatorium School; Talihina, Oklahoma<br>2. Methvin Institute; Anadarko, Oklahoma<br>3. Lone Wolf Boarding School; Lone Wolf, Oklahoma<br>4. Washita Boarding School; Washita, Oklahoma<br>5. Stickney Home Mission School for Indians; Washington |
| **Category 3**: Merging of Federal Indian boarding schools – two schools that were identified during Volume I reporting that were determined during Volume II research to be the same school. | <u>-1 school</u><br><br>1. St. Rose/St. Francis Xavier School and Holy Child Academy; Avoca, Minnesota |
| **Category 4**: Separating Federal Indian boarding schools – two sites that have a significant enough change to be considered their own Federal Indian boarding school. If a school changed any two of the three data elements of | <u>+1 school</u><br><br>1. Forest Grove Indian Training School separated from Chemawa Indian Training School; Oregon |

| | |
|---|---|
| location, name, or operator, they are considered a new Federal Indian boarding school. | |
| **Category 5**: Federal Indian boarding school in Volume I of BSI reporting that upon further research was determined to be an Other Institution. | **-2 schools** <br><br> 1. Shawnee Boarding School: was related to the Absentee Shawnee Boarding School. BSI researchers also updated the school's name on the "Other Institutions" list to Shawnee Mission Quaker School, as additional research shows it was an Indian day school; Shawnee, OK <br> 2. Puyallup Indian School: Additional research shows it was an Indian day school. When the school moved to the Puyallup reservation and was eventually renamed Cushman Indian School, it did have a boarding component. Cushman Indian School is a separate school on the "Federal Indian Boarding School" list; Squaxin Island, Washington. |

The Department acknowledges that some institutions classified as Federal Indian boarding schools for purposes of its investigation continue to operate but without historical assimilationist intention or practices. Instead, the Bureau of Indian Education and Kamehameha Schools are critical to providing quality education opportunities from early childhood through life, accounting for the mental, physical, religious, and cultural aspects of children from Indian Country and the Native Hawaiian Community.

## Data Points

The charts in the individual Federal Indian Boarding School Profiles include data points for enrollment, attendance, and capacity. These figures typically came from the Annual Report to the Commissioner of Indian Affairs (ARCIA). The definitions below for "enrollment" and "attendance" are based on instructions for collecting student and school data for the ARCIA. Capacity was not specifically defined in the instructions. Occasionally, these data points were located in other types of documents and may not have complied precisely with the same definition.

**Enrollment:** The maximum number of unique students over the reporting time period calculated by either taking the data from the prior year or the start of the current year or reflecting additions and deletions for a final number at the close of the year.

**Attendance:** The number of students present at the institution. The attendance of each student was recorded daily. The total number of days for all students was divided by the total number of days in the reporting time period to calculate the institution's average annual attendance.

33

**Capacity:** The maximum number of students that a school could support. In some cases, capacity was the number of students the institution was receiving funding for but did not reflect the entire student population.

The List of Other Institutions includes Indian boarding schools operated by religious institutions and organizations that did not receive U.S. Government support, available in **Appendix F**.



32

32 Photograph No. 313190186; "Shower Room at Blackfoot Reservation, Montana," May 1951; General Photographs of Indians, 1900-1957; Records of the Bureau of Indian Affairs, Record Group 75; National Archives at College Park, College Park, MD. Description: Blackfoot Reservation, Montana, Cutbank Boarding School. Shower room in basement of girls dorm. No heat, cement floor, leaky water pipes. During coldest part of winter girls are not permitted to shower. These are the only showers or facilities of any kind for taking a bath in the girls dorm. Girls had to go from second floor to the basement. Photo by Morrow, May 1951.



★ ★ ★ ★ ★ ★

## 6.    List of Other Institutions

The Federal Indian Boarding School Initiative – List of Other Institutions included in this section is a description of institutions that, based on an examination of additional U.S. Government records, met some, but not all four of the criteria to be considered a Federal Indian boarding school, as described above.  The Department's investigation identified 1,025 other institutions across 1,027 total sites, including Indian day schools, sanitariums, asylums, orphanages, stand-alone dormitories, and Indian boarding schools operated by religious institutions and organizations that received no U.S. Government support.  Some of the aforementioned institutions may have involved education of Indian people, mainly Indian children.

While not Federal Indian boarding schools, these other institutions also supported the U.S. Government policy of Indian assimilation.  As noted in Vol. I: The Federal Indian Boarding School Initiative investigation did not examine the U.S. Government's Indian day school system, the precursor education system to the Federal Indian boarding school system.  The Department has described that "day school instruction is the initial and most important element in the education of the Indian."[34]  "To the day school the Indian child

---

[33] Kilbourne, K. (1931). Miss [illegible] & Orphans [Photograph]. Katherine Kilbourne photograph album of a Jicarilla Apache Nation boarding school in Dulce, New Mexico, 1931 (I.10. verso), Princeton Collections of the American West, Princeton University Library.

[34] ARCIA for 1904, at 394.

comes fresh from the tepee and finds himself at once amid new and strange surroundings."[35]  U.S. Government Indian day schools were primarily located on Indian reservations and did not have housing for children directly on-site with the education institution.  Indian day schools "have, in nearly every instance, preceded the boarding school" and "in many cases been established through the benevolent efforts of missionaries or the wives of Army officers stationed at military reservations in the Indian [C]ountry."[36]

For purposes of this investigation, the following general descriptions for other institutions are used:

**Indian Day School:** During the U.S. Government Indian boarding school time-period, day schools could be public or private. In historical documents relating to boarding schools, day school is also defined as a school operating from 9am to 4pm where the children return home to their parents daily.  Documentation also indicated that day schools were prevented from providing such things as certain meals and clothing that were provided only at boarding schools.

**Sanatorium:** During the U.S. Government Indian boarding school period, it was common to use sanitoriums to treat patients with tuberculosis.  Some schools converted to sanatoriums when infections escalated.  Some sanitoriums were constructed as a medical facility, which also offered education coursework for convalescing youth.  Finally, there is a record of at least one Preventorium, which is described as an institution to protect Indian children from going home to conditions perceived as riskier than isolation in the school setting.

**Asylum:** During the U.S. Government Indian boarding school period, those housed in an asylum were not necessarily mentally ill by modern definitions.  Documentation shows a variety of reasons that a student was committed to an asylum.

**Orphanage:** During the U.S. Government Indian boarding school period, orphan status could be used for full orphan, half orphan, or ward of the State.

A large portion of the List of Other Indian Institutions is comprised of Indian day schools that did not meet the housing criteria.  The list indicates the current determination for each of the four criteria.  The Federal Indian Boarding School criteria columns indicate "Yes", "No", or "TBD."  The list provides information about each institution including a name, other names identified, city, state, and Federal Indian Boarding School criteria.

This phase of work of the Federal Indian Boarding School Initiative focused on further research of Federal Indian boarding schools.  Any institutions that met some, but not all four, of the Federal Indian Boarding School criteria, for purposes of the Department's investigation, are documented in the List of Other Indian Institutions.  This

---

[35] ARCIA for 1904, at 392.
[36] ARCIA for 1886, at LXI.

is not definitive confirmation of the Federal Indian Boarding School determination. It represents only what has been documented as of this phase of research. Sometimes, entities on the List of Other Institutions have certain words in their name that may indicate certain attributes of those entities. The words in the name of the institution do not necessarily indicate the type of institution. The data is as of January 1, 2024.

The List of Other Indian Institutions contains the following information:

- **Name** – A primary name used to identify the institution. *An asterisk on the name indicates that this name is currently being used for the institution.

- **Other Names** – Other names by which the institution may have been identified. *An asterisk on the name indicates that this name is currently being used for the institution.

- **City** – The nearest city identified that represents where the institution is physically located.

- **State** – The state identified that represents where the institution is physically located.

The Federal Indian Boarding School Initiative investigation also did not examine the Outing System. First established by the Carlisle Indian Industrial School, U.S. Government Indian boarding schools "placed out" Indian children to non-Indian families in surrounding communities to work.[37] As described to the Interior Secretary in 1928:

> The system is conducted under very rigid rules and in its operation suggests the parole system of a correctional institution. It is not surprising that an Indian who has seen something of the present system characterizes it as a kind of peonage which the children must undergo. 'As food appropriations at the school get short they think they must turn the children out,' he says.[38]

---

[37] Lewis Meriam, Institute for Government Research, The Problem of Indian Administration, 627 (1928) [hereinafter Meriam Report].
[38] Id.

Schools placed Indian children "in the homes of *substantial people*, usually Quakers, with the understanding that they were to be treated as members of the family with school privileges if they remained during the school year, but under strict supervision..."[39] Although the Federal Indian Boarding School Initiative investigation did not examine the Outing System, the Department recognizes this additional experience to Federal Indian boarding school attendance often was harmful as well.

40



★ ★ ★ ★ ★

## 7.    Indian Child Names and Tribal Identities

"…[I]n my research looking for her records, I have looked upon ledger after ledger after ledger of names of children and

---

[39] Id. (emphasis added).
[40] SMC Cartographic Section Concho, Oklahoma. (n.d.) *SMC Express, Elementary Education Leupp School, SMC + school staff* [Photograph]. Pp. 75-76, "Pictures of Pupils 822.7," Record ID 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-0025-0036, Box Identifier 83051, File Identifier 3460098, American Indian Records Repository, Lenexa, KS.

their ages and their tribes. It's just heartbreaking when you see the thousands of names that, you know, until now have been forgotten." [41]

-    The Road to Healing, Arizona Visit

Based on available records, the Department has been able to identify by name and Tribal identity at least 18,624 Indian children who attended Federal Indian boarding schools between 1819 and 1969. This number is not a complete count of all children who attended Federal Indian boarding schools, but instead represents the number of individuals whom the Department can identify by name and Tribal identity in this investigation. It also does not include children who: attended a Federal Indian boarding school outside 1819-1969, may be listed as an attendee on records not available to the Department including those of religious institutions and organizations, or may be listed as an attendee of an Other Institution including Indian day schools, sanitariums, asylums, orphanages, stand-alone dormitories, and Indian boarding schools operated by religious institutions and organizations that received no U.S. Government support. This information confirms for Indian Tribes, countless Indian families, and individuals the attendance of select individuals at schools in the Federal Indian boarding school system. The Department acknowledges that the actual number of children who attended Indian boarding schools is greater.

**Appendix G** provides a list of Tribal identities. Data collected represents the Tribal identities identified at Federal Indian boarding schools. The number of Federal Indian boarding schools is unique to each line of data. Individual Tribal identities do not add up to totals as schools can contain multiple Tribal identities. **Appendix H** provides a Graph of Deceased Indian Children by Year. **Appendix I** provides a List of Deceased Indian Children by Indian Tribe.

Based on available records, the Department concludes that at least 973 documented Indian child deaths occurred in the Federal Indian boarding school system. This information is not complete and does not count children that died who: attended a Federal Indian boarding school outside the period 1819-1969, may be listed as an attendee on records not available to the Department including those of religious institutions and organizations, or may be listed as an attendee of an Other Institution including Indian day schools, sanitariums, asylums, orphanages, stand-alone dormitories, and Indian boarding schools operated by religious institutions and organizations that received no U.S. Government support. The Department acknowledges that the actual number of children who died while in Indian boarding schools is greater.

---

[41] The Road to Healing, Arizona Transcript 19 (2023).

Because some records are no longer available, the Department recognizes that there may be missing information for certain Indian children who attended a school in the Federal Indian boarding school system. The Department did not examine potentially available records out of its control, including those held by other U.S. Government agencies or religious institutions and organizations.

For identified students, available U.S. Government records document various names, whether a given name or renamed English name, gender, Tribal identity, date of birth, date of death, and the Federal Indian boarding school(s) or Other Indian Institution(s) the individual attended. Available U.S. Government records also provided year(s) of attendance and status at the institution. Note that some individuals may not necessarily have attended the other institution as a Federal Indian boarding school student. For example, the individual may have been classified as a patient. Data is as of January 1, 2024.



42

---

[42] Photograph No. 251699 (Photograph probably made by Charles R. Scott, an employee of the Seneca Training School, for Superintendent Horace B. Durant); "Group of School Children," 1905; Photographs, 1982-1982; Records of the Bureau of Indian Affairs, Record Group 75; National Archives at Fort Worth, Fort Worth, TX. [Online version, https://catalog.archives.gov/id/251699, National Archives and Records Administration, December 9, 2023.]

★　★　★　★　★　★

## 8.　Marked and Unmarked Burial Sites



43

44

> On **May 23, 1881**, Chief Spotted Tail and parents from the Rosebud Sioux Tribe wrote a letter to the United States Indian Service, requesting the return of human remains of their children buried at the Carlisle Indian Industrial School, Pennsylvania to the Rosebud Sioux Indian Reservation in South Dakota.
>
> On **July 14, 2021**, the United States honored that request when the U.S. Army returned the following human remains of children from the U.S. Army Carlisle Barracks to the Rosebud Sioux Tribe alongside U.S. Interior Secretary Haaland:
>
> Dennis Strikes First (Blue Tomahawk); Rose Long Face (Little Hawk); Lucy Take The Tail (Pretty Eagle); Warren Painter (Bear Paints Dirt); Ernest Knocks Off (White Thunder); Maud Little Girl (Swift Bear); Alvan, aka Roaster, Kills Seven Horses, One That Kills Seven Horses; Friend Hollow Horn Bear; and Dora Her Pipe (Brave Bull).
>
> After 140 years, the Rosebud Sioux Tribe brought the human remains of their children back to their home territory on the Rosebud Sioux Indian Reservation in South Dakota.

---

43 Associated Press Photo, Matt Rourke, 2021.
44 Notice of Intended Disinterment, 86 FR 17373, (2021), Letter from Chief Spotted Tail & Other Rosebud Sioux Chiefs to Richard Henry Pratt (May 23, 1881).

The Department confirms the presence of 74 marked and unmarked burial sites at 65 different Federal Indian boarding schools based on available records.

The composition of the approximate numbers of identified burial sites to date is as follows:

- **Marked burial sites – 53**
- **Unmarked burial sites – 21**

This information is not complete and does not include burial sites that may be: associated with Federal Indian boarding schools in operation outside the period 1819-1969, listed on records not available to the Department including those of religious institutions and organizations, or associated with Other Institutions including Indian day schools, sanitariums, asylums, orphanages, stand-alone dormitories, and Indian boarding schools operated by religious institutions and organizations that received no U.S. Government support. The Department acknowledges that the actual number of burial sites associated with Indian boarding schools is greater.

Profiles for each school are provided in **Appendix B**. If the Department identified a burial site associated with the school site, the profile describes the burial site by designation. If documented as "marked", U.S. Government records provided evidence of physical grave markers. If documented as "unmarked", U.S. Government records provided no evidence of physical markers. If documented as "onsite", U.S. Government records placed the burial site location at the school or adjacent to it. If documented as "offsite", U.S. Government records placed the burial site further away from the school, such as in a surrounding community.

To identify marked and unmarked burial sites across the Federal Indian boarding school system, the Department faced several research limitations including: (1) inconsistent U.S. Government reporting of child deaths, including the number and cause or circumstances of death, and burial sites; and (2) non-examination of potentially relevant records in the control of other U.S. Government agencies or religious institutions and organizations.

The Department will not make public the specific locations of burial sites associated with the Federal Indian boarding school system, in order to protect against the well-documented occurrence and threat of grave-robbing, vandalism, and other disturbances to Indian burial sites.[45]

The Department is working with Indian Tribes that wish to repatriate or not disturb any human child remains and funerary objects from historical Indian boarding school sites

---

[45] *See, e.g.,* 3 C.F.R. §§ 7.18, 10.3 (2023).

that are currently located on U.S. Government lands consistent with specific Tribal practices and, as may be applicable, under the NAGPRA and ARPA processes.

The Department supports the OAC, United States Army collaborating with Indian Tribes, Alaska Native Villages, and descendants regarding the 180 human child remains buried at the Carlisle Barracks Main Post Cemetery consistent with specific Tribal practices for disinterment, continued safeguarding of child remains at the cemetery, or headstone modification.



Annual Memorial Services, Haskell Cemetery.

46

★  ★  ★  ★  ★  ★

## 9.  Indian Treaties Involving the Federal Indian Boarding School System and Indian Education

---

46 Annual Memorial Services, Haskell Cemetery. From "The Baccalaureate Address," by R. Harlan, 1913, June, *The Indian Leader*, *XIV*, p. 11.

> **The Federal Indian Boarding School Initiative Investigation notes that Indian education is a priority in U.S.-Indian relations and U.S. Government provision of Indian education is a Treaty-right, evidenced by the 171 Indian Treaties that the U.S. entered into with Indian Tribes and ratified that implicate the Federal Indian boarding school system or education generally, provided in Appendix J.**

As described in Volume I: Through treaties and other agreements, Indian Tribes ceded to the United States approximately 1 billion acres of land.[47]  Like Great Britain and the colonial governments before it, the United States negotiated and entered into formal treaties with Indian Tribes as separate and distinct sovereigns.[48]  From 1722 to 1869, the British Crown and the United States made at least 374 treaties with Indian Tribes.[49]  As non-Indian settlement increased over time, the negotiation power of Indian Tribes diminished.  A congressional report appendix stated that "[e]ducation policy … took place in the context of wave after wave of invasion by white settlers reinforced by military conquest.  Treaties, although almost always signed under duress, were the window dressing whereby we expropriated the Indian's land and pushed him back across the continent."[50]

Indian Treaties remain valid federal law today as recognized by the Supreme Court.[51]  As described in Vol. I, the "text of many Indian treaties evinces that Indian education was a priority in U.S.-Indian relations."[52]

The Treaty Clause of the Constitution reads:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state

---

[47] Kennedy Report, at 143.
[48] National Records and Archives Service, General Services Administration, Ratified Indian Treaties 1722-1869, at 1 (1973).
[49] Id.
[50] Kennedy Report, at 142.
[51] U.S. Const. Art. VI., cl. 2; McGirt v. Oklahoma, 140 S.Ct. 2452, 2469 (2020); Herrera v. Wyoming, 139 S.Ct. 1686, 1696 (2019); Washington v. Cougar Den, 139 S.Ct. 1000, 1013 (2019); Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 202 (1999).
[52] Dep't of Interior, Bryan Newland, Federal Indian Boarding School Initiative Investigative Report 33 (May 2022) (BIA Report).

shall be bound thereby, anything in the Constitution or laws of
any State to the contrary notwithstanding.[53]

As a result, Indian Treaties and successive statutes, including during the Federal Indian boarding school era, originate with the Constitution and involve U.S.-Indian relations;[54] U.S.-Native Hawaiian relations;[55] and political relationships unique to Indian Tribes, Alaska Native Villages, and the Native Hawaiian Community.[56]

The Department confirms that the United States entered into **171 Treaties** with Indian Tribes that implicate the Federal Indian boarding school system or general U.S. Government provision of education to Indians. The United States and respective Indian Tribes made the Treaties between 1819 and 1868.

**Appendix J** provides: the ratifying legislation citation, year, treaty name, and relevant treaty language, and indicates whether the language refers to an Indian boarding school(s) or general Indian education.

**Appendix K** provides a List of Federal Indian Policies associated with the Federal Indian boarding school system. The Department acknowledges that this list is not comprehensive.



---

[53] U.S. Const. Art. VI., cl. 2.

[54] *See, e.g.,* United States v. Lara, 541 U.S. 193, 201 (2004) ("And for much of the Nation's history, treaties, and legislation made pursuant to those treaties, governed relations between the Federal Government and the Indian tribes.").

[55] *See, e.g.,* Rice v. Cayetano, 528 U.S. 495, 501 (2000) ("the United States and European powers made constant efforts to protect their interests and to influence Hawaiian political and economic affairs in general. The first 'articles of arrangement' between the United States and the Kingdom of Hawaii were signed in 1826 … and additional treaties and conventions between the two countries were signed in 1849, 1875, and 1887").

[56] *See* Yellen v. Confederated Tribes of the Chehalis Reservation, 141 S. Ct. 2434, 2440 (2021); United States v. Cooley, 141 S. Ct. 1638, 1642 (2021); McGirt v. Oklahoma, 140 S. Ct. 2452, 2477 (2020); Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate, 470 F.3d 827, 847 (9th Cir. 2006) (en banc); Worcester v. Georgia, 31 U.S. 515, 557 (1832).

## 10.  The Role of Religious Institutions and Organizations in the Federal Indian Boarding School System

> The Federal Indian Boarding School Initiative Investigation determined that the United States entered into public-private relationships with religious institutions and organizations, with direct U.S. Government support for 59 different religious institutions and organizations to advance the Federal Indian boarding school system, which might face constitutional challenges today.  The list of religious institutions and organizations is provided in Appendix L.



57

It is surprising to how many very common customs these old beliefs apply and how firmly they are held by them.  Their pagan beliefs therefore constitute the chief basis of life, so that little change is possible, except through a change in religion.  Pagan Indians have a peculiar religious philosophy which so powerfully, shapes their lives in the wrong direction that only the true inculcations of the true religions can set them right.  The hope of the Indian's regeneration, therefore, lies not in

---

57 Photograph No. 518925; "Little Girls Praying Beside Their Beds, Phoenix Indian School, Arizona," 1900; Exhibit Prints Related to Various Jurisdictions, Tribes, Indian Schools and Activities, 1904-1936; Records of the Bureau of Indian Affairs, Record Group 75; National Archives at College Park, College Park, MD.

education alone, nor in civilization alone, but in Christianity
united with these great forces.

-    Daniel Dorchester, Superintendent of Indian Schools, BIA.[58]

Volume I of this investigation describes the public-private relationship between
the United States and religious institutions and organizations in U.S.-Indian relations,
that might face constitutional challenges today.

Based on available U.S. Government records, the Department concludes that the
United States supported at least **59** different religious institutions and organizations
to operate or support schools in the Federal Indian boarding school system.
Accordingly, **210 of 417** Federal Indian boarding schools were operated by
a religious institution or organization.  This number does not include Indian
boarding schools operated by religious institutions and organizations that received no
U.S. Government support.   This volume lists the religious institutions and
organizations that the U.S. provided support to, provided in **Appendix L**.

Overall, the religious institution and organization operation is as follows:

- **The Catholic Church:** 80
- **Protestant Denominations:** 134
- **Other Denominations:** 4 (Independent, Nonsectarian Missionary,
  Unitarian Church, and the United Brethren in Christ).

Individual religions do not add up to the total Federal Indian boarding schools because,
over time, many operated under multiple religious institution or organizational affiliations.
Data is as of January 1, 2024.

---

**"The Catholic mission … with the meekness and humility of the true Christian, they
prefer, to the cold and heartless ceremonies of fashionable life, the more pleasant
and philanthropic duty of training up the rude children of the forest to intelligence
and [C]hristianity."**

**-    E. Murray, Superintendent of Menominee Territory**

[59]

---

[58] ARCIA for 1891, at 538.
[59] ARCIA for 1852, at 35.

The Department also acknowledges that under authorization from Congress, it issued numerous land patents to religious institutions and organizations for existing religious or school activities on Indian reservations. At the turn of the 20th century, Congress passed special statutes for specific Indian reservations and the Territory of Alaska authorizing the Department to issue land patents to religious institutions and organizations for given areas used for religious or school purposes.

The 1900 Act governing land disposition in the Territory of Alaska directs:

> The Indians or persons conducting schools or missions in the Territory of Alaska shall not be disturbed in the possession of any lands actually in their use or occupation on June 6, 1900, and the land, at any station not exceeding six hundred and forty acres, occupied on said date as missionary stations among the Indian tribes in the section, with the improvements thereon erected by or for such societies, shall be continued in the occupancy of the several religious societies to which the missionary stations respectively belong, and the Secretary of the Interior is directed to have such lands surveyed in compact form as nearly as practicable and patents issued for the same to the several societies to which they belong; but nothing contained in this Act shall be construed to put in force in the Territory the general land laws of the United States.[60]

For this investigation, the Department did not examine the number of land patents it issued to religious institutions and organizations in the then-Territory of Alaska.

In 1909, Congress passed the Indian Appropriation Act (the 1909 Act), authorizing the Secretary of the Interior to issue unrestricted land patents to religious institutions and organizations or missionary boards already engaged in religious or school activities on Indian reservations. The 1909 Act states:

> That the Secretary of the Interior is hereby authorized and directed to issue a patent in fee simple to the duly authorized missionary board, or other proper authority of any religious organization engaged in mission or school work on any Indian reservation, for such lands thereon as have been heretofore set apart to and are now being used and occupied by such organization for mission or school purposes.[61]

---

[60] June 6, 1900, ch. 786, §27, 31 Stat. 330 (1900).
[61] Indian Appropriation Act of March 3, 1909, ch. 263, 35 Stat. 781, 814 (1909).

In 1922, Congress enacted another statute (the 1922 Act), authorizing the Secretary of the Interior to issue land patents of up to 160 acres to religious institutions and organizations or missionary boards already engaged in religious or school activities on Indian reservations. The 1922 Act notably requires that Indians maintain a reversionary interest in such land patents:

> That the Secretary of the Interior is hereby authorized and directed to issue a patent to the duly authorized missionary board, or other proper authority, of any religious organization engaged in mission or school work on any Indian reservation for such lands thereon as have been heretofore set apart to and are now being actually and beneficially used and occupied by such organization solely for mission or school purposes, the area so patented to not exceed one hundred and sixty acres to any one organization at any station: *Provided*, That such patent shall provide that when no longer used for mission or school purposes said lands shall revert to the Indian owner.[62]

For this investigation, the Department did not examine the number of land patents it issued to religious institutions and organizations under the 1909 or 1922 Acts or statutes specific to select Indian reservations.



## 11.    U.S. Government Support for the Federal Indian Boarding School System

---

[62] Act of September 21, 1922, ch. 367 § 3, 42 Stat. 994, 995 (1922).



63

---

63 Students working outside [Photograph]. (ca. 1900-1930). Thomas Indian School glass plate negatives, Box 5; National Museum of the American Indian, Smithsonian Institution (Catalog Number N49089).

**50**

In this report, the Department estimates that the U.S. Government made appropriations available of more than $23.3 billion in FY23 inflation-adjusted dollars between 1871 and 1969 for the Federal Indian boarding school system as well as other similar institutions and associated assimilation policies.

Due to time and resource constraints, we did not research actual amounts spent on Federal Indian boarding schools and similar institutions. Further research on actual expenditures would help to further illuminate the extent of U.S. Government resources committed to this policy.

In some instances, Congress made lump-sum appropriations that included multiple categories of appropriations. In these cases, it is not possible to quantify how much of a general appropriation is attributable to Federal Indian boarding schools, other similar institutions, and related assimilation policies or programs. So as not to exclude relevant appropriations, the Department has included the full amount of these lump-sum appropriations in the overall estimate. Further details on the appropriations included in the Department's estimate are available in section 11 and **Appendix M** of this report.

Acknowledging these limitations and the uncertainty inherent in any estimate of U.S. Government appropriations for the purposes of this report, this report relies on $23.3 billion as the estimated U.S. Government appropriations available for the Federal Indian boarding school system, as well as other similar institutions and associated assimilation policies.

This amount excludes the following: Treaty-stipulated support, religious institution and organization support, U.S. military support, state support, wealth generated by Indian or Native Hawaiian children while in the system including for the agriculture and railroad industries, Indian domestic and other labor for non-Indian families and communities through the Outing System, and expenditures by non-federal entities.

Further, the Department did not analyze appropriations beyond the Federal Indian boarding school system. That is, a separate financial analysis is needed for appropriations associated with Federal Indian boarding schools operational outside 1871-1969 or associated with Other Institutions including Indian day schools, sanitariums, asylums, orphanages, stand-alone dormitories, and Indian boarding schools operated by religious institutions and organizations that received no U.S. Government support in order to create a complete picture of the resources that supported these policies.

The total amount appropriated by year is based upon available U.S. Government records and information.

The Department analyzed Federal appropriations for the Federal Indian boarding school system for the years 1819 through 1969.  Prior to 1871, Indian boarding schools were funded through treaty stipulations.  Following the end of formal treaty making, Congress began to make general appropriations for the system in fiscal year 1871 and specific appropriations for the system in fiscal year 1875.  Therefore, **Appendix M** addresses federal appropriations from 1871 forward.

The Department first reviewed Volumes 15-82 of the Statutes at Large from the Library of Congress to identify yearly appropriations and then reviewed each year's appropriations Acts to identify general and specific appropriations.  **The total amount appropriated by year is based on available U.S. Government records and information.**

To ensure that the numbers are reported as accurately as possible despite intermingled appropriations, the Department created multiple labeled columns by year that reflect how the appropriations were made for that year.  Within a given year, there may have been general appropriations, specific appropriations, or both.  Also, general appropriations and specific appropriations vary within years and from year to year regarding the type of schools and nature of the expenses they cover.  Each of these distinctions in yearly appropriations is reflected in **Appendix M**, which are categorized first by general or specific appropriations, and then by subtype.  The columns are described in detail below:

**General Appropriation - Education & Support of Federal Indian Industrial & Federal Indian Day Schools Not Otherwise Appropriated For:**  General appropriations include both Indian Industrial schools (which had a boarding component) and Indian day schools for which there was no specific appropriation.  There is no breakdown of the respective appropriated amounts allocated between Indian Industrial schools and Indian day schools.

**General Appropriation - Education & Support of Federal Indian Industrial & Federal Indian Day Schools & Public Schools Not Otherwise Appropriated For:**  General appropriations include Indian Industrial schools and Indian day schools as well as public schools.  There is no breakdown of the respective appropriated amounts allocated amongst these three types of schools.

**General Appropriation - Other Appropriation for Federal Indian Industrial & Federal Indian Day Schools Not Otherwise Appropriated For:**  Other support includes construction, repairs, supplies, sewage, water, electricity, barns, superintendents of the individual schools, livestock, etc.

**General Appropriation – Federal Indian Industrial & Federal Indian Day Schools & Public Schools – Transportation:**  General appropriation for the transportation of Indian students to Indian Industrial, Indian day, and public schools, and placement under

the care and control of white families.   There is no breakdown of the respective appropriated amounts allocated amongst these three types of schools and for placement with white families.

**General Appropriation - Lump Sum Appropriation for all expenses for Indian Education & Indian Welfare Services, including Federal Indian Day, Federal Indian Boarding, State Schools, and Public Schools and Other Expenses:** There is no breakdown of the respective appropriated amounts allocated amongst these types of funding.

- For example, FY 1964: "Bureau of Indian Affairs - For expenses necessary to provide education and welfare services for Indians, either directly or in cooperation with States and other organizations, including payment (in advance or from date of admission), of care, tuition, assistance, and other expenses of Indians in boarding homes, institutions, or schools; grants and other assistance to needy Indians; maintenance of law and order, and payment of rewards for information or evidence concerning violations of law on Indian reservations or lands; and operation of Indian arts and crafts shops and museums; $89,235,250."

**Specific Appropriation - Education & Support of Non-Reservation Federal Indian Boarding Schools:** Appropriations were for the education and support of specific Non-Reservation Boarding Schools.

**Specific Appropriation - Education & Support of Non-Reservation Federal Indian Boarding Schools Combined with Specific Other Appropriation for Non-Reservation Federal Indian Boarding Schools:** Appropriation is for Education and Support of specific schools along with specific other appropriation by school for construction, repairs, supplies, sewage, water, electricity, barns, superintendents of the individual schools, livestock, transportation, employees (including farmers & school superintendents), etc. Some appropriations also include "Other Schools" without further specification.  Amounts for education and support cannot be distinguished from other appropriated amounts.

**Specific Appropriation - Other Appropriation for Non-Reservation Federal Indian Boarding Schools:**   The appropriation includes construction, repairs, supplies, sewage, water, electricity, barns, superintendents of the individual schools, livestock, transportation, employees (including farmers & school superintendents), etc.

**Specific Appropriation - Alaska (includes Education, Care, Building, & Other Expenses):**  Prior to fiscal year 1932, the cost of educating Indian students from Alaska was typically included in the General Appropriations or the specific appropriations by school. However, the years 1885-1888 and 1895-1900 included additional language that the General Appropriations, which varied by year, could be used for the education and

support of children in Alaska (without specifying how the appropriations should
be distributed among day or industrial schools).

- For example, FY 1918 - General Appropriations: "The provisions of this section shall
  also apply to native Indian pupils of school age under twenty-one years of age brought
  from Alaska."

  FY 1918 - Specific Appropriations - Salem School: "For support and education of six
  hundred Indian pupils, including native Indian pupils brought from Alaska, at the
  Indian school, Salem Oregon …''

  FY 1900 - General Appropriations: "of which amount the Secretary of the Interior
  may, in his discretion, use five thousand dollars for the education of Indians in
  Alaska ..."

Beginning with the appropriations for 1932, and ending in 1947, specific funding was
appropriated for "Natives in Alaska."

- For example, FY 1933: "Natives in Alaska: To enable the Secretary of the
  Interior, in his discretion and under his direction to provide for support and
  education of the Eskimos, Aleuts, Indians, and other natives of Alaska, including
  necessary traveling expenses of pupils to and from industrial boarding schools in
  Alaska; erection, purchase, repair, and rental of school buildings, including
  purchase of necessary lands; ..."

**Total Expenditure of Specific Appropriations for Non-Reservation Indian Boarding
Schools Not to Exceed X Amount (includes Education, Support, & Other Expenses):**
Appropriation language specified that the total expenditure of specific appropriations for
Non-Reservation Indian Boarding Schools (excluding Alaska) was not to exceed a certain
amount. However, the total amount specifically appropriated exceeded the expenditure
cap in most instances.

The estimated value of historical appropriations is adjusted to 2023 U.S. Dollars.
Official data for the Consumer Price Index (CPI) comparable to the modern version
maintained by the U.S. Bureau of Labor Statistics did not exist prior to 1913. An index
assembled by the Minneapolis Federal Reserve Bank estimating inflation back to 1800 was
used for the adjustments shown in **Appendix M**.

The Department did not analyze appropriations beyond the Federal Indian boarding
school system. That is, for a complete picture of the resources that supported these policies,
a separate financial analysis is needed for appropriations and expenditures associated with
Federal Indian boarding schools operational outside 1819-1969 or associated with Other
Institutions including Indian day schools, sanitariums, asylums, orphanages, stand-alone
dormitories, and as well as expenditures by Indian boarding schools operated by religious

institutions, and organizations that received no Federal support. The Department acknowledges that the actual amount of funds spent on Indian boarding schools is likely far greater, and must include Indian child labor both for institution operations and through the Outing System to non-Indian families.



64

★  ★  ★  ★  ★  ★

## 12.    Preventing Indian Child Removal: The Indian Child Welfare Act

> **"Before the Indian boarding schools, we took wagonloads of laundry down to the river, and all my aunts would wash their clothes in the river on the rocks; and we would hang them over the willow trees that would grow in there, while we fished. We lived off wildlife.  I never knew you bought meat from a market. We lived off the deer, the rabbits, pheasants, prairie dogs."**
>
> -      The Road to Healing Montana Participant

65

Over time, U.S. policy for Indian assimilation through Indian child removal and confinement to the Federal Indian boarding school system, including the Outing System, lost political support.  The U.S. Government shifted support to state

---

64 Kilbourne, K. (1931). Miss [illegible] & Orphans [Photograph]. Katherine Kilbourne photograph album of a Jicarilla Apache Nation boarding school in Dulce, New Mexico, 1931 (I.10. verso), Princeton Collections of the American West, Princeton University Library.
65 Montana Transcript, 36 edited for clarity.

action to remove Indian children for mainstream U.S. assimilation.[66] The health effects, described below, however, to individual American Indians and Alaska Natives from the Indian boarding school experience remained. And studies suggest that adverse health effects may also be associated with the placement of Indian children in non-Indian foster care and adoptive homes.

As described in Vol. I, Indian childhood experiences in Indian boarding schools, "at a minimum, the separation from family," contributed to poor health impacts on child attendees as adults.[67] The Running Bear studies, funded by the National Institutes of Health (NIH), are the first biomedical studies to systematically and quantitatively examine the relationship between American Indian boarding school child attendance and physical health status, the number of physical health conditions diagnosed by a medical doctor, and specific chronic health conditions, while also controlling for parental attendance in a large sample. The "[c]ombined direct indirect results (beta = -.39, CI = -1.20, .42) show American Indians who attended boarding school have lower physical health status (beta = -1.22, CI = -2.18, -.26, p. ≤ .01) than those did not."[68] Indian boarding school child attendees had a 44 percent greater count of past-year chronic physical health problems (PYCPHP) as adults compared with adult non-attendees.[69] Now-adult attendees were more likely to have cancer (more than three times), tuberculosis (more than twice), high cholesterol (95 percent), diabetes (81 percent), anemia (61 percent), arthritis (60 percent), and gall bladder disease (60 percent) than non-attendees.[70] Other studies demonstrate that now-adult attendees experience increased risk for post-traumatic stress disorder (PTSD), depression, and unresolved grief.[71] As a result, a "prevailing sense of despair, loneliness, and isolation from family and community are often described."[72]

"Both individual and paternal boarding school attendance are associated with chronic health problems" of now-adult Indian boarding school attendees.[73] A father's Indian boarding school attendance was independently associated with chronic physical health problems.[74] Participants whose fathers attended Indian boarding school had on

---

[66] Matthew L.M. Fletcher & Wenona T. Singel, Indian Children and the Federal-Tribal Trust Relationship, 95 Neb. L. Rev. 885 (2016).

[67] Maria Yellow Horse Brave Heart, The Historical Trauma Response Among Natives and Its Relationship with Substance Abuse: A Lakota Illustration, 35 J. of Psychoactive Drugs 1, 7-13 (2003).

[68] Ursula Running Bear et al., Boarding School Attendance and Physical Health Status of Northern Plains Tribes, 13 Applied Res. in Qual. of Life 633 (2018).

[69] Ursula Running Bear et al., The Impact of Individual and Parental American Indian Boarding School Attendance on Chronic Physical Health of Northern Plains Tribes, 42 Fam. Community Health 1, 3-4 (2019).

[70] Id. at 5.

[71] Maria Yellow Horse Brave Heart, The Historical Trauma Response Among Natives and Its Relationship with Substance Abuse: A Lakota Illustration, 35(1) J. of Psychoactive Drugs 1, 7-13 (2003).

[72] Ursula Running Bear et al., Boarding School Attendance and Physical Health Status of Northern Plains Tribes, 13 Applied Res. Qual. of Life 633 (2018).

[73] Ursula Running Bear et al., The Impact of Individual and Parental American Indian Boarding School Attendance on Chronic Physical Health of Northern Plains Tribes, 42 Fam. Community Health 1, 3-4 (2019).

[74] Id. at 4-5.

average a 36 percent greater PYCPHP count than those whose fathers did not attend boarding school.[75]  When controlling for maternal and paternal boarding school attendance, only a father's attendance was related to an increased number of PYCPHP in adulthood, suggesting that a father's Indian boarding school attendance is an *independent* predictor of his child's adult PYCPHP.[76]  Previous research has noted that American Indian men experienced more physical and sexual abuse in Indian boarding school than women: "Men – more fullblood Lakota in appearance and language – experienced greater trauma in boarding schools including more physical and sexual abuse and experienced greater sadness, survivor guilt, and shame as well as joy."[77]  The increased trauma that men faced in the Indian boarding school system may have produced increased stress, which then may affect the biological systems of the body.[78]  These stressors may then introduce epigenetic alterations that are then transferred to their children, also known as epigenetic inheritance.[79]



80

---

[75] Id.

[76] Id.

[77] Maria Yellow Horse Brave Heart, The Historical Trauma Response Among Natives and Its Relationship with Substance Abuse: A Lakota Illustration, 35(1) J. of Psychoactive Drugs 1, 7-13 (2003).

[78] Michelle Sotero, A conceptual model of historical trauma: implications for public health practice and research, 1 J. Health Dispar. Res. Pract 93 (2006).

[79] Rachel Yehuda et al., Holocaust exposure induced intergenerational effects on FKBP5 methylation, 80 Biol. Psychiatry 372 (2016); Zaneta Thayer et al., Biological memories of past environments: epigenetic pathways to health disparities, 6 Epigenetics 798 (2011).

[80] Photograph No. 12462819; "Girl Writing on Chalkboard" (Pine Ridge Agency); Photographs, ca. 1923-ca. 1955; Records of the Bureau of Indian Affairs, Record Group 75; National Archives at Kansas City, Kansas City, MO.

81



<hr />

[81] Dr. W. P. Whitted examines the eyes of a trachoma patient, Trachoma School, Fort Defiance, Arizona, 1941. From "*If you knew the conditions . . .": Health Care to Native Americans*, National Library of Medicine. Source: National Library of Medicine. Attributed by National Library of Medicine to the "Courtesy National Archives and Records Administration."



82

In the Running Bear studies, American Indian child attendees "punished for the use of language and who were also 8 years or older when attendance began reported the lowest physical health status scores."[83]  "The critical age for learning language is up to 7 and 8, after which there is a steep decline."[84]  American Indian children "removed from their homes at age 8 or older had a greater degree of language skill and proficiency and may have been more likely to speak their language leading to punishment."[85]  Although similar interaction effects are not found for other boarding school experiences, the studies point to other adverse effects.[86]  Now-adult attendees with then-limited family visits, forced church attendance, and who were prohibited from practicing their culture and traditions had lower physical health status as adults than those who did not have these experiences in Indian boarding school as children.[87]  The Running Bear studies reinforce that Federal Indian

---

[82] Choate, J. N. (ca. 1898). Six Carlisle students from Alaska in school uniform [Photograph]. Scope and Contents: "Annie Coodlalook, Tomiclock, Laublock, Anna Buck, Cooki Glook, and Esenetuck," Culture: "Alaskan Eskimo," Photo lot 81-12, John N. Choate photographs of Carlisle Indian School, National Anthropological Archives, Smithsonian Institution.

[83] Ursula Running Bear et al., The relationship of five boarding school experiences and physical health status among Northern Plains Tribes, 27 Applied Res. in Qual. of Life 153 (2018).

[84] Dale Purves et al., The development of language: A critical period in humans, in Neuroscience (2d ed.) (2001).

[85] Ursula Running Bear et al., The relationship of five boarding school experiences and physical health status among Northern Plains Tribes, 27 Applied Res. Qual. of Life 153 (2018).

[86] Id.

[87] Id.

boarding school policies "often impacted several generations."[88]

In 1957, as national Indian policy shifted, the U.S. Government, through the Department, coordinated with the Child Welfare League of America to advocate for state social workers on Indian reservations to adopt out Indian children to non-Indian families.[89] The public-private partnership was named the Indian Adoption Project, adopting out hundreds of Indian children to non-Indian families between 1958 and 1968.[90] The Indian Adoption Project supported the broader U.S. policy goal at the time to terminate the legal and political relationship between the U.S. and Indian Tribes—diminishing the already low tribal citizenship base necessary for the security of Indian Tribes and Alaska Native Villages.[91]

As Congress has determined, studies demonstrated that approximately 25-35 percent of Indian children were forcibly removed from their families by state and private child welfare agencies, that such removals were often unwarranted, and that over 85 percent of those Indian children were placed in non-Indian homes.[92] The disparity between Indian and non-Indian removal was stark. For example, in Minnesota the foster care or adoption placement rate of Indian children was 5 times greater than the non-Indian rate; in Washington, the adoption rate was 19 times greater and the foster care rate was 10 times greater; in Montana, the foster care rate was 13 times greater; and, in South Dakota, the foster care rate was 16 times greater.[93] Similar to the Federal Indian boarding school system, as Indian children experienced state foster care and adoption placement with non-Indian foster or adoptive homes or institutions, Federal examination and independent studies indicate that they experienced negative medical outcomes.

Studies examining American Indian and Alaska Native child adoptees as adults reveal poor medical outcomes are associated with Indian adoption and placement in non-Indian homes. Although many adoptees received socioeconomic advantages by virtue of their adoption, Indian adoptees experienced higher rates of depression, low self-esteem, and suicide compared to white adoptees.[94] For example, a 2017 study disclosed that Indian

---

[88] Ursula Running Bear et al., The Impact of Individual and Parental American Indian Boarding School Attendance on Chronic Physical Health of Northern Plains Tribes, 42 Fam. & Community Health 1 (2019).

[89] David Fanshel, Far from the Reservation: The Transracial Adoption of American Indian Children 37-8, ix (1972); See also Charles F. Wilkinson & Eric R. Biggs, The Evolution of the Termination Policy, 5 Am. Indian L. Rev. 139, 140 (1977).

[90] Id.

[91] Id; see, e.g., Press Release, "Indian Adoption Project Increases Momentum," Bureau of Indian Affairs (Apr. 18, 1967) (praising States "rank[ing] highest … in placing Indian children for adoption in non-Indian homes").

[92] U.S. House of Representatives, Committee on Interior and Insular Affairs, Establishing Standards for the Placement of Indian Children in Foster or Adoptive Homes, To Prevent the Breakup of Indian Families, H.R. Rep. No. 95-1386, 9 (1978); see also 25 U.S.C. § 1901(4); Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 32 (1989).

[93] Id.

[94] Margaret D. Jacobs, A Generation Removed: The Fostering and Adoption of Indigenous Children in the Postwar World 143-46 (2014).

child adoptees as adults are more likely than white child adoptees as adults to report depression (M=88%, M=82% respectively), alcohol addiction (M=28%, M=7% respectively), and drug addiction (M=14%, M=6% respectively).[95]  Many child adoptees continue, as adults, to struggle with identity and report feelings of loneliness and isolation.[96]

After centuries of Federal and state Indian child removal, Congress in 1978 found that the "wholesale separation of Indian children from their families is perhaps the most tragic and destructive aspect of American Indian life today."[97]  Congress responded by enacting the Indian Child Welfare Act of 1978 (ICWA).[98]  At the familial and individual levels, the ICWA provides minimum federal standards in state-court proceedings for the removal of Indian children from their families and placement in foster-care or adoptive homes, and affirms exclusive or concurrent tribal jurisdiction over child-welfare proceedings involving Indian children.[99]  As such, ICWA requires prevention-based measures to restore health for Indian children, their families, and Indian Tribes.  The Act codifies the opportunity for an Indian child to become exposed to the top protective factors for Indian child and adolescent health: cultural connectedness and family connectedness.[100]

A protective factor is "a characteristic at the biological, psychological, family, or community level that is associated with a lower likelihood of problem outcomes or that reduces the negative impact of a risk factor on problem outcomes."[101]  Because protective factors are independently capable of having a direct behavioral effect and positive health effects are recognized to influence the entire community, protective factor enhancement is considered a medical best practice.[102]  Key protective factors for general child and adolescent health include connecting with adults beyond family, self-regulation, defined as the deliberate control of emotions, attention, and behaviors to achieve a goal, and academic

---

[95] Ashley Landers et al., American Indian and White Adoptees: Are There Mental Health Differences?, American Indian and Alaska Native Mental Health Research, 24(2), 54-75 (2017).
[96] Jacobs, *supra* note 17; Troy Johnson & Holly Tomren, Helplessness, Hopelessness, and Despair: Identifying the Precursors to Indian Youth Suicide, Am. Indian Culture and Res. J., 23, 287-301 (1999).
[97] U.S. House of Representatives, Committee on Interior and Insular Affairs, Establishing Standards for the Placement of Indian Children in Foster or Adoptive Homes, To Prevent the Breakup of Indian Families, H.R. Rep. No. 95-1386, 9 (1978); 25 U.S.C. § 1901; Jacobs, *supra* note 17.
[98] Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901-1963 (2019).
[99] 25 U.S.C. § 1902, 1911, 1912, 1915.
[100] Michele Henson et al., Identifying Protective Factors to Promote Health in American Indian and Alaska Native Adolescents: A Literature Review, 38(1-2) J. of Primary Prevention, 5-26 (2017).
[101] Mary Ellen O'Connell et al., Preventing Mental, Emotional, and Behavioral Disorders Among Young People: Progress and Possibilities, The National Academies Collection: Reports funded by National Institutes of Health, 78, 82-111 (2009).
[102] Henson, *supra* note 89; Juliette Mackin et al., The Power of Protection: A Population-based comparison of Native and non-Native Youth Suicide Attempts, 19(2) Am. Indian & Alaska Native Mental Health Research, 20-54 (2012); O'Connell, *supra* note 132; Iris Wagman Borowsky et al., Suicide Attempts Among American Indian and Alaska Native Youth: Risk and Protective Factors, Archives of Pediatrics and Adolescent Med., 153, 573-580 (1999);

achievement.[103]  However, research suggests that signature protective factors for Indian child health are *distinct* from factors supporting non-Indians.[104]  Factors such as cultural connectedness and family connectedness are of particular relevance for Indian children to attain health.[105]

Cultural connectedness refers to culture interest development and identification including transmission of cultural expectations, values, and self-perception of success living the culture and the degree of practicing culture such as Native passage rites, language, and religion.[106]  Family connectedness refers to parent-child relationships, parent expectations, and perceived family caring.[107]

American Indian and Alaska Native medical trends manifest the need for protective factor enhancement.  The Department of Health and Human Services records that "[d]ifferences in the prevalence of alcohol use, interpersonal problems, and access to mental health treatment among American Indians and Alaska Natives might be symptoms of disproportionate exposure to poverty, *historical trauma*, and other contexts of inequity and should not be viewed as inherent to American Indian and Alaska Native culture."[108]

For example, the suicide rate of American Indians and Alaska Natives ages 15-24 is more than double the national rate (14.1 and 5.8 respectively).[109]  Expanding the age range, more than one third (35.7%) of American Indian and Alaska Native decedents from suicide are aged 10-24 years (versus 11.1% of whites).[110]  More than two thirds (69.4%) of American Indian and Alaska Native decedents from suicide resided in nonmetropolitan areas, while most white decedents (72.7%) resided in metropolitan areas (adjusted odds ratio [aOR] = 6.6; 95% CI = 5.9-7.3).[111]  Moreover, American Indian and Alaska Native decedents from suicide have 1.8 times the odds of a reported alcohol problem compared

---

[103] O'Connell, *supra* note 132.

[104] Henson, *supra* note 89.

[105] Henson, *supra* note 89; Brief for the American Academy of Pediatrics and American Medical Association as Amici Curiae supporting Secretary of the Interior & Petitioners, p. 9, Haaland v. Brackeen, 599 U.S. 255 (2023).

[106] Henson, *supra* note 89; Donald Warne, American Indian health disparities: psychosocial influences, 9(10) Social & Personality Psychology Compass, 567-579 (2015); Jia Pu et al., Protective Factors in American Indian Communities and Adolescent Violence, 17 J. of Maternal & Child Health, 1199-1207 (2013); James Allen et al., Suicide Prevention as a Community Development Process: Understanding Circumpolar Youth Suicide Prevention Through Community Level Outcomes, 68(3) Int'l J. of Circumpolar Health 274-291 (2010).

[107] Henson, *supra* note 89; Nancy Whitesell et al., Trajectories of Substance Use Among Young American Indian Adolescents: Patterns and Predictors, 43 J. of Adolescent Health, 437-453 (2014); Les B. Whitbeck et al., Traditional Culture and Academic Success among American Indian Children in the Upper Midwest, 40(2) J. of Am. Indian Educ., 48-60 (2001); Jan-Richard Cummins et al., Correlates of Physical and Emotional Health Among Native American Adolescents, J. of Adolescent Health, 38-44 (1998).

[108] Leavitt RA, Ertl A, Sheats K, et al., Suicides Among American Indian/Alaska Natives — National Violent Death Reporting System, 18 States, 2003-2014, U.S. Dept. of Health & Human Services (2018) (emphasis added).

[109] Casey Family Programs & Center for Native American Youth at the Aspen Institute, The Well-being of American Indian and Alaska Native Youth: Using What We Know to Make Better Policy (2015).

[110] Leavitt RA, Ertl A, Sheats K et al., Suicides Among American Indian/Alaska Natives — National Violent Death Reporting System, 18 States, 2003-2014, U.S. Dept. of Health & Human Services (2018).

[111] Id.

with white decedents (95% CI = 1.6-2.1).[112]

Compared with white decedents, American Indian and Alaska Native decedents have 2.4 times the odds of the suicide of a friend or family member affecting their own death (as established through a note or interviews with persons who knew the decedent) (95% CI = 1.9-3.1) and 1.7 times the odds of the non-suicide death of a family member or friend affecting their own death (95% CI = 1.4-2.1)—suggesting suicide contagion and that overall community health plays a greater role in suicide risk of individual American Indians and Alaska Natives than for white individuals.[113]

In general, the American Indian and Alaska Native population between 2016-2020 experienced alcohol-related deaths at significantly higher rates (51.9/100,000) than the rest of the U.S. population (11.7/100,000 )—more than four times.[114]  And in 2019 and 2020, drug overdose death rates remained highest for American Indians and Alaska Natives at 30.5 (2019) and 42.5 per 100,000 (2020) despite rates increasing for all populations in the U.S.[115]  Between 2019-2020 alone, American Indian and Alaska Native overdose death rates increased by 39 percent.[116]

Research demonstrates that childhood events can negatively affect mental and physical health and cognition over an individual's lifetime.[117]  Adverse Childhood Experiences (ACEs) are a measure of potentially traumatic events that occur in childhood (0-17 years) that are assessed by eight challenges: physical abuse, sexual abuse, emotional abuse, intimate partner violence, household substance use, household mental illness, parental separation or divorce, and household member incarceration.[118]  Although ACEs are an individual measure, the literature recognizes that ACEs for American Indians and Alaska Natives "may be associated with intergenerational experiences and trauma including genocide of [American Indian and Alaska Native] individuals, abuse from the boarding school system, interruption of traditional practices, and centuries of colonialism."[119]

All ACE scores for American Indians and Alaska Natives are higher compared to those for white individuals: 2.32 M (95% CI = 2.28 - 2.37) versus 1.53 M (95% CI = 1.52 - 1.54); and higher when compared to black and Hispanic individuals: 2.32 M (95% CI = 2.28 - 2.37) versus 1.66 M (95% CI = 1.65 - 1.67) and 1.63 M (95% CI = 1.62 - 1.64)

---

[112] Id.

[113] Id.

[114] Hedegaard H, Miniño AM, Spencer MR, Warner M, Drug overdose deaths in the United States, 1999-2020. NCHS Data Brief, no 428, U.S. Dept. of Health & Human Services (2021).

[115] Kariisa M, Davis NL, Kumar S et al. Vital Signs: Drug Overdose Deaths, U.S. Dept. of Health & Human Services (2022).

[116] Id.

[117] Giano Z, Camplain RL, Camplain C et al., Adverse Childhood Events in American Indian/Alaska Native Populations, Am J Prev Med (2021).

[118] Id.

[119] Id.

respectively.[120]  Moreover, among American Indians and Alaska Natives, individuals that identify as gay or lesbian have the highest mean ACE score (4.05), with approximately 70 percent of individuals in this category experiencing household substance abuse and parental separation or divorce.[121]  Although the smallest population, health outcomes of American Indians and Alaska Natives are extreme compared to the rest of the U.S. population.

Studies markedly reveal, however, that both cultural and family connectedness positively influence Indian child and adolescent resilience, emotional health including depression, suicide attempt, academic success, alcohol, tobacco, and substance use, and delinquent and violent behavior.[122]  For example, a 2012 study determined that among high-risk, low-protection groups, the loss of protective factors was associated with a larger increase in reported suicide attempts in Indian youth than in non-Indian youth (from 20 percent - 46 percent and from 17 percent - 26 percent respectively).[123]  Research further suggests that historical traumatic experiences can add to an individual's adverse childhood experiences and persist in adverse adult experiences.[124]  Core behaviors like coping and parenting are abnormally affected.[125]  Unresolved adult issues are then transferred to descendants, creating a negative cycle of adverse childhood experiences in later generations.[126]  Medical best practice includes protective factor enhancement because positive health effects are recognized to influence the entire community.[127]

The American Medical Association (AMA) and American Academy of Pediatrics (AAP) as *amici* in *Haaland v. Brackeen* in support of respondent U.S. Secretary Haaland to uphold the Indian Child Welfare Act recognize the medical phenomenon:

> American Indian and Alaska Native children experience historical loss symptoms at roughly the same rate as adults. '[T]he historical losses experienced by North American Indigenous people are not 'historical' in the sense that they happened long ago and a new life has begun.  Rather, they are 'historical' in that they originated long ago and have persisted. The reminders of historical loss remain ever present.'

---

[120] Id.

[121] Id.

[122] Pu, *supra* note 95; Mackin, *supra* note 37; Allen *supra* note 95; Teresa D. LaFromboise et al., Family, Community, and School Influences on Resilience Among American Indian Adolescents in the Upper Midwest, 32(2) J. of Cmty. Psychology, 193-209 (2006).

[123] Mackin, *supra* note 37.

[124] Casey Family Programs & Center for Native American Youth at the Aspen Institute, The Well-being of American Indian and Alaska Native Youth: Using What We Know to Make Better Policy (2015); Warne, *supra* note 128.

[125] *Id.*

[126] Id.

[127] Mackin, *supra* note 37.

ICWA provides a clear, sensible mechanism for *preserving family and community connections*.[128]

Limited quantitative research of Federal Indian boarding school survivors, individuals removed to non-Indian foster or adoptive homes or institutions, and current American Indian and Alaska Native individual and population health indicate that Indian child removal alone produces individual and population health changes over time.[129]

Moreover, recent exams of PTSD in patients suggest that "traumatic memories are a qualitatively divergent cognitive entity."[130]  That is, brain scan evidence of PTSD patients shows that brain recall of traumatic memories often display as intrusions in the posterior cingulate cortex (PCC) instead of activity in the hippocampus, the part of the brain that organizes and contextualizes memories including processing "regular" negative memories.[131]  This means that during traumatic memory reactivation, an individual engages the part of the brain, the PCC, associated with internal processing, self-analysis, or self-relevance.[132]  The traumatic memory in turn is not experienced as a regular memory but instead re-lived or re-experienced as "fragments of prior events, subjugating the present moment."[133]  Although the understanding of brain function differences in PTSD-associated traumatic memories is emerging, early findings call for increased medical investment in understanding the individual and intergenerational impacts of American Indian and Alaska Native traumatic experiences involving the Federal Indian boarding school system and placement in non-Indian foster or adoptive homes or institutions.

The ICWA strengthens the health status of American Indians and Alaska Natives.[134]  U.S. Congress, through the Act, enhanced protective factors by requiring court and agency compliance in state child welfare proceedings with two provisions: active efforts and placement preferences.  Congress expressly developed minimum standards for Indian child welfare proceedings requiring the party seeking removal to provide active efforts to prevent the breakup of the Indian family.[135]  The Department's ICWA regulations define "active efforts" as "affirmative, active, thorough, and timely efforts intended primarily to *maintain*

---

[128] Brief for the American Academy of Pediatrics and American Medical Association as Amici Curiae supporting Secretary of the Interior & Petitioners, p. 14, 27, Haaland v. Brackeen, 599 U.S. 255 (2023) (emphasis added).

[129] Ursula Running Bear et al., The Impact of Individual and Parental American Indian Boarding School Attendance on Chronic Physical Health of Northern Plains Tribes, 42 Fam. Community Health 1, 3-4 (2019); Ursula Running Bear et al., Boarding School Attendance and Physical Health Status of Northern Plains Tribes, 13 Applied Res. Qual. of Life 633 (2018); Maria Yellow Horse Brave Heart, The Historical Trauma Response Among Natives and Its Relationship with Substance Abuse: A Lakota Illustration, 35 J. of Psychoactive Drugs 1, 7-13 (2003).

[130] Perl, O., Duek, O., Kulkarni, K.R. et al. Neural patterns differentiate traumatic from sad autobiographical memories in PTSD. Nat Neurosci 26, 2226-2236 (2023).

[131] Id.

[132] Id.

[133] Id.

[134] Gallegos, Joaquin R., Fort, Kathryn E., Protecting the Public Health of Indian Tribes: the Indian Child Welfare Act, 12 Harvard Pub. Health Rev. (2018).

[135] 25 U.S.C. § 19012(d).

*or reunite* an Indian child with his or her family."[136]  The active efforts regulation with the law supports family maintenance and biological family reunification by requiring parties to assist Indian parent(s) or custodian(s) in executing the state's child welfare case plan as well as in accessing or developing the resources necessary to satisfy the case plan.[137]  It also enhances cultural and family connectedness by requiring that agencies, to the maximum extent possible, conduct active efforts "in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe."[138]  Finally, the regulation recognizes that active efforts is not a one-size-fits-all and provides examples of the type of remedial services and rehabilitative programs that may constitute active efforts in a particular case, including assistance to parents and families in accessing community resources such as housing, financial, transportation, mental health, substance abuse, and peer support services.[139]

The ICWA also directs preferences for an Indian child's placement in foster or adoptive homes.  The ICWA's placement preferences provision reflects "[f]ederal policy that, where possible, an Indian child should remain in the Indian [Tribe or] community."[140]  When a child must be removed from her parent(s) or guardian(s), ICWA requires that a preference be given, "in the absence of good cause to the contrary," to placement with extended family, other members of the child's Indian Tribe, other Indian families, and other preferences authorized by the child's Indian Tribe.[141]  Compliance with ICWA's placement preferences protects Indian Children and the survival of Indian Tribes by increasing the odds that the child will remain with her Indian Tribe or Alaska Native Village and connected to her Indian culture.  At end, the "limited data we do have about ICWA and child welfare generally indicate the law is a benefit that can directly address adverse childhood experiences."[142]

The U.S. medical field acknowledges that "efforts to destroy native cultures cause trauma that reverberates across generations."[143]  A minority of law and policy actors nonetheless continue to bring legal claims attempting to end the ICWA's legal and medical protections for Indian children and Indian Tribes and Alaska Native Villages.

Congress enacted the ICWA to protect Indian children, Indian families, and Indian

---

[136] 25 C.F.R. § 23.2.
[137] Id.
Id.
[139] Id.
[140] Indian Child Welfare Act Proceedings Final Rule, 82 Fed. Reg. 38,778, 38782 (June 14, 2016).
[141] 25 U.S.C. § 1915.
[142] Fort, Kathryn E., The Road to *Brackeen*: Defending ICWA 2013-2023 (July 1, 2023), Am. U. Law Review, Vol. 72, No. 5, 2023.
[143] Brief for the American Academy of Pediatrics and American Medical Association as Amici Curiae supporting Secretary of the Interior & Petitioners, p. 9, Haaland v. Brackeen, 599 U.S. 255 (2023); *See* Gallegos, Joaquin R., Fort, Kathryn E., Protecting the Public Health of Indian Tribes: The Indian Child Welfare Act, 12 Harvard Pub. Health Rev. (2018) (discussing how ICWA's protections, specifically, the active efforts and placement preference provisions, can help restore wellness within Indian Tribes by promoting cultural and family connectedness).

Tribes.[144]  In so doing, the United States helped prevent repetition of the harms caused by Indian assimilation through the Federal Indian boarding school system and unwarranted removal of Indian children from their homes and predatory state foster care and adoption placement with non-Indian foster or adoptive homes or institutions.  In doing so, the U.S. Government acted upon its moral and trust obligations to advance the well-being of American Indians and Alaska Natives.

★   ★   ★   ★   ★   ★

## 13.    Indigenous Child Removal: Canada, New Zealand, Australia

The Holy Roman Catholic Church and subsequent branches of Christianity endorsed European colonization of Canada, Australia, New Zealand, and the United States, the "CANZUS states", and ultimately Indigenous child removal for both claimed civilization and Christian conversion.  Given that the United States was the first to initiate widescale Indigenous child removal, and the other three countries subsequently adopted those practices, the U.S. should revisit this well-documented history and examine the actions of the other CANZUS states for redressing actions against Indian Tribes, Alaska Native Villages, and the Native Hawaiian Community.

The Holy See[145] issued the following Papal Bulls to authorize Catholic countries in Europe to conquer non-Christians and seize their territories, serving as the basis for The Doctrine of Discovery[146]:

- His Holiness the Pope Nicholas V, 1452, *Dum Diversas*.
- His Holiness the Pope Nicholas V, 1455, *Romanus Pontifex*.
- His Holiness the Pope Alexander VI, 1493, *Inter Caetera*.

The British Empire and France authorized their conquest of non-Christians and seizure of their territories through self-termed discovery and subsequent possession or occupation.[147]

Canada, Australia, New Zealand, and the United States derive from the British Empire and maintain English common law systems.[148]  The four countries are distinct, as they have political and legal relationships with Indigenous Peoples based on founding national documents, centuries-old judicial decisions, and legislative and executive actions and instruments—unlike other countries that base official interactions with Indigenous

---

[144] 25 U.S.C. § 1901.

[145] The Holy Roman Catholic Church.

[146] The Holy See, Joint Statement of the Dicasteries for Culture and Education and for Promoting Integral Human Development on the "Doctrine of Discovery" (2023).

[147] Johnson v. M'Intosh, 21 U.S. 543, 558 (1823); Brian Slattery, "Paper Empires: The legal dimensions of French and English Ventures in North America" in John McLaren, A. R. Buck; Nancy E. Wright, Despotic Dominion, property Rights in British Settler Societies. Vancouver: University of British Columbia Press, 55 (2005).

[148] Johnson v. M'Intosh, 21 U.S. 543, 558 (1823); *see*, Holland Rose, J., Newton, A. P., Benians, E.A., The Cambridge History of the British Empire, Vol. I, II, III (Cambridge Un. Press 1929).

Peoples on human rights or non-binding principles.[149]  For example, from 1722 to 1869, the British Crown and the United States entered into 374 treaties with Indian Tribes.[150]

Secretary Haaland and Assistant Secretary Newland visited Canada, Australia, and New Zealand to meet with officials to learn about historical Indigenous child boarding schools in these countries and subsequent redress.

In Canada, between 1870-1997, the state removed over 150,000 First Nations, Inuit, and Métis children from their families and Indigenous governments for placement in state or religious institution-run Indian residential schools.[151]  In 2006, Canada enacted the Indian Residential Schools Settlement Agreement of $2 billion to formally address the Indian residential school legacy, including $100 million secured from Catholic, Presbyterian, Anglican, and United Church of Canada religious institutions and organizations.[152]  The settlement, the then-largest class action settlement in Canadian legal history, included the following components:

- Establishing the Indian Residential Schools Truth and Reconciliation Commission to, in part, document and preserve survivor experiences;

- Common Experience Payment (CEP): $10,000 per survivor for the first year of attendance and $3,000 for each additional year;

- Independent Assessment Process (IAP): an extra-judicial process to resolve survivor claims up to $275,000, and potential $250,000 award for claims of income loss, for experienced sexual abuse, serious physical abuse, and other wrongful acts committed by:

  o An adult employee or another adult who was lawfully on the premises;
  o One student against another where staff knew or should have known about the abuse, or, in serious sexual abuse cases, where reasonable supervision standards were not in place; or
  o An adult employee or adult lawfully on the premises where the abuse caused serious psychological consequences for the claimant per the IAP;

---

[149] U.S. Const. art. I, §§ 2, 8; Commonwealth of Australia Constitution Act, 1900; Treaty of Waitangi, 1840; Mabo v. Queensland (No 2) (1992) 175 CLR 1; Mabo v. Queensland (No 1) (1988) 166 CLR 186; Johnson v. M'Intosh, 21 U.S. 543, 558 (1823); Treaty of Waitangi Act 1975; Indian Act of 1876, R.S.C., 1985, c. I-5.
[150] National Records and Archives Service, General Services Administration, Ratified Indian Treaties 1722-1869, at 1 (1973).
[151] Truth and Reconciliation Commission of Canada, Canada's Residential Schools: History, Part 1 Origins to 1939, 4 (McGill-Queen's Un. Press 2015).
[152] Indian Residential Schools Settlement Agreement (2006).

- $125 million for individual and community-based healing programming for physical, sexual, mental, cultural, and religious abuses in the Indian residential school system, including intergenerational impacts; and

- $20 million for commemoration projects.[153]

From 2019-2023, Canada provided $232.1 million for marked and unmarked burial site research and activities, including for location or GPR services, documentation, memorialization, and repatriation of Indian child human remains.[154] In 2021, to strengthen existing medical funding, Canada added $107.3 million for providing mental health, culture, and emotional services to Indian residential school survivors to support intergenerational trauma recovery.[155] Canada provided $100.1 million to aid First Nation, Inuit, and Métis management of on-reserve former Indian residential school infrastructure including for building demolition, land remediation, or new facility construction for community-based activities.[156]

Canada addressed the Indian residential day school system through settlements with First Nation, Inuit, and Métis children that experienced Indian day schools or residential schools but did not board overnight *and* Tribes that were part of the class action. This includes for children that "suffered abuse or harm from teaching staff, officials, students and other third parties at the school" *or* for the "common experience" of attendance.[157]

- ***McLean v. Canada* Settlement:**

  o $1.27 billion, at $10,000 per survivor; and

  o $200 million to support "commemoration, wellness/healing, and the restoration and preservation of Indigenous languages and culture" for the benefit of the survivor and descendant classes.[158]

- ***Gottfriedson v. Canada* Settlement:**

  o $10,000 per survivor, not a part of the *McLean* Settlement, *with no total cap*, that did not necessarily suffer abuse or harm but had the "common experience"; and

  o $50 million towards the creation of the Day Scholars Revitalization Society, "an Indigenous-led organization to support healing, wellness, education, language,

---

[153] Id.
[154] Crown-Indigenous Relations and Northern Affairs Canada (CIRNAC), Residential Schools Missing Children Community Support Fund (2023).
[155] Crown-Indigenous Relations and Northern Affairs Canada (CIRNAC), Government of Canada supports Indigenous communities across the country to address the ongoing legacy of residential schools (2022).
[156] Id.
[157] Gottfriedson v. Canada, 2021 FC 988; McLean v Canada, 2019 FC 1075.
[158] McLean v Canada Settlement Agreement, T-2169-16.

culture, heritage and commemoration for the benefit of the Survivor and Descendant classes."[159]

o $2.8 billion to the 325 class Indian bands for loss of language and culture:

▪ An initial $200,000 to advance Indigenous languages; revival and protection of Indigenous cultures; protection and promotion of heritage; and wellness for Indigenous communities and their members; and

▪ $325 million trust, with each band receiving a share of annual investment income.[160]

Moreover, the "Sixties Scoop" refers to the practice in Canada between the late 1950's through early 1990's "of removing large numbers of Indian children from their families and communities and placing them in the care of non-indigenous foster or adoptive families."[161]  "Indian children who were victims of the Sixties Scoop lost their cultural identity and suffered psychologically, emotionally, spiritually and physically."[162]  "They were also deprived of their status, their aboriginal and treaty rights and monetary benefits to which they were entitled pursuant to the *Indian Act*, RSC 1985, c I-5 and related legislation and policies."[163]

By the 1970s, approximately one third of all children in state care were First Nation, Inuit, and Métis children with approximately 70 percent of them placed with white families.[164]  In the 2018 *Riddle* Settlement, Canada for $800 million settled with a now-adult First Nation, Inuit, and Métis class that experienced state foster care and adoption removal during the Sixties Scoop for legal damages for "loss of cultural identity."[165]  Per the agreement, each qualified claimant receives a one-time $25,000 compensation and Canada directed $50 million to reunification and holistic wellness services for class members.[166]

Today, First Nation, Inuit, and Métis children represent 7.7 percent of the child population but 52.2 percent of children in foster care.[167]  In 2007, several First Nations brought the *Moushoom* and *Trout* class action suits against Canada for chronic

---

[159] Gottfriedson v. Canada Settlement Agreement, T-1542-12.
[160] Gottfriedson v. Canada, 2023 FC 327.
[161] Sixties Scoop Settlement Agreement (2017).
[162] Id.
[163] Id.
[164] Sinclair, Raven. "Identity lost and found: Lessons from the sixties scoop." First Peoples Child and Family Review. 3(1), 2007: 66; Fournier and Crey; Johnston, Patrick. Native Children and the Child Welfare System. Toronto: James Lorimer and the Canadian Council on Social Development, 1983.23.
[165] Brown v. Canada 2018 ONSC 3429; Riddle v. Canada, 2018 FC 641.
[166] Id.
[167] First Nations Child and Family Services, Indigenous Services Canada (ISC), Government of Canada (2023).

underfunding of and discrimination in the child welfare system against First Nations children.  The cases were consolidated with plaintiffs advancing two main claims:

1. "Canada chronically underfunded the [First Nations Child & Family Services (FNCFS)] program on reserves and in the Yukon, and operated it in a discriminatory manner, which *systemically incentivized* the removal of First Nations children from their families, communities and cultures; and[168]

2. "Canada failed to provide non-discriminatory access to essential health and social services…"[169]

For the first claim, plaintiffs raised the issue in the Indian residential school system and predatory foster care and adoption practice timeline:

> [The] underfunding persisted despite: (a) the heightened need for such services on reserve due to the inter-generational trauma inflicted on First Nations people by the legacy of the Indian residential schools and the Sixties Scoop; and (b) Canada's knowledge of the deficiencies in the FNCFS program based on numerous governmental and independent reports detailing these significant deficiencies, the inequities in the FNCFS program and their harmful impacts on First Nations people.

> [The] incentive to remove First Nations children from their homes has caused traumatic and enduring consequences for First Nations children (including the Representative Plaintiffs), many of whom already suffer the effects of trauma inflicted by Canada on their parents, grandparents and ancestors by Indian residential schools and the Sixties Scoop.[170]

In December 2023, Canada settled the consolidated *Moushoom* and *Trout* cases for $43.34 billion.[171]  The settlement includes:

- **$23.34 billion:** to compensate First Nations children and families harmed by discriminatory underfunding of the First Nations Child and Family Services (FNCFS) program and those impacted by Canada's failure to provide non-discriminatory access to essential health and social services.[172]

---

[168] Moushoom v. Canada (Attorney General), [4], 2023 FC 1533 (emphasis added).
[169] Id.
[170] Id. at 7, 8.
[171] Id.
[172] Id.

71

- **$20 billion:** to long-term reform the First Nations Child and Family Services system including, but not limited to: increasing funding for culturally appropriate prevention activities based on the best interests of the child; support for young First Nations adults aging out of the child welfare system and formerly in care up to their 26th birthday or a greater age if specified in provincial or Yukon legislation; increasing housing on reserves per the needs of First Nations children.[173]

Canada formed a trust with the $43.34 billion settlement funds to run independent from the Federal government.[174]

During the *Moushoom* and *Trout* class action litigation, Canada in 2019 enacted Bill C-92 (An Act Respecting First Nations, Inuit and Métis Children, Youth and Families).[175]

Among other provisions, Bill C-92 affirms the rights of First Nation, Inuit, and Métis governments to exercise jurisdiction over child and family services; establishes the best interests of the child standard which includes cultural continuity; requires notice, confirms the right of the parent(s) and Tribal government to "make representations"; establishes placement preferences, and confirms that if there is a discrepancy between a tribal and Federal (other than sections 10-15) or provincial law, the tribal law will prevail to the extent of the conflict.[176]

Quebec, Alberta, Manitoba, and the Northwest Territories subsequently filed suit against Canada, *Attorney General of Québec v. Attorney General of Canada*, arguing Bill C-92 is unconstitutional, infringing on provincial jurisdiction as the law provides that Indigenous governments possess the right to manage their own child and family services and where provincial law conflicts with tribal law, tribal law governs. In February 2024, the Supreme Court of Canada unanimously decided the law was constitutional, recognizing rights already protected by the Aboriginal rights section of Canada's Constitution.[177]

In Australia, between 1910-1970, the state removed 1 in 3 Aboriginal and Torres Strait Islander children from their families and Indigenous communities across the now-called Commonwealth territories that include the Northern Territory, Australian Capital Territory, and Jervis Bay for placement in state or "mission" (religious institution or organization-run) dormitories or with white families.[178] Aboriginal and Torres Strait Islander people who, as children, were removed are referred to as the "Stolen

---

[173] Government of Canada, Assembly of First Nations, First Nations Child and Family Caring Society, Chiefs of Ontario, Nishnawbe Aski Nation, The Agreement-in-Principle on Long-Term Reform of the First Nations Child and Family Services (FNCFS) Program and Jordan's Principle (2023).
[174] Id.
[175] Parliament of Canada, Bill C-92 (Royal Assent) (2019).
[176] Id. at 8, 9(1), (2), 10, 12(1), 14(1), 16, 18(1), 22(1), (3).
[177] Attorney General of Québec v. Canada (SCC 40061) [Bill C-92 Reference].
[178] Parliament of Australia, Apology to Australias Indigenous Peoples (2008).

Generations."[179]   "Many experienced neglect, physical and sexual abuse, exploitative labor, and were denied contact with their families and communities."[180]  By the mid-1930s, more than half of Aboriginal children in the Northern Territory were housed in state-run institutions.[181]

In 1995-7, Australia established the National Inquiry to receive testimony and report on Aboriginal and Torres Strait Islander child removal practices and reparation options.[182] In 2018, Australia separately delivered the National Redress Scheme to provide sexual abuse survivors, while in government or non-government institutions, including those of the Catholic Church, counseling access, a direct personal response, and a redress payment up to $150,000.[183]  Aboriginal and Strait Torres people who experienced sexual abuse as children in dormitory or mission schools may secure support through this mechanism.[184]

In 2021, Australia delivered a $378.6 million redress scheme for living Stolen Generations members who were removed from their families in the Northern Territory and the Australian Capital Territory prior to self-government and the Jervis Bay Territory.[185]

The scheme provides:

- A one-time payment of $75,000 in recognition of the harm caused by forced removal;

- A one-time assistance payment of $7,000 to facilitate individual-specific healing; and

- The opportunity, if elected, for each survivor to confidentially tell their experience about removal impact to a senior official and receive acknowledgement and a face-to-face or written apology for their removal and resulting trauma.[186]

Several states of Australia have delivered additional redress schemes for removal including:

---

[179] Id.
[180] Commonwealth of Australia, Australian Human Rights Commission, Bringing them Home: National Inquiry into the Separation of Aboriginal and Torres Strait Islander Children from Their Families (1997).
[181] Robert Manne, "Aboriginal Child Removal and the Question of Genocide, 1900-1940, in A. Dirk Moses (ed). Genocide and Settler Society. New York: Berghahn Books: 217, 227 (2004).
[182] Commonwealth of Australia, Australian Human Rights Commission, Bringing them Home: National Inquiry into the Separation of Aboriginal and Torres Strait Islander Children from Their Families (1997).
[183] Commonwealth of Australia, National Redress Scheme for Institutional Child Sexual Abuse Act (2018).
[184] Id.
[185] Parliament of Australia, Territories Stolen Generations Redress Scheme (2021).
[186] Id.

- **Victoria** (2022), $155 million.[187] The package is open to individuals "who were removed by a *government or non-government agency* in Victoria prior to the 31 December 1976."[188] Qualified individuals receive $100,000, a personal apology from the Victorian Government, access to healing and reconnection to national programs, and an opportunity to share their experience.[189]

- **New South Wales** (2016), $73 million.[190]  The package is open to individuals "*removed by, committed to, or otherwise came into the care of* the New South Wales Aborigines Protection or Welfare Boards under the Aborigines Protection Act 1909, up until the Act was repealed on 2 June 1969."[191]  Qualified individuals receive $75,000, a personal apology from the New South Wales Government, and $7,000 to support funeral costs. [192]

- **South Australia** (2015), $11 million.[193]  The package was open to individuals removed in Southern Australia or by Southern Australian authorities prior to the 21 December 1975.[194]  Qualified individuals received $30,000.[195] South Australia used approximately $2 million to support community healing projects.[196]

- **Tasmania** (2006), $5 million.[197]  The package was open to individuals removed and in state custody for at minimum 12 months and prior to 31 December 1975.[198] Qualified individuals received $58,333.33 and descendants of decedent qualified individuals received $5,000 not to exceed $20,000 per family.[199]

Aboriginal and Torres Strait Islander children today represent 6 percent of the child population but 56.8 percent of children in foster care.[200]

In 1984, Australia, through the Community and Disability Services Ministerial Advisory Council, adopted the policy of the Aboriginal and Torres Strait Islander Child

---

[187] Victorian Government, Stolen Generations Reparations Package (2022).
[188] Id. (emphasis added).
[189] Id.
[190] Government of New South Wales, New South Wales Stolen Generations Reparations Scheme and Funeral Assistance Fund (2016).
[191] Id. (emphasis added).
[192] Id.
[193] Government of South Australia, Stolen Generations Reparations Scheme (2015).
[194] Id.
[195] Id.
[196] Id.
[197] Tasmanian Government, Stolen Generations of Aboriginal Children Act 2006 (2006).
[198] Id.
[199] Id.
[200] Commonwealth of Australia, Proportion of children in out-of-home care (0-17 years old) that are Aboriginal and Torres Strait Islander, Closing the Gap Information Repository (2023).

Placement Principle for states and territories to implement.[201]  The principle in policy and practice reduces over-representation of Aboriginal and Torres Strait Islander children in child protection and out-of-home care systems by keeping Aboriginal and Torres Strait Islander children connected to their family, community, culture, and Australia.[202]  The various state and territory laws implement and include, but are not limited to, the following: establishing the best interests of the child standard; creating placement preferences or "hierarchy" for *all* out of home care placements, and cultural support plans for last-result non-Indigenous placements; utilizing comprehensive health and social services to support the child's (or children's) parent(s) to maintain in-home care; and requiring reunification or "restoration" as the end-goal of a child welfare case.[203]  Notably, if a child is not placed with their extended Aboriginal and Torres Strait Islander family, the placement must be within "close geographic proximity" to the child's family."[204]

In Australia, "[a]ll jurisdictions have adopted the Aboriginal and Torres Strait Islander child placement principle in legislation and policy."[205]

In New Zealand, the Church Missionary Society from Great Britain established the first boarding school for Māori children for Christianization.[206]  Following the New Zealand Wars, the state enacted the Native Schools Act 1867 to create a national system of state-operated or state-funded and religious institution-operated boarding schools with Māori Tribes required to donate the land for the schools and contribute to infrastructure and staff costs.[207]  In 1894, the state made Māori child boarding school attendance compulsory.[208]  In 1969, New Zealand transferred national control of the system to regional education boards.[209]

In 1975, the Crown established The Waitangi Tribunal to assess claims of the Crown breaching the Treaty of Waitangi from 1840-present and enter into direct Crown negotiations.[210]  As of 2024, the Crown signed 100 settled deeds.  There are approximately

---

[201] Formerly the Council of Social Welfare Ministers; Australian Institute of Family Studies, Resource Number 8 (2005); Lock, J., Foster Care: What is the Aboriginal and Torres Strait Islander Child Placement Principle (1997).
[202] Commonwealth of Australia, Australian Institute of Health and Welfare, The Aboriginal and Torres Strait Islander Child Placement Principle indicators (2023).
[203] Id.
[204] Commonwealth of Australia, Productivity Commission, Report on Government Services 2023, 16 Child protection services (2023).
[205] Id.
[206] John Butler to Secretary of Sydney Correspondence Committee, 6 Nov. 1814, Mission Books 1820-1822, CN/M1 Microfilm, AU.
[207] Native Schools Act 1867 (31 VICT 1867 No 41).
[208] School Attendance Act 1894 (58 VICT 1894 No 26).
[209] Education Amendment Act 1968 (1968 No 11).
[210] Treaty of Waitangi Act 1975, section 5 (1975 No 114).

50 remaining settlements.[211]  Queen Elizabeth II herself signed the 1995 Act effectuating the Waikato-Tainui Claim Settlement.[212]

The approximate total settlement amount is NZD $2.74 billion, with most settlements including an official apology, financial award, territory-return, water rights, fishery rights, and mineral rights return, and cultural redress like restoring place names in the Māori language.[213]

In 1989, following ICWA implementation in the U.S., New Zealand enacted the Oranga Tamariki Act (Children's and Young People's Well-being Act) to prevent contemporary and future unwarranted Indigenous child removal.[214]   Among other provisions, the law establishes the best interests of the child standard and requires kinship care and placement preferences (whānau, hapū, iwi, or family group) for when an Indigenous child must be removed from the home.[215]  In 2019, New Zealand revised the Oranga Tamariki Act regulations that affirmed kinship care, placement preferences, support to establish, maintain, and improve whānau connections, and separate reporting information or results for Māori children and young people on regulation compliance.[216]

On July 25, 2022, His Holiness Pope Francis of the Holy See officially apologized on behalf of the Holy Roman Catholic Church for its participation in Canada's Indian residential school policies.  His Holiness Pope Francis stated:

> I ask forgiveness, in particular, for the ways in which many members of the Church and of religious communities cooperated, not least through their indifference, in projects of cultural destruction and forced assimilation promoted by the governments of that time, which culminated in the system of residential schools … What our Christian faith tells us is that this was a disastrous error, incompatible with the Gospel of Jesus Christ.  It is painful to think of how the firm soil of values, language and culture that made up the authentic identity of your peoples was eroded, and that you have continued to pay the price of this. In the face of this deplorable evil, the Church kneels before God and implores his forgiveness for the sins of her children (cf. JOHN PAUL II, Bull Incarnationis Mysterium [29 November 1998], 11: AAS 91 [1999], 140).  I myself wish to reaffirm this, with shame and

---

[211] New Zealand Ministry of Justice, Waitangi Tribunal (2023).
[212] Waikato Raupatu Claims Settlement Act 1995 (1995 No 58).
[213] New Zealand Ministry of Justice, Waitangi Tribunal (2023).
[214] New Zealand Parliamentary, Children, Young Persons, and Their Families (Oranga Tamariki) Legislation Act 2017 (2017 No 31).
[215] Id.
[216] New Zealand Parliamentary, Oranga Tamariki Legislation Act 2019 (2019 No 30).

unambiguously.   I humbly beg forgiveness for the evil committed by so many Christians against the indigenous peoples.[217]

And on March 30, 2023, His Holiness Pope Francis of the Holy See officially renounced The Doctrine of Discovery, signaling repudiation of the Papal Bulls authorizing Catholic countries in Europe to conquer non-Christians and seize their territories.[218]

To date, the U.S. Government is unaware of any support by the United States Conference of Catholic Bishops for His Holiness Pope Francis to officially apologize on behalf of the Holy Roman Catholic Church for its participation in U.S. Federal Indian boarding school policies.  On June 14, 2024, the United States Conference of Catholic Bishops approved by vote (181-2) "Keeping Christ's Sacred Promise: A Pastoral Framework for Indigenous Ministry," issuing a formal apology for the Catholic Church's role in the U.S. of inflicting a "history of trauma" to Indian Tribes, Alaska Native Villages, and the Native Hawaiian Community and affirmed its official repudiation of The Doctrine of Discovery.[219]  The Conference noted:

> The Indian boarding school 'system itself left a legacy of community and individual trauma that broke down family and support systems among Indigenous communities.   These multigenerational traumas continue to have an impact today, one that is perpetuated by racism and neglect of all kinds… Many Indigenous people feel unaccepted by and unwelcomed in society and even the Church.  Further, Indigenous peoples still suffer disrespect and neglect within the larger U.S. society.'[220]

The Conference also provided a series of recommendations to confront the following issues in Indian Country and the Native Hawaiian Community: Natural Resources; Housing and Access to Financing; Education; Health Care; Racism; and Concerns of Urban Natives.[221]

---

[217] The Holy See, Apostolic Journey of His Holiness Pope Francis to Canada: Meeting with Indigenous Peoples: First Nations, Métis and Inuit (2022).
[218] The Holy See, Joint Statement of the Dicasteries for Culture and Education and for Promoting Integral Human Development on the "Doctrine of Discovery" (2023).
[219] United States Conference of Catholic Bishops, Keeping Christ's Sacred Promise: A Pastoral Framework for Indigenous Ministry," 5, 6, 7 (2024).
[220] Id. at 10.
[221] Id. at 33.

> "We are here with the desire to pursue together a journey of healing and reconciliation that, with the help of the Creator, can help us shed light on what happened and move beyond the dark past."
>
> -   **His Holiness Pope Francis**

222



## 14.   The Road to Healing and Oral History Project

> "I believe we are born with an obligation.  We're not just people here on this earth taking up space, we have an obligation to honor the legacy of our ancestors, so they didn't starve in vain, so they didn't die in vain, so they weren't ripped away from their mother's arms in vain.  It's our obligation to help people, to honor our earth, and protect our environment for future generations.  We know that things don't die when we die.  We're not here to use up as much as we can and then who cares about our children and grandchildren.  That's not who we are as people."
>
> -   **Secretary Haaland at The Road to Healing Southern California**

223

As part of the Federal Indian Boarding School Initiative, and in response to Assistant Secretary Newland's Vol. I recommendations, Secretary Haaland launched "The Road to Healing," a tour across the country to hear directly from survivors about their experiences in the Federal Indian boarding school system.  As part of The Road to Healing, Secretary Haaland, Assistant Secretary Newland, and other U.S. officials, visited the following 12 areas:

---

222 Pope Francis, Address, Meeting with Young People and Elders at a Primary School in Iqaluit, July 29, 2022.
223 Southern California Transcript, 129 edited for clarity.

- Riverside Indian School, Oklahoma (7/9/2022).

- Little Traverse Bay Bands of Odawa Indians, Michigan (8/13/2022).

- Rosebud Sioux Tribe, South Dakota (10/15/2022).

- Gila River Indian Community, Arizona (1/20/2023).

- Navajo Nation, New Mexico, Arizona, Utah (1/22/2023).

- Tulalip Indian Tribes, Washington (4/23/2023).

- Mille Lacs Band of Ojibwe, Minnesota (6/3/2023).

- Sherman Indian High School, Southern California (8/4/2023).

- Federated Indians of Graton Rancheria, Northern California (8/6/2023).

- Alaska Native Heritage Center, Alaska (10/22/2023).

- Pueblo of Isleta, New Mexico (10/29/2023).

- Montana State University, Montana (11/5/2023).

The Secretary also met with members of the Native Hawaiian Community in Kailua, Oʻahu on June 26, 2023, to learn more about Native Hawaiian experiences in historical boarding schools established by religious institutions and organizations across the Hawaiian Islands.

The Road to Healing was part of the Department's effort to create a permanent oral history collection.

During events for The Road to Healing, the Department of Health & Human Services (Indian Health Service & Substance Abuse and Mental Health Services Administration), the Alaska Native Tribal Health Consortium, and the Southcentral Foundation provided trauma-informed mental health providers or traditional healers onsite for individuals experiencing secondary trauma from telling their experiences, often for the first time.

The Road to Healing affected descendants, many of whom are learning or understanding for the first time of their parents' or relatives' Indian boarding school experiences. Preliminary themes from survivor and descendant experiences shared on The Road to Healing centered on intergenerational trauma, including familial secrecy, embarrassment, shame, chemical dependency, and disassociation. Survivors and descendants are also facing the general effects from Federal Indian law and policy associated with the Indian boarding school system, as U.S. society continues to confront this part of American history.

The following themes of learning emerged from hearing directly from survivors and their descendants on all 12 visits on The Road to Healing:

## Physical and Mental Health Impacts

The assimilation methods used in Federal Indian boarding schools were physically all-encompassing, from the pain of being stripped and 'cleaned' upon arrival, to the erasure of Native foods, and forcing children to adapt to western dietary tastes. Survivors and descendants frequently shared the connections between experiences at Federal Indian boarding schools and the resulting impacts on physical health of children who attended. The Department heard from individuals who were able to cope and because of their coping skills, considered themselves to be very fortunate. However, survivors often acknowledged the physical toll of coping. Survivors mentioned the experience of coping with Federal Indian boarding school trauma as adults through chemical dependency, addiction, and other compounding adverse effects on health. Many survivors shared details of the painful experience of having their hair cut upon arrival at Federal Indian boarding school, physically altering their appearance. Several attendees also noted the hard physical labor involved in the system. Food was also weaponized in Indian boarding school settings, in sharp contrast to traditional Native American practices of food as medicine. Food that was seen by Federal Indian boarding school staff to be reminiscent of Native American culture was not allowed, and survivors frequently spoke of being forced to eat highly processed, unfamiliar, or spoiled food. Many also shared traumatic experiences of physical or sexual abuse or witnessing physical or sexual abuse occurring to other children.

*"[T]he Anaktuvuk Pass Eskimo from Central Alaska just above us, when they came into Wrangell, I remember, they came in after we did, they had all their parka, their caribou pads, I mean, they're dressed – I remember coming in, I was so impressed about how beautiful they were. They came in, they stripped them down, put all their clothes, the food they bring in, dry caribou, salmon, and stuff like that, they put it all on the side. They made them go through the shower, shave them, give them their uniform and a number. And I know it, I think I probably cried when they took all their clothes down there and burned them in the furnace, all the beautiful, beautiful parkas and everything."* [224]

- The Road to Healing Alaska Participant

*"For my own grandchildren, for my great-grandchildren and I – some of the things happened in boarding school – is going to be a long time of healing and forgetting. I mean you're put in there, treated like you was some type of a hired hand. I stayed in the summers, worked in the heat, hauled brush…If we got poison ivy, we still had to go back the next day."* [225]

---

[224] Alaska Transcript, 25.
[225] Oklahoma Transcript, 57-58.

-     The Road to Healing Oklahoma Participant

*"She said 'I've got a treat for you, go in the dining room and sit in there.' Now this is after a couple of years of being there. She knew one of the most torturous things to me was to give a raisin cookie … so I go in the dining room and here on the dining room table is a little saucer and a raisin cookie … It was her ultimate torture for me as she knew I hated raisins…I threw mine out in my milk carton and threw it in the garbage. I didn't realize she was watching me, but she made me dig in the garbage, get the milk carton out, dig those raisins out and put them in my mouth."* [226]

-     The Road to Healing Michigan Participant

*"A lot of the – all of the food we ever ate when we first got there were so foreign and alien to us we couldn't eat traditional – we couldn't bring any of our traditional foods. We ate industrial Western processed foods and these huge industrials cans of salted meats and salted vegetables. There was powdered juice, powdered milk, powdered eggs. We were forced to eat all those kind of foods [sic], and of course, we all got violently ill because our bodies couldn't process changing our diet [sic] over from our traditional Native foods. And we had vomiting, we had diarrhea, we had both and we were often punished for soiling our pants or clothing or bedding and we got beaten for that."* [227]

-     The Road to Healing Alaska Participant

*"And my grandpa was on a wagon and took our little suitcases off, my brother and I, and when we got on, I got off the wagon to go get on the bus. My grandpa's last words were, 'We're going to experience some things,' in Cheyenne. He was talking Cheyenne. We're going to probably get our haircuts, because a lot of our Cheyenne people got our haircuts. He said, 'When they go away to school,' he said, 'they get haircuts.' He said our hair is very sacred. Culturally, our hair is sacred. 'We do not cut our hair, but they're going to do that to you. You get there, your black braids are not going to come home.' And that was hard. My braids got cut off. Excuse me. Just remembering what happened to some of us first day of school."* [228]

-     The Road to Healing Montana Participant

*"…[T]hey said 'We're going to run away and we're going to go home and when we get home, we'll send for you.' They told us 'We'll send for you girls.' So we said okay and we ran up a fire escape, which was out – on the outside of the building, we ran up there and we could see them running way over by the trees and we waved to them. They waved to us and were just really happy because they said when they get home, they're going to send for us. Well, they didn't know they were on – the school is on an island and the next*

---

[226] Michigan Transcript, 76-78.
[227] Alaska Transcript, 16-17.
[228] Montana Transcript, 28.

*morning, we went into the dining hall and they all came in.  They were all wearing – their heads were shaven and they were all wearing little black and white prison suits and us girls just started crying."* [229]

- The Road to Healing Alaska Participant

*"My story begins in St. Patrick's Mission…When I started school, my father and mother took me by my right hand and dropped me off at St. Patrick's and the moment I landed there, they took me downstairs, took all my clothes off and threw a bunch of green stuff all over me and it stung like hell.  It stung my eyes.  It stung all over me, and when they put the water on me, it stung even worse.  They did not care."* [230]

- The Road to Healing Oklahoma Participant

*"Unfortunately, Wrangell was a place that attracted pedophiles and many matrons, men and women, perpetrated themselves upon little boys and girls.  And what I witnessed in the boys dorm were where matrons were sodomizing boys in their beds or in the bathrooms. We saw girls going home in the middle of the school year pregnant and a lot of these children were like 11 and 12, 13 years old."* [231]

- The Road to Healing Alaska Participant

*"But, you know, the sad part about it is a lot of us had to watch the priest sodomize our -- so, had to watch our classmates become sexually assaulted.  So that's -- nobody wants to share things like that.  I've learned how to be tough because you couldn't cry.  Couldn't do that."*[232]

- The Road to Healing South Dakota Participant

## Generational Impacts on Families

Survivors across the United States frequently discussed the impacts of being separated from family due to Federal Indian boarding schools.  They expressed how it reduced their capacity to be an affectionate parent or reestablish healthy attachments with family.  Descendants of survivors across all 12 visits on The Road to Healing shared how upon discovery of their grandparents' or parents' experience at Indian boarding schools, they had new or deepened understanding of why their childhoods were more difficult and often less loving and affectionate because of the trauma that their grandparents or parents experienced in Indian boarding schools.  Descendants who may have never gone to Indian boarding schools themselves shared the heavy lift of breaking generational cycles of traumatized parenting and the effort required to establish new ways of being with their own

---

[229] Alaska Transcript, 40-41.
[230] Oklahoma Transcript, 11.
[231] Alaska Transcript, 16.
[232] South Dakota Transcript, 100.

children and family. This frequently involved the need for professional therapy and journeys into recovery from chemical dependency, addiction, and physical, emotional, or sexual abuse. Many survivors recounted the loss of the parent-child relationship and the permanent impact to their closest familial relationships as a result of being separated from their families at a young age and for long periods of time. They described feelings of abandonment, deep sadness, and shame that they lived with at Indian boarding schools and long after.

*"But I think the worst part of it was at night, listening to all the other children crying themselves to sleep, crying for their parents, and just wanting to go home. And I remember one girl was a bedwetter, and they made her scrub the entire bathroom on her hands and knees with her toothbrush."[233]*

- The Road to Healing Michigan Participant

*"I could just hear all – you could just hear crying. First it would just start really slow and then pretty soon, you could hear the whole dorm crying. You'd hear girls saying they want to go home. And it was true, all our clothes were taken away from us and we were given government issued clothing and...we were given numbers, you know, we weren't – we never called by our name, we were all called by our numbers. My number was 77 too because my sister was there before me and her number was 77 and then – and it was marked on everything you owned."[234]*

- The Road to Healing Alaska Participant

*"I would like to say my aunt said after we all left, after the planes came and we all left, she said the village was so quiet because there was no children. No children in the village."[235]*

- The Road to Healing Alaska Participant

*"Once I graduated, I had to go straight to the Marine Corps because I had no parents, nobody there when I finished that, and to this day, I know it affected my sister, because I haven't seen her in probably 30 years, and she's been in and out of prison ever since. She's never been back to the – to the Indian reservation, and I don't have – it created a thing where I don't have a very good relationship with my mother, because by the time we started*

---

[233] Michigan Transcript, 149.
[234] Alaska Transcript, 39.
[235] Alaska Transcript, 38.

*talking again and she – she – there's a lot of feelings that was brought up just because of separation."*[236]

        -  The Road to Healing Northern California Participant

*"I think the biggest thing of learning this experience and having my dad as a survivor is I survived my dad. And I'm really lucky that he was able to repress and repress and repress and nothing came out. He wasn't an alcoholic. He didn't do drugs. He just was so detached. He was not here. And so there are sometimes when you can see him and you literally have to just, like, trauma. Dad, come back. Come back to us. We're here right now. We're safe. Come back. Be with us right here. Feel it. We love you. And I think the biggest thing for him is that he just wasn't the parent that he wanted to be or that he could be."*[237]

        -  The Road to Healing Montana Participant

*"I experience feelings of abandonment because I think of my mother standing on that sidewalk as we were loaded into the green bus to be taken to a boarding school. And I can see it – still have the image of my mom burned in my brain and in my heart where she was crying. What does a mother think? She was helpless."*[238]

        -  The Road to Healing Arizona Participant

*"Listening to some of the stories here, I was thinking, you know, I don't remember ever getting a hug from my mom. I don't remember, ever, my mother telling me she loved me. I remember getting whipped with a switch and finally being able to go live with my father because they didn't live together anymore. And that wasn't allowed. He never did anything like that. He said, 'That's because of the schools.'"*[239]

        -  The Road to Healing Washington Participant

*"My boarding school experience at Seneca – the most traumatic thing for me was being separated from my family, from my siblings. And the years that you're separated, you never get back. The days that you're separated they don't return, but you learn to live. You learn to become part of the trauma. You don't understand it. I know many days, even now, I don't understand why I had to go through what I went through. And healing is a long entire life process."*[240]

        -  The Road to Healing Oklahoma Participant

[236] Northern California Transcript, 70.
[237] Montana Transcript, 90.
[238] Arizona Transcript, 81.
[239] Washington Transcript, 97-98.
[240] Oklahoma Transcript, 66-67.

*"The important years of bonding with your parents and getting loved and hugged on daily is vital to child health, growth, and emotional well-being. I did not get that. We didn't get that. There were no hugs, no encouragement, no praise."* [241]

- The Road to Healing Michigan Participant

## Economic and Militarizing Impacts to Indian Tribes

Memories of the militaristic practices of Federal Indian boarding schools were another shared experience among survivors across the country. Many participants in The Road to Healing noted the prominence of marching and vigorous cleaning assignments as part of their training at Indian boarding schools. Later entrance into U.S. Armed Services was commonly noted as easy after the experience of Indian boarding schools. Many noted the agricultural duties and manual or domestic labor that Federal Indian boarding schools emphasized over formal education, which disrupted and debilitated tribal economies. Several survivors and their descendants noted the intertribal connections that were made in Federal Indian boarding schools from meeting other children belonging to different Indian Tribes. Several shared that they met their spouses at Federal Indian boarding school. All these experiences impacted the shape, ability to self-govern, and economic well-being of Indian Tribes.

*"And for those who went to boarding school, and for those who talk of their military experience serving and having gone to school at a boarding school, boot training was no match. It was very easy."* [242]

- The Road to Healing Navajo Participant

*"When she got here to Tulalip, she did talk of having to be marched everywhere. She talked about that bell that would ring. And I think it was in the 1980s we were brought here to a ceremony to commemorate this bell. I found Mom sitting alone by herself, and I asked her what was she thinking. She said, "Thank God it's silenced. No more will that bell ever tell me where to go, where to be." She talked of being marched all the time and marching the little children."* [243]

- The Road to Healing Washington Participant

*"He was born right up the road here, between White Sulfur Springs and Belt, in a tipi. And when they rounded him up, they took him to St. Paul's. He never got to go to school, he said. He never learned so much as they talk about, oh, you're going to school. No. He*

---

[241] Michigan Transcript, 131.
[242] Navajo Transcript, 21.
[243] Washington Transcript, 36-37.

*was labor. He had to take care of the garden. He had to take care of the sheep. He had to take care of the milk cows."*[244]

- The Road to Healing Montana Participant

*"I came through that boarding school. I was not academically prepared to succeed in higher education. The Vietnam War was going strong in the late 1960s. That's where I ended up, serving for this country. One year, day-to-day, in Vietnam."*[245]

- The Road to Healing South Dakota Participant

*"So I think – you know, when I think back to the things that she has taught us, the cooking and the sewing and the ironing and punctuality. Punctuality was a big thing, because she said that, you know, this lining up to go get your meal, lining up to go play outside, lining up – the constant marching ... that's what she remembered."*[246]

- The Road to Healing Northern California Participant

*"She didn't call them boarding schools. She called them military school where she had to get up and march every single day. And as soon as she finished marching, she had to go to work. And I said, 'What did you do?' She said, 'Well, we worked in the farm, in farmyards, the animals, the cows, the chickens. We plucked the chickens. We fed them. And we took care of the goats, the cow. Cooked the bread, worked in the kitchen, cleaned the halls, did all the work. And the boys did blacksmith and other things like that.'"*[247]

- The Road to Healing Washington Participant

*"When I came back home from Vietnam, I was doing the same thing you're doing today, and I went around because I wanted to find out all the bad about Sherman Indian School. And, you know, I talked to my mother about it.... And I got back home to my mother. I said, 'They don't want to talk to me about it.' And she said, 'That's because you're asking them to say bad things about the school.' She says, 'You got to remember, this is the only thing that they had. You know, it meant a lot to them...This is what they had. This is what they shared together and the friendship and what it represented; a lot of them met their spouses here.' I have an aunt that was from Hualapai, I have two uncles from Pomo, you know, because they met here."*[248]

- The Road to Healing Southern California Participant

## Impacts on Indian Languages, Cultures, and Religions

---

[244] Montana Transcript, 108.
[245] South Dakota Transcript, 88.
[246] Northern California Transcript, 121.
[247] Washington Transcript, 128.
[248] Southern California Transcript, 29-30.

86

One of the most prominent shared experiences of survivors across the country was the grief and trauma that resulted from Native languages loss from the Federal Indian boarding school system. The punishments for speaking Native languages instead of English, even when children could not understand or speak English, commonly involved their mouths being washed with lye soap or varying types of corporal punishment that ranged in severity. Many survivors of Federal Indian boarding schools were so traumatized from these punishments that they would not allow future generations to learn the language, even long after experiencing the Federal Indian boarding school. Secretary Haaland regularly shared that this mirrored her family experience. Descendants described the impact on them. In addition to the loss of Native languages, the loss of cultural practices and ceremonies was a frequent topic among both survivors and their descendants. The dominance of Western religious practices and the punishing indoctrination that occurred in Federal Indian boarding schools sought to instill a sense of inner badness, shame, inferiority, and doom in children. Survivors and descendants who participated in The Road to Healing shared that recovering from these spiritual wounds often proved to be a lifelong and difficult task for those who survived. Participants commonly described methods of psychological abuse employed by Federal Indian boarding school staff, which impacted some survivors to this day.

*"I had been there for a few weeks and wanted to go home. I said to Sister Naomi, I think I'm going to go home now. She leaned way over into my face and said, 'You're not going anywhere, you're going to be here for a long, long time. So, I choked back my tears and I hide inside myself."*[249]

- The Road to Healing Michigan Participant

*"I think, one of the things that we look at is the priests and the nuns, you know, who tell you that you'll burn in hell, you know. 'If you lie, you're going to burn in hell'; or, 'If you steal, you're going to burn in hell.' And you hear that all the time…"*[250]

- The Road to Healing South Dakota Participant

*"To this day I can still see that nun standing and she said, 'Here,' she gave me a bag and I said, 'Oh, what is it?' 'Oh, it's from your brother.' 'Oh, is he here?' 'No, he's dead.' I could still see her standing there and I was still a little girl. And I thanked her."*[251]

- The Road to Healing Minnesota Participant

*"The nuns: They taught – they looked the other way, because this is – it wasn't just physical; it was psychological torture. It was warfare against Indian children. So the*

---

[249] Michigan Transcript, 127-128.
[250] South Dakota Transcript, 103.
[251] Minnesota Transcript, 40.

*littler children, when they got bigger, they could beat up little children for crying, and the nuns looked the other way. That was part of their strategy."*[252]

- The Road to Healing South Dakota Participant

*"At night, they would come and hover over both of us and shine their flashlights on us. I don't know why. Just to scare us, I guess. Because the dorms, the lights were off. We turned off all the lights, and they did that every once in a while, pulled the sheets off and shined the flashlight on us. And if we weren't good, if you were messing around when the lights were off, they would take us and punish us and put us in the basement. And the lights were all off in the basement, and we'd have to sit on the steps. The line of light for the door is we would sit right there by it because we were afraid of the dark, and sometimes they would forget about us and they wouldn't – sometimes they would forget that they had put us down in the basement. Wouldn't get out of there until early morning, and it was – maybe that's why I'm afraid of the dark now. I don't know. I leave the light on in my bedroom. Even today. That was a – that was hurt – hard for me. I still think about those nights when I had to sit in the basement. I was afraid of the dark. And I survived there for – the dorms for six years."*[253]

- The Road to Healing Montana Participant

*"My sister talked about being put in the closet with the mops and the brooms. And, to this day, she can't sleep without a light on. She could be deep in her sleep, and as soon as somebody turns off the bathroom light, she wakes up screaming. And she's a grandmother today. She doesn't know where this comes from."*[254]

- The Road to Healing Washington Participant

*"Little girls, from Parcel Post, they got these shoes. They had bows on them, like sandals. They'd all wear them. I had to wear those shoes for two weeks. Psychological punishment, you know, because I was ridiculed, you know; made fun of."*[255]

- The Road to Healing South Dakota Participant

*"I was in boarding school and I was told I wouldn't make a good mother. And I would tell God when I have children I will love them and care for them. And treat them like a person, because in boarding school you're not a person. You're not even a human being."*[256]

- The Road to Healing Minnesota Participant

---

[252] South Dakota Transcript, 64.
[253] Montana Transcript, 48-50.
[254] Washington Transcript, 116.
[255] South Dakota Transcript, 68.
[256] Minnesota Transcript, 39.

*"It took me 40 years to put my feet back on the ground and stop believing in Christ and the Lord and the Holy Spirit and all of these kind of things that they tried to pound into me in boarding school.  But I had to go back to my Sun Dance and sweat lodge and my elders telling me what I needed to know about the higher power.  And without that, I think I would have had – I would probably still be drunk."*[257]

- The Road to Healing Montana Participant



[258]

## The Oral History Project

The Department announced, in September of 2023, the launch of an oral history project that will document and make accessible the experiences of the generations of Indigenous children who attended the Federal Indian boarding school system.  This first-time effort to gather Indian boarding school survivor experiences – by the U.S. Government

---

[257] Montana Transcript, 17.
[258] Parrell, W. (2024). [Photograph of totem in Anchorage, Alaska that was raised to honor Federal Indian boarding school survivors and descendants]. U.S. Department of the Interior Museum (Research Files), Washington D.C.

– will ensure that experiences that survivors share can be heard, and learned from, by current and future generations. The National Native American Boarding School Healing Coalition, which has a record of collecting experiences through a survivor-centered protocol, will receive a total of $3.7 million in grant funding to help facilitate this project. Funding for the grant through the Bureau of Indian Affairs was made possible in part through funding from the National Endowment for the Humanities and the Andrew W. Mellon Foundation. Key deliverables are related to specified supports to protect participating survivors, requiring an outline and plan for cultural protocols, trauma-informed mental health support, spiritual protocols, and onsite therapeutic activities to be in place before, during, and after oral history narratives are gathered.

This project will focus on gathering first-person survivor narratives and establishing an oral history collection. Survivors will have the opportunity to make their interviews available to Federal partners, Tribal governments, policymakers and researchers, and the public. The Department will continue its engagement with the Department of Health and Human Services, including the Indian Health Service and the Substance Abuse and Mental Health Services Administration, to coordinate trauma-informed survivor-centered support.



259

---

[259] Photograph No. 313189990; "School Band" (Haskell Institute); Exhibit Prints Related to Various Jurisdictions, Tribes, Indian Schools and Activities, 1904-1936; Records of the Bureau of Indian Affairs, Record Group 75; National Archives at College Park, College Park, MD.



## 15.  List of Information Resources

The List of Information Resources is a collection of sources of information related to the Federal Indian boarding school system.  The list includes Federal Government repositories, Federal reports, non-Federal archives, museums, and historical society repositories, books, journal articles, theses papers, newspapers, magazines, newsletters, and organizations.

In the List of Information Resources, the sections related to repositories and reports include a general description, a description of the type of information stored or available at that resource, and a link if available.  The sections on publications and organizations are organized alphabetically, by author if applicable.

The Department is providing this information to expand family reunification and survivor and descendant support, scientific and scholarly analysis, and understanding across the United States and world of the Federal Indian boarding school system.



260

---

260 Photograph on pp. 7-8. "Pictures of Pup7ils 822.7", Record ID 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-0025-0036, Box Identifier 83051, File Identifier 3460098, American Indian Records Repository (AIRR). Notation on p. 8, "Otto Lomavito + children unloading truck Poston #2 9-1-45 4pm" and is stamped "Please give credit for this photograph as follows: Milton Snow [illegible]". P. 8 also has a handwritten notation as follows: "HP1-133".



## 16. Federal Indian Boarding School Initiative Findings and Conclusions

The Assistant Secretary's findings of the Federal Indian Boarding School Initiative investigation, based on examination of U.S. Government records, include the following:

1. The Federal Indian boarding system was expansive, consisting of 417 Federal Indian boarding schools, comprised of 451 specific sites, across 37 states or then-territories, including 22 schools in Alaska and 7 schools in Hawai'i.

2. Multiple generations of American Indian, Alaska Native, and Native Hawaiian children were induced or compelled by the U.S. Government to experience the Federal Indian boarding school system, given their political and legal status as Indians and Native Hawaiians. At least 18,624 Indian children entered the Federal Indian boarding school system between 1819 and 1969. This information is not complete and does not count children who: attended a Federal Indian boarding school outside 1819-1969, may be listed as an attendee on records not available to the Department including those of religious institutions and organizations, or may be listed as an attendee of an Other Institution including Indian day schools, sanitariums, asylums, orphanages, stand-alone dormitories, and Indian boarding schools operated by religious institutions and organizations that received no U.S. Government support.

3. The Federal Indian boarding school system includes burial sites of Indian children who died while institutionalized. There are 74 marked or unmarked burial sites at 65 different schools across the Federal Indian boarding school system based on available records. This information is not complete and does not include burial sites that may be: associated with Federal Indian boarding schools in operation outside the period 1819-1969; listed on records not available to the Department including those of religious institutions and organizations, or associated with Other Institutions including Indian day schools, sanitariums, asylums, orphanages, stand-alone dormitories, and Indian boarding schools operated by religious institutions and organizations that received no U.S. Government support.

4. The twin Federal policy of Indian territorial dispossession and Indian assimilation through Indian education extended beyond the Federal Indian boarding school system, including an identified 1,025 other institutions across 1,027 total sites, including Indian day schools, sanitariums, asylums, orphanages, stand-alone dormitories, and Indian boarding schools operated by religious institutions and organization that received no U.S. Government support.

5.  Congress made appropriations available of more than an estimated $23.3 billion in FY23 inflation-adjusted dollars between 1871 and 1969 for the Federal Indian boarding school system as well as for similar institutions and associated assimilation policies. This amount does not include the present-day value of Indian territory loss associated with the Federal Indian boarding school system, any funds that may have been obtained from Tribal trust accounts for the benefit of Indians and maintained by the United States, or funds expended by other institutions including religious institutions and organizations for Indian boarding school operation.

6.  Through public-private partnerships, at least 59 religious institutions and organizations received U.S. Government support to operate or support schools in the Federal Indian boarding school system. Religious institutions or organizations operated 210 of 417 Federal Indian boarding schools. This number does not include Indian boarding schools operated by religious institutions and organizations that did not receive U.S. Government support.

7.  A priority of U.S.-Indian relations is Indian education, a treaty right, demonstrated by the 171 Treaties that the U.S. entered into with Indian Tribes and ratified by the Senate that implicate the Federal Indian boarding school system or education generally.

8.  The Federal Indian boarding school system deployed militarized and identity-alteration methods to assimilate American Indian, Alaska Native, and Native Hawaiian people—primarily children—through education.

9.  The Federal Indian boarding school system predominately used the manual labor of American Indian, Alaska Native, and Native Hawaiian children to compensate for the poor conditions of school facilities and lack of financial support from the U.S. Government.

10. The Federal Indian boarding school system discouraged or prevented the use of American Indian, Alaska Native, and Native Hawaiian languages or cultural or religious practices through punishment, including corporal punishment.

11. Tribal preferences for the possible disinterment or repatriation of remains of children discovered in marked or unmarked burial sites across the Federal Indian boarding school system vary widely. Depending on the religious and cultural practices of an Indian Tribe, Alaska Native Village, or Native Hawaiian Community, it may prefer to disinter or repatriate any remains of a child discovered across the Federal Indian boarding school system for return to the child's home territory or to leave the child's remains undisturbed in its current burial site. Moreover, some burial sites contain human remains or parts of remains of multiple

individuals or human remains that were relocated from other burial sites, thereby preventing Tribal and individual identification.

12. The U.S. Government has not commemorated or memorialized Indian children who experienced the Federal Indian boarding school system.

Based on the findings of the Federal Indian Boarding School Initiative, the Assistant Secretary concludes that:

1. The United States' creation of the Federal Indian boarding school system was part of a broader policy aimed at acquiring collective territories from Indian Tribes, Alaska Natives, and the Native Hawaiian Kingdom and lands from individuals therein. From the earliest days of the Republic, the United States' official objective—based on Federal and other records—was to sever the cultural and economic connection between Indian Tribes, Alaska Native Villages, the Native Hawaiian Kingdom, and their territories. The assimilation of Indian children through the Federal Indian boarding school system was intentional and part of that broader goal of Indian territorial dispossession for the expansion of the United States.

2. Assimilation of American Indian, Alaska Native, and Native Hawaiian people eventually became an objective of Federal policy in and of itself. The Federal Indian boarding school policies targeted Indian children as one method to accomplish this objective.

3. The intentional targeting, removal, and confinement of American Indian, Alaska Native, and Native Hawaiian children to achieve the goal of forced assimilation of Indian people was both traumatic and violent. In addition to the removals, deaths of Indian children while under the care of the U.S. Government, or U.S. Government-supported institutions, led to the breakup of Indian families and the erosion of Indian Tribes, Alaska Native Villages, and the Native Hawaiian Community.

4. Many more Indian children who survived the Federal Indian boarding school system live(d) with their experiences from the school(s). Moreover, several generations of Indian children experienced the Federal Indian boarding school system. The Federal Indian boarding school system directly disrupted Indian families, Indian Tribes, Alaska Native Villages, and the Native Hawaiian Community for nearly two centuries, with many continuing effects that are present today.

5. Further review is required to determine the reach and impact of the violence and trauma inflicted on Indian children through the Federal Indian boarding school system. The Department has recognized that targeting Indian children for the Federal policy of Indian assimilation contributed to the loss of: (1) life; (2) physical

and mental health; (3) territories and wealth; (4) Tribal and family relations; and (5) use of Tribal languages. This policy also caused the erosion of Tribal religious and cultural practices for Indian Tribes, Alaska Native Villages, and the Native Hawaiian Community, and over many generations.



261

★   ★   ★   ★   ★   ★

## 17.   Recommendations of the Assistant Secretary for Indian Affairs

> **The Federal Indian Boarding School Initiative Investigation estimates that the U.S. Government made appropriations available of more than $23.3 billion in FY23 inflation-adjusted dollars between 1871 and 1969 for the Federal Indian boarding school system as well as other similar institutions and associated assimilation policies.**

*"An apology is needed. An apology from the U.S. Government, but also, to take it a step further, to understand and learn the true history of this place that we call home; the bad things that have happened to us, but also to understand the light that came from the*

---

261 Photograph No. 40571897; "Drafting" (Flandreau School and Agency); Photographs, 1936-1954; Records of the Bureau of Indian Affairs, Record Group 75; National Archives at Kansas City, Kansas City, MO.

*people that had to face, you know, the fires of hatred and the burning of their skin because they're speaking their language, you know, that we still are here today."*[262]

-    The Road to Healing Washington Participant

*"I think the U.S. Government should fund treatment centers on every reservation. Because treatment centers are part of our justice in cleaning up the mess that was caused by the trauma of boarding schools."* [263]

-    The Road to Healing Montana Participant

*"The most important bond in the world, between a child and a mother, was destroyed by boarding school abuse and memories that she shared with thousands of Native children across Turtle Island, children who did not witness healthy parenting, lost forever, which is affecting our communities."*[264]

-    The Road to Healing South Dakota Participant

*"We are making difficult choices today that will affect our children for generations to come. Our duty is to be good ancestors by leading them to healing. We must end the generational trauma by acknowledging its harmful effects on our people, communities, and unlearn the oppressive behaviors associated with this trauma."*[265]

-    The Road to Healing Michigan Participant

*"Both my grandparents on my dad's side went to the Ursuline boarding school in St. Ignatius ... both spoke Salish as their first language. The first dreams they had were in Salish, not in English. I will never have the privilege of having a dream in Salish. And that is not my fault."*[266]

-    The Road to Healing Montana Participant

---

[262] Washington Transcript, 107 edited for clarity.
[263] Montana Transcript, 44-45.
[264] South Dakota Transcript, 144.
[265] Michigan Transcript, 89-90.
[266] Montana Transcript, 42.

*"She used to talk about some of the handprints that were on some of the concrete portions of the school, of the forced labored children that built that school... It was her experience as a survivor in Eufaula that fueled her interest in working with Phoenix Indian School survivors and the Arizona community to successfully advocate for at least part of that property to be preserved for public and as a remembrance and recognition, not just of the tragedies that occurred there. And there are many, many tragedies that occurred there. But also in honor of everyone that went there and their spirit's survival that came from that experience"*[267]

-    The Road to Healing Oklahoma Participant

*"Let's bring our children home. It's their inherent right to come home to Alaska. It is a world Indigenous right for our people to come home."*[268]

-    The Road to Healing Alaska Participant

*"I remember my braids being cut off; washed like we were dirty; talked to us like we were dirty. We were dressed in uniforms. They took everything from us and handed, like in the military, this bundle with a towel in it; with soap in it; socks; and a uniform. It wasn't what our ancestors wanted for us when they signed the Treaties. That's not what we agreed to."* [269]

-    The Road to Healing South Dakota Participant

*"I share these stories because we need to remember my aunties, we need to remember everyone that endured all the horrific treatment, the abuse, the violence, everything that they all went through. Because we need to be the truth tellers. We need to be the change makers. All those who are brave enough and courageous enough for sharing the truth."* [270]

-    The Road to Healing Minnesota Participant

---

[267] Oklahoma Transcript, 59-62.
[268] Alaska Transcript, 37 edited for clarity.
[269] South Dakota Transcript, 82.
[270] Minnesota Transcript, 83.

*"We know that this is not just an issue nationally or on this continent, but it's also a global issue."*[271]

- The Road to Healing New Mexico Participant

For nearly two full centuries, the United States pursued, embraced, or permitted the policy of forced assimilation of American Indian, Alaska Native, and Native Hawaiian people. The Federal Indian boarding school system was developed to target Indian children to accomplish this policy objective for over 150 years and influence U.S.-Indian relations and U.S.-Native Hawaiian relations. The United States should fully account for its role in this effort and renounce the forced assimilation of Indian Tribes, Alaska Native Villages, and the Native Hawaiian Community as a legitimate policy objective.

To aid the process of collective and individual healing from the harm and violence caused by the assimilation policy, the United States should affirm an express policy of cultural revitalization—supporting the work of Indian Tribes, Alaska Native Villages, and the Native Hawaiian Community to revitalize their languages, cultural and religious practices, and traditional food systems, and to protect and strengthen intra-Tribal relations.

To complete the Secretary's objectives of the Federal Indian Boarding School Initiative, and to begin the pursuit of this express policy of cultural revitalization, the Assistant Secretary for Indian Affairs Bryan Newland provides **eight** recommendations based on the current findings.

1. **Acknowledge, Apologize, Repudiate, and Affirm.** The U.S. Government should issue a formal acknowledgment of its role in adopting a national policy of forced assimilation of Indian children, and carrying out this policy through the removal and confinement of Indian children from their families and Indian Tribes and the Native Hawaiian Community and placement in the Federal Indian boarding school system. Such an acknowledgment should include a recognition that the United States operated or supported public-private partnerships with religious institutions and organizations to carry out its policy; that many Indian children suffered physical, sexual, and emotional abuse at these institutions, and that many Indian children died; and that these harms continue to impact American Indian and Alaska Native individuals and Indian Country. The United States should accompany this acknowledgment with a formal apology to the individuals, families, and Indian Tribes that were harmed by U.S. policy. In addition, the United States could formally repudiate forced assimilation of American Indian, Alaska Native, and Native Hawaiian people as a national policy, and affirm that it is the policy of the United States to ensure that American Indian, Alaska Native, and Native Hawaiian people have the right to maintain their unique cultural identities and languages.

---

[271] New Mexico Transcript, 44.

Such a statement should be issued through appropriate means and officials to demonstrate that it is made on behalf of the people of the United States and be accompanied by bold and actionable policies.

2. **Invest in Remedies to the Present-Day Impacts of the Federal Indian Boarding School System.** The United States could invest in healing Indian Tribes, the Native Hawaiian Community, and American Indian, Alaska Native, and Native Hawaiian individuals from the legacy impacts of forced assimilation on a scale that is, at a minimum, commensurate with the investments made in the Federal Indian boarding school system between 1871 and 1969. This investment should be in addition to annual appropriations to fund agency programs to fulfill the U.S. Government's trust and treaty obligations, and consistent with the full scope of its authority to act on behalf of Indians under various articles and clauses of the Constitution. The funding should be designed to remedy the present-day harms caused by historical Federal Indian boarding schools and policies of forced assimilation. These investments should also be designed to reach American Indian, Alaska Native, and Native Hawaiian individuals in urban communities. Funding to remedy the harms flowing from assimilationist policies and institutions should consider that Federal Indian boarding schools received funding and investments above and beyond annual appropriations from Congress.

Consideration for this investment should be applied to all of these recommendations, and include **five** interdependent areas of focus:

a. *Individual and Community Healing.* Provide funding and support for culturally based, community-driven healing efforts in Indian Country, urban Indian communities, and the Native Hawaiian Community. This support should be aimed at addressing the effects of Adverse Childhood Experiences (ACEs), traumatic stress, and intergenerational trauma. In distributing these funds, U.S. Government agencies should be flexible when it comes to access and use of the funds, including allowing tribal governments and other organizations to coordinate and consolidate funds from a range of federal programs to provide services. The U.S. Government should, support holistic and innovative approaches, including those rooted in connections to homelands and culture, and make these funds available to Indian Tribes, as well as organizations based in American Indian, Alaska Native, and Native Hawaiian communities, including in urban areas. It is also important to develop infrastructure to support this work, including facilities to provide specialized patient services for the treatment of historical and intergenerational trauma caused by the Federal Indian boarding school system and other institutions.

**b.** ***Family Preservation and Reunification.*** The U.S. Government should continue efforts to preserve, protect, and reunify American Indian and Alaska Native families. This funding would enable Indian Tribes to provide prevention and intervention services based in culture and tradition to families in need. The U.S. Government should support Tribal government agencies and courts in their actions to exercise jurisdiction over Indian child welfare cases, including ensuring that Tribal governments can directly administer child welfare programs, and to support the reunification of families. In addition, the U.S. Government should develop a national strategy for Native children and families, with a defined goal of measurably reducing the number of American Indian, Alaska Native, and Native Hawaiian children in foster care, and supporting Tribes' long-term goals to preserve families and communities though self-determination and self-governance.

**c.** ***Violence Prevention.*** The United States has trust obligations to protect Indian Tribes, the Native Hawaiian Community, and American Indian, Alaska Native, and Native Hawaiian individuals.[272] Having safe communities and safe family home environments are crucial for positive life outcomes. The U.S. Government should place a priority on prevention and healing from historical and current violence across Indian Country.

Indian Tribes are hampered in their efforts to engage in violence prevention by patchwork jurisdiction over public safety within their borders that limits Tribal governmental powers, as well as the lack of funding to carry out this important work. With some exceptions, Indian Tribes have lacked the ability to exercise criminal jurisdiction over non-Indians on their lands.

There have been several recent reports commissioned by the U.S. Government to examine and combat violence in Indian Country, and many of the recommendations included in those reports have not yet been fulfilled.[273] The U.S. Government should implement many of those recommendations and continue to work to strengthen the ability of Tribes to exercise jurisdiction to directly prevent, investigate, and prosecute violent crimes within Indian country, including violent crimes committed by non-

---

[272] Cf. U.S. v. Jicarilla Apache Nation, 564 U.S. 162, 175 (2011) (describing "that the Government 'has a real and direct interest' in the guardianship it exercises over the Indian tribes; 'the interest is one which is vested in it as a sovereign.' United States v. Minnesota, 270 U.S. 181, 194 (1926). This is especially so because the Government has often structured the trust relationship to pursue its own policy goals. Thus, while trust administration 'relat[es] to the welfare of the Indians, the maintenance of the limitations which Congress has prescribed as a part of its plan of distribution is distinctly an interest of the United States.' Heckman v. United States, 224 U. S. 413, 437 (1912)"); Oglala Sioux Tribe v. U.S., 674 F.Supp.3d 635 (2023).

[273] *See, e.g.,* The Attorney General's Advisory Committee on American Indian/Alaska Native Children Exposed to Violence: Ending Violence So Children Can Thrive; The Way Forward Report of the Alyce Spotted Bear & Walter Soboleff Commission on Native Children; The Final Report to The President | Activities and Accomplishments of Operation Lady Justice; The Not One More: the Not Invisible Act Commission Final Report.

Indians on Indian lands.[274]   The U.S. Government should also invest in violence prevention programs for Indian Tribes, the Native Hawaiian Community, and urban Indian communities; and, invest in tribal justice systems and victim services.

In addition to carrying out recommendations made in federally commissioned reports, the U.S. Government should develop a strategy to measurably reduce the occurrence of Adverse Childhood Experiences (ACEs) for American Indian, Alaska Native, and Native Hawaiian children. In making these investments, the Federal Government should also ensure that Indian Tribes and Alaska Native Villages can exercise self-determination in the use of those funds, including pooling resources from various U.S. Government agencies, to carry-out this work.[275]

**d.** ***Redress Indian Education.***  The U.S. Government should better fulfill its Treaty and trust obligations, consistent with the full scope of its authority to act on behalf of Indians under various articles and clauses of the Constitution, by investing in high-quality elementary, secondary, and higher education for American Indian, Alaska Native, and Native Hawaiian individuals.  This investigation reveals the historical U.S. strategy to use education systems against Indian Tribes and the Native Hawaiian Community.  In response, the U.S. Government should adequately fund the Bureau of Indian Education and increase investments to Tribal and public school systems to support American Indian, Alaska Native, and Native Hawaiian students.  The U.S. Government should also consider ways to promote public higher education access by providing nationwide in-state tuition rates for American Indian, Alaska Native, and Native Hawaiian individuals at public colleges and universities receiving U.S. Government support.   U.S. Government education funding to Indian Tribes and the Native Hawaiian Community should be delivered with minimal agency administrative barriers and represent a correct response to education needs, including for modern infrastructure and water and sanitation systems.

**e.** ***Revitalization of First American Languages.***  First American languages, those spoken by the Indigenous Peoples of the United States, are a vital aspect of identity, improve academic performance, are foundational to

---

[274] *See, e.g.*, 2013 and 2022 Reauthorizations of the Violence Against Women Act, recognizing the inherent authority of participating Tribes to exercise special domestic violence criminal jurisdiction over certain defendants, regardless of their Indian or non-Indian status, who commit certain covered crimes in Indian country; Tribal Law and Order Act.

[275] U.S. Government action should be consistent with the commitments laid out in President Biden's Executive Order 14112, *Reforming Federal Funding and Support for Tribal Nations To Better Embrace Our Trust Responsibilities and Promote the Next Era of Tribal Self-Determination*.

individual and group healing, and bolster socioeconomic resilience. The Federal Indian boarding school system, and assimilationist policies, have severely damaged the ability of American Indian and Alaska Native individuals to use, develop, and transmit their languages, oral histories, and knowledge to current and future generations.

The U.S. Government should provide funding to repair that damage and affirm that Indian Tribes and the Native Hawaiian Community have the right to revitalize and use their languages. This funding should support community-based efforts to preserve and revitalize Indian and Native Hawaiian languages. These investments should be available to Indian Tribes, the Native Hawaiian Community, community organizations, schools, and universities in a way that supports language learning and usage by people at all ages and stages of development, and promote ownership of intellectual property by Indian Tribes, Alaska Native Villages, and the Native Hawaiian Community.

3. **Build a National Memorial.** The U.S. Government should establish a national memorial to acknowledge and commemorate the experiences of Indian Tribes, individuals, and families within the Federal Indian boarding school system. This memorial should be accessible to the American people, so it may also educate the nation about the existence and effects of these institutions and honor the loss of American Indian, Alaska Native, and Native Hawaiian children.

4. **Identify and Repatriate Children who Never Returned from Federal Indian Boarding Schools.** The U.S. Government should assist individuals in locating the records of their family members who attended Federal Indian boarding schools. Where children are known to have died and been buried at burial sites, the U.S. Government should assist individuals in locating the burial sites of their family members and supporting them, and Tribes, in any efforts to either protect those burial sites or repatriate their remains to their homelands. Congress should amend the Recreation and Public Purposes Act[276] to facilitate the use of Bureau of Land Management (BLM) lands to allow for the reburial of remains and funerary objects of Indian children who died at Indian boarding schools repatriated pursuant to NAGPRA, or by other authority, and consistent with specific Tribal practices on BLM lands. Many Indian Tribes do not have the land base to rebury human remains and funerary objects in many cases, cultural practices require repatriation to occur in a person's homelands, which are often found on lands managed by the U.S. Government today.

---

[276] 43 U.S.C. 869 - 869-4.

5. **Return Former Federal Indian Boarding School Sites.**  The Department should conduct reviews, upon request of Tribes, of property and title documents for former Indian boarding school sites, including land patents provided to religious institutions and organizations or states, including during territorial status.  When required by patent, deed, statute, or other law, including reversionary clause activation, the Department should work to facilitate the return of those Indian boarding school sites to U.S. Government or Tribal ownership.  This includes reversionary clauses under the Indian Appropriation act of September 21, 1922, 42 Stat. 994, 995 ("1922 Act") and Tribal-specific legislation.  Where former boarding school sites revert to U.S. Government ownership or remain in U.S. Government ownership, the Department should engage with Indian Tribes in government-to-government consultation when asked, to address the ownership and management of those sites, including the protection of burial sites and cultural resources.

6. **Tell the Story of Federal Indian Boarding Schools.**  The U.S. Government should work with appropriate institutions to ensure that the American people learn about the role of Federal Indian boarding schools in the history of the United States.  This should include allowing people to share their firsthand accounts of their time at Federal Indian boarding schools.  Afterward, the U.S. Government should make information regarding Federal Indian boarding schools available to individuals, Indian Tribes, organizations, academic institutions, and government agencies.

7. **Invest in Further Research.**  The U.S. Government should make further investments in research regarding the present-day health and economic impacts of the Federal Indian Boarding School system, as well as policies of child removal, confinement, and forced assimilation.  This research should be designed to understand how these policies affected mental and physical health outcomes for individuals, families, and their descendants; and, how these policies affected individual, family, and tribal wealth, health, and well-being.

For biomedical and behavioral research, Congress should appropriate funds to the National Institutes of Health (NIH), in the Department of Health & Human Services, to support research grants, contracts, cooperative agreements, or other transactions to develop new and expand on existing scientific studies, including the Running Bear studies, examining the impact of the Federal Indian boarding school system on American Indian, Alaska Native, and Native Hawaiian physical, mental, and emotional health, parenting practices, and well-being at the individual, familial, and population levels.  This action should also include supporting studies in collaboration with Indian Tribes and the Native Hawaiian Community that test and advance culturally-relevant interventions that promote healing from intergenerational trauma at the individual, familial, and population levels.

8. **Advance International Relationships.**  The U.S. Government could strengthen engagement with other countries with their own histories of boarding schools or other assimilationist policies, including Canada, Australia, and New Zealand to exchange best practices for healing and redress between Federal governments and Indigenous governments for Indigenous child removal through boarding schools and predatory foster care and adoption practices.  To further this goal, the U.S. should expand capacity, including through the Department's Bureau of Indian Affairs (BIA), to support engagement on international Indigenous issues.  To strengthen the U.S. Government's expertise on Indigenous issues globally and connections with other countries, the U.S. Government should establish an ambassador position focused on engagement on international Indigenous issues.

---

**"My mother and grandmother did not have any choice in how they were raised or educated. They were in Indian boarding schools, and because they were there, I unknowingly was born into shame, survival, and then, later in life, pride. The way I live now without shame is to honor my grandmother and mother and insist the children who lived at those godforsaken residential schools did exist; their lives matter; their children's lives matter.  If the United States Government cannot say that, then we the Indigenous survivors must say that.  Every child matters."**

**-    The Road to Healing Washington Participant**

---

The U.S. Department of the Interior values the special contributions to this report from the following:

In Memory of BTFA AIRR Director Maria Meredith.

With notable appreciation for the dedication and care by:

U.S. Secretary of the Interior Deb Haaland
Bureau of Trust Funds Administration Director Jerry Gidner and Team to include:
Senior Advisor Margaret C. Williams
Project Management Coordinator Colleen Stegner
Management and Program Analyst Nikki A. Oliver
Regional Trust Director Danelle J. McQuillen

Office of the Assistant Secretary for Indian Affairs:
U.S. Assistant Secretary for Indian Affairs Bryan Newland
U.S. Principal Deputy Assistant Secretary Wizipan Little Elk
U.S. Deputy Assistant Secretary Kathryn Isom-Clause
Advisor Joaquin R. Gallegos
Chief of Staff Clint J. Bowers
Senior Project Manager Chelsea J. Wilson
Office of Public Affairs Director Joshua Barnett
Deputy Director Office of Public Affairs Wesley Parrell
Senior Counselor Meghan Bishop
Senior Counselor Samuel Kohn
Senior Advisor Tracy Goodluck

Office of the Secretary:
Chief of Staff Rachael Taylor
Senior Counselor Melissa Schwartz and her team to include: Tyler Cherry, John Grandy,
Giovanni Rocco, Felicia Salazar, Sally Tucker, Michelle Gullett, and Justin Horn
Senior Advisors Heidi Todacheene, Summer Sylva, and Raina Thiele
Principal Deputy Solicitor Ann Marie Bledsoe Downes and the Office of the Solicitor
Director of Scheduling and Advance Amanda Kules and her team to include: Brendan
Jackson, David Baler, and Catherine Ming

Bureau of Indian Education Director Tony Dearman, Advisor Stephanie Conduff, and Team
Bureau of Indian Affairs

Director Roselyn Tso and the Indian Health Service
CAPT Karen Hearod and the Substance Abuse and Mental Health Services Administration
Chair Shelly Lowe and the National Endowment for the Humanities
CEO Deb Parker and the National Native American Boarding School Healing Coalition
National Archives and Records Administration
The Department of the Interior Library